1  Herbert P. Kunowski (State Bar No. 150141)
   Darren Le Montree, Esq. (State Bar No. 198715)
2  WILSON, ELSER, MOSKOWITZ,
      EDELMAN & DICKER LLP
3  555 South Flower Street, Suite 2900
   Los Angeles, California 90071
4  Telephone:  (213) 443-5100
   Facsimile:   (213) 443-5101
5
6  Attorneys for Defendants

7

8              UNITED STATES DISTRICT COURT

9        FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  ROBERT L. YOUNG,                    )    Case No.:  C07-05711 SBA
                                        )
12       Plaintiff,                     )    DECLARATION OF MICHAEL
                                        )    LEEST IN SUPPORT OF MOTION
13  v.                                  )    FOR SUMMARY JUDGMENT
                                        )
14  ILLINOIS UNION INSURANCE            )
    COMPANY; ACE WESTCHESTER            )
15  SPECIALTY CLAIMS; and DOES 1        )
    through 50, inclusive,              )
16                                      )
         Defendants.                    )
17                                      )

18

19       I, Michael Leest, certify and declare as follows:

20       1.    I am an authorized representative of Illinois Union Insurance

21  Company ("Illinois Union"), I am familiar with the records maintained by Illinois

22  Union and make the following declaration based upon my personal knowledge.  If

23  called to testify, I could and would attest to the following.

24       2.    The records attached hereto were prepared and/or maintained by

25  personnel of the Illinois Union in the ordinary course of business at or near the

26  time of the act, condition or event.

27

28
                                        1

Law Offices of
## ALBERT E. CORDOVA
A Professional Law Corporation
Diversified Financial Centre
1299 Fourth Street, Suite 202
San Rafael, CA 94901

Albert E. Cordova

Telephone: (415) 457-9656
Facsimile: (415) 453-6260

June 7, 2005

ACE Westchester Specialty Claims
1133 Avenue of the Americas, 38th Floor
New York, NY 10036

RECEIVED
JUN 17 2005
ACE Westchester Specialty Group
Claim Department - New York

Re:     Insured: *Tri Commercial Real Estate Services*
        Policy No.: BMI20016061

Dear Sir/Madame:

I am writing on behalf of your insured, TRI Commercial Real Estate Services, Inc. with reference to a demand by Mr. Robert Young, a former officer and shareholder of the insured. Mr. Young has demanded that the insured indemnify him in connection with a claim being asserted against Mr. Young as well as TRI Commercial by Raybern Foods, Inc. The gravamen of the Cross-complaint is that Robert Young undertook to represent Raybern Foods, Inc., as legal counsel in a business negotiation being brokered by TRI without fully disclosing to Raybern his relationship with TRI. A copy of the Cross-complaint is included with this letter.

I enclose a series of letters to and from Mr. Young and his firm. TRI has taken the position that it has no duty to defend or indemnify Mr. Young for actions taken in his capacity as an independent attorney and not within the scope of his duties as officer/director of TRI. In response, Mr. Young has threatened action both against TRI Commercial and its principals individually for its refusal to indemnify him.

Although TRI does not wish to tender this matter to the carrier at this time, I am informing you of these developments out of an abundance of caution in order not to jeopardize the insured's rights under the policy.

I would be happy to discuss this with your representative at your earliest convenience.

Sincerely,

ALBERT E. CORDOVA
A Professional Law Corporation

By
Albert E. Cordova

AEC:ll

EXHIBIT___6

3



212-703-7068 *tel*
212-703-7049 *fax*

naya.howell@ace-ina.com
www.ace-ina.com

**ace westchester
specialty group**

ACE Westchester Specialty Group
1133 Avenue of the Americas
38th Floor
New York, NY 10036
USA

**Naya A. Howell**
*Chief Claims Specialist*

July 06, 2005

<u>VIA CERTIFIED MAIL.RRR</u>

Andrew Murbach
Tri Commercial Real Estate Services Inc.
One California Suite 1200
San Francisco, CA 94111

Re:  Insured:      Tri Commercial Real Estate Services ("Tri-Commercial")
    Claimant:    Raybern Foods Inc. ("Raybern")
    Policy #:     BMI20016061
    Claim #:     JY05J009580X

Dear Mr. Murbach:

Illinois Union Insurance Company ("Illinois Union") once again acknowledges receipt of the documents forwarded to us, including a Cross-Complaint filed Superior Court of the State of California in Alameda County entitled, <u>Tri Commercial Real Estate Services v. Raybern Foods et al.</u>  The complaint contains claims related to breach of fiduciary duty, professional negligence, negligence, and promissory fraud.

This matter arises out Raybern's retention of Tri-Commercial to form a strategic business alliance with another entity.  Raybern hired Robert Young as counsel for this matter based on the suggestion of Tri-Commercial and specifically, Mr. John Fults, an officer at Tri-Commercial. During the course of representation of Raybern, Mr. Young failed to adequately protect its financial interest when Mr. Fults announced he was withdrawing from representing Raybern. It is alleged that Mr. Young, Mr. Fults and Tri-Commercial breached their respective fiduciary duties to Raybern, resulting in damages.  Raybern in demanding compensatory and punitive damages, as well as disgorgement of professional fees and costs of suit.

Illinois Union has not made any determination as to the validity of the plaintiff's allegations nor do we assert that any liability exists.

Full Body's claims made insurance policy has a Policy Period of August 1, 2004 to August 1, 2005 and contains Employment Practices and Directors & Officers and Company Coverage Sections.  Based on the allegations made by Raybern, this matter will be analyzed under the Directors & Officers and Company Coverage Section, which has a Limit of Liability of $2,000,000 and $0 Retention for each Claim under all Insurance Clauses.

EXHIBIT____7

4

**ace westchester
specialty group**

We refer you to the Insuring Clause of the Directors & Officers and Company Coverage Section, which provides:

A.    INSURING CLAUSES

1.   Insurer shall pay on behalf of the Directors and Officers Loss resulting from any Claim first made against the Directors and Officers during the Policy Period for a Wrongful Act.

2.   Insurer shall pay on behalf of the Company Loss, which the Company is required or permitted to pay as indemnification to any of the Directors and Officers resulting from any Claim first made against the Directors and Officers during the Policy Period for a Wrongful Act.

3.   Insurer shall pay on behalf of the Company Loss resulting from any Claim first made against the Company during the Policy Period for a Wrongful Act.

The purpose of this letter is to advise that coverage for this matter is not available for Tri-Commercial, Mr. Fults or Mr. Young based upon a review of the allegations in connection with the terms of the Policy. As a result, Illinois Union will neither defend nor indemnify Tri-Commercial, Mr. Fults or Mr. Young.

We also direct your attention to Section B. of the Directors & Officers and Company Coverage Section B.9., which states the definition of Wrongful Act:

9.    Wrongful Act means an actual or alleged error, omission, misleading statement, neglect, breach of duty or act by:

a)      any of the Directors and Officers, while acting in their capacity as:

i. a director, officer or employee, manager, member manager or member of the board of managers of the Company or the functional equivalent to a director or officer of the Company in the event the Company is incorporated or domiciled outside of the United States; and

ii. a director, officer, trustee, governor, executive director or similar position of any Outside Entity where such service is with the knowledge and consent of the Company; and

b)      with respect to Insuring Clause 3. of this Coverage Section only, the Company.

**ace westchester
specialty group**

Mr. Young and Mr. Fults provided a personal guaranty for the financial transaction that occurred between Raybern and Tri-Commercial. Therefore, coverage for a breach of that guaranty will not be covered since it would not have been provided in their capacity as a directors or officers of the Company.

With respect to the breach of fiduciary duty claims against Tri-Commercial, please note the following Exclusion under the Directors & Officers and Company Coverage Section that will apply to this matter:

1.    Insurer shall not be liable to make payment under this Coverage Section in connection with any Claim:

q)    based upon, arising out of, directly or indirectly resulting form or in consequence of, on in any way relating to any act, error or omission in connection with performance of any professional services by or on behalf of ay of the Insureds for benefit of any other entity or person provided however, this exclusion shall not apply to any such Claim brought directly, derivatively or otherwise by one or more securities holders of the Company in their capacity as such.

Raybern is alleging breach of fiduciary duties, negligence and promissory fraud as it relates to professional services rendered by Tri-Commercial and Mr. Young, based on the above Exclusion, these claims are not covered under the Policy.

For the reason cited above, Illinois Union will not be assigning defense counsel to defend the matter nor will we be taking any further action.

Additionally, in accordance with regulations promulgated under the California Insurance Code, we are obligated to advise you that if an Insured believes that coverage under an insurance policy has been wrongfully denied, in whole or in part, the Insured may have the matter reviewed by the California Department of Insurance. The Department can be contacted at: California Department of Insurance, Claims Service Bureau, 11th Floor, 3000 South Spring Street, Los Angeles, CA 90013, (213) 897-5961 or (800) 927-4357 (in California only).

Illinois Union reserves the right to deny coverage based upon grounds other than those expressly set forth in this letter and to supplement and/or amend this letter to address additional coverage issues as they may arise, based upon all of the provisions, terms, conditions, exclusions, endorsements, and definitions found in the Policy and additional facts that may come to Illinois Union's attention. Illinois Union further reserves the right to recoup defense costs, charges and expenses in the event it is determined that coverage for this matter is not available. Nothing stated herein and no further action taken by Illinois Union or on its behalf should be construed as a waiver of any of its rights under the Policy. On the contrary, by

Page 3/4

6



# ace westchester
# specialty group

providing this or any prior correspondence to the Insured, engaging in any prior or future discussions with the Insured, or paying or agreeing to pay any amount to or on behalf of the Insured, Illinois Union does not waive any rights that it has under the Policy.

If you have any questions in the interim, please contact me at (212) 703-7068.

Sincerely,

Naya A. Howell
Chief Claims Specialist

cc:    Joseph Ferrari
        (email)

7





ace usa

## Illinois Union Insurance Company

This Policy is issued by the stock insurance company listed above (herein "Insurer").

## DECLARATIONS

EACH OF THE COVERAGE SECTIONS OF THIS POLICY (EMPLOYMENT PRACTICES, DIRECTORS & OFFICERS AND COMPANY, FIDUCIARY, TECHNOLOGY, MEDIA AND PROFESSIONAL SERVICES AND MISCELLANEOUS PROFESSIONAL SERVICES, WHICHEVER ARE APPLICABLE) IS WRITTEN ON A CLAIMS-MADE AND REPORTED BASIS. EXCEPT AS OTHERWISE PROVIDED, THESE COVERAGE SECTIONS COVER ONLY ANY CLAIM FIRST MADE AND REPORTED AGAINST THE INSURED DURING THE POLICY PERIOD. THE CRIME COVERAGE SECTION, IF APPLICABLE, APPLIES ONLY TO LOSS OCCURRING DURING THE POLICY PERIOD.

**Policy Number:**   BMI20016061

Item A.   Parent Company:          **_TRI Commercial Real Estate Services, Inc_**
        Principal Address:       One California, Suite 1200
                          San Francisco, CA 94111

Item B.   Policy Period:  From: <u>August 1, 2004</u>          To: <u>August 1, 2005</u>
                 12:01 a.m. Standard Time at the Principal Address Stated in Item A.

Item C.   Coverage Section Description(s):

**Employment Practices**

    a)   Limit of Liability      $2,000,000        in the aggregate for this Coverage Section

    b)   Retention            $0            each **Claim** for all **Insured Persons**
                    $10,000        each **Claim** for the **Company**

    c)   Continuity Date       August 1, 1999

**Directors & Officers and Company**

    a)   Limit of Liability      $2,000,000        in the aggregate for this Coverage Section

    b)   Retention            $0            each **Claim** all **Directors and Officers** under Insuring Clause 1.
                    $0            each **Claim** under Insuring Clause 2.
                    $0            each **Claim** under Insuring Clause 3.

    c)   Continuity Date       August 1, 1999

**EXHIBIT__8____**

Item D.    Premium:  **$29,028**

Item E.    1.    Premium for **Discovery Period**:  100% of the total premium, as provided in Clause H. 1. of the General Terms and Conditions.

2.    Length of **Discovery Period**:  365 Days

Item F.    Insured Percentage:   100% of **Loss** in excess of any applicable retention.

Item G.    Notification under the Policy shall be given to:   **ACE Westchester Specialty Claims**
**1133 Avenue of the Americas, 38th Floor**
**New York, NY  10036**

Item H.    Form Numbers of Endorsements Attached at Policy Issuance: GT&C102, D&O120, SPEC101

**IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed by its President and Secretary and countersigned by a duly authorized representative of the Insurer.**

GEORGE D. MULLIGAN, Secretary

SUSAN RIVERA, President

**DATE:**     August 25, 2004

**AUTHORIZED REPRESENTATIVE**

09

## GENERAL TERMS AND CONDITIONS

**A.    SEVERABILITY OF GENERAL TERMS AND CONDITIONS**

Except for the General Terms and Conditions below or unless stated to the contrary in any Coverage Section, the terms and conditions of each Coverage Section apply only to that Coverage Section and shall not be construed to apply to any other Coverage Section.

**B.    DEFINITIONS**

The following terms, whenever used in this Policy (including each Coverage Section) in boldface type, shall have the meanings indicated.

1.    **Application** means:

   a)    the application for this Policy or any policy of which this Policy is a renewal, and

   b)    any materials submitted therewith, which shall be retained on file by Insurers and shall be deemed attached hereto, as if physically attached hereto.

2.    **Company** means:

   a)    the Parent Company, and

   b)    any Subsidiary.

3.    **Takeover** means:

   a)    the acquisition by any person or entity of more than 50% of the outstanding securities of the Parent Company representing the present right to vote for the election of directors,

   b)    the merger of the Parent Company into another entity such that the Parent Company is not the surviving entity, and

   c)    the Parent Company ceasing to be publicly-held.

4.    **Discovery Period** means the period described in Item E.2. of the Declarations and Clause H. below.

5.    **Parent Company** means the entity named in Item A. of the Declarations.

6.    **Policy Period** means the period from the effective date and hour of the inception of this Policy to the Policy expiration date and hour as set forth in Item B. of the Declarations, or its earlier cancellation date and hour, if any, or the end of the Discovery Period, if purchased.

7.    **Subsidiary** means any entity while more than 50% of the outstanding securities representing the present right to vote for the election of such entity's directors or managers are owned by the Parent Company, directly or indirectly, if such entity:

   a)    was so owned prior to the inception date of this Policy and was insured under a Policy issued by Insurer of which this Policy is a renewal,

   b)    was so owned on the inception date of this Policy, or

   c)    becomes so owned after the inception date of this Policy.

Other definitions particular to each Coverage Section are contained in the separate Definitions Clause in each Coverage Section.

**C.    LIMITS OF LIABILITY AND RETENTIONS**

The Limits of Liability and Retentions for each Coverage Section are separate Limits of Liability and Retentions pertaining to the Coverage Section for which they are shown. The application of a retention to Loss under one Coverage Section shall not reduce the retention under any other Coverage Section, and no reduction in the Limit of Liability applicable to one Coverage Section shall reduce the Limit of Liability under any other Coverage Section.

In the event that any Claim or more than one Claim arising from Interrelated Wrongful Acts shall be covered, in whole or in part, under two or more Insuring Clauses or more than one Coverage Section, the total applicable Retention shall not exceed the single largest applicable Retention. Such largest applicable Retention shall apply only once to such Claim.

**D.    WARRANTY CLAUSE**

It is warranted that the particulars and statements contained in the Application, a copy of which is attached hereto, are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy and of each Coverage Section.

By acceptance of this Policy, the Insureds agree:

1.    that the statements in the Application are their representations, that they shall be deemed material to the acceptance of the risk or the hazard assumed by Insurer under this Policy and that this Policy and each Coverage Section are issued in reliance upon the truth of such representations,

2.    that in the event the Application contains misrepresentations made with the actual intent to deceive, or contains misrepresentations which materially affect either the acceptance of the risk or the hazard assumed by Insurer under this Policy, this Policy and each and all Coverage Sections shall be void and of no effect whatsoever with respect to any of the Insureds who had actual knowledge of such misrepresentations, and

3.    that this Policy and each Coverage Section shall be deemed to be a single unitary contract and not a severable contract of insurance or a series of individual contracts with each or all of the Insureds.

E.   CANCELLATION CLAUSE

1.   By acceptance of this Policy, the Insureds hereby confer the exclusive power and authority to cancel this Policy on their behalf to the Parent Company. Such entity may cancel this Policy by surrender thereof to Insurer, or by mailing to Insurer written notice stating when thereafter cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the Policy Period. Delivery of such written notice shall be equivalent to mailing.

2.   This Policy may only be cancelled by Insurer for nonpayment of premium by mailing to the Parent Company written notice stating when, not less than 10 days thereafter, such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the Policy Period. Delivery of such written notice by Insurer shall be equivalent to mailing. If the foregoing notice period is in conflict with any governing law or regulation, then such period shall be amended to afford the minimum notice period permitted there under.

3.   If this Policy is cancelled, Insurer shall retain the pro rata proportion of the premium hereon. Payment or tender of any unearned premium by Insurer shall not be a condition precedent to the effectiveness of cancellation.

F.   SPOUSAL EXTENSION

Insurer agrees to extend coverage under each Coverage Section to all persons who were, now are, or shall be the lawful spouse of any natural person who is one of the Insureds solely to the extent such spouse is the subject of any Claim because of marriage to any such natural person Insured.

G.   COMPANY AUTHORIZATION CLAUSE

By acceptance of this Policy, the Insureds agree that the Parent Company will act on their behalf with respect to the giving of all notice to Insurer, the receiving of notice from Insurer, the payment of the premium and the receipt of any return premium.

H.   DISCOVERY PERIOD

1.   If this Policy is cancelled pursuant to Clause E.1. or if Insurer refuses to renew this Policy for reasons other than non-payment of premium or noncompliance with the terms and conditions of this Policy or if the Parent Company elects not to renew the Policy, then the Parent Company shall have the right, upon payment of an additional premium calculated at that percentage shown in Item E.1 of the Declarations of the total premium for this Policy, to an extension of the coverage granted by this Policy with respect to any Claim first made during the period of time set forth in Item E.2 of the Declarations after the effective date of such cancellation or, in the event of such refusal to renew, after the Policy expiration date, but only with respect to any Wrongful Act committed before such date.

2.   The quotation of a different premium, retention or limit of liability for renewal does not constitute a cancellation or refusal to renew for the purposes of this Clause.

3.   As a condition precedent to the right to purchase the Discovery Period, the total premium for the Policy must have been paid. The right to purchase the Discovery Period shall terminate unless written notice, together with full payment of the premium for the Discovery Period, is received by Insurer within 30 days after the effective date of cancellation, or, in the event of a refusal to renew, within 30 days after the Policy expiration date. If such notice and premium payment is not so given to Insurer, there shall be no right to purchase the Discovery Period.

4.   In the event of the purchase of the Discovery Period, the entire premium therefore shall be deemed earned at its commencement.

5.   The exercise of the Discovery Period shall not in any way increase the limit of Insurer's liability under any Coverage Section.

I.   RUN-OFF COVERAGE

In the event of a Takeover:

1.   The Parent Company shall have the right, upon payment of an additional premium calculated at 125% of the total premium for this Policy, to an extension of the coverage granted by this Policy with respect to any Claim first made during the period of six calendar years after the effective date of the Takeover, but only with respect to any Wrongful Act committed before such date; provided, however, that the additional premium shall be reduced by the amount of the unearned premium from the date of the Takeover through the expiration date set forth in Item B. of the Declarations.

2.   If this extension of coverage is elected and purchased then:

   a)   Clause E., above, is deleted in its entirety, and

   b)   Clause H., above, is deleted in its entirety, and

   c)   the maximum aggregate Limit of Liability of Insureds under this Policy for this extension of coverage shall be an amount twice that shown in Item C. of the Declarations for each Coverage Section. The maximum aggregate Limit of Liability of Insurer in connection with any one Claim shall be the amount shown in Item C. of the Declarations relating to that Coverage Section and subject to the Limit of Liability and Retentions Clause of each Coverage Section.

J.   ALLOCATION

In the event any of the Insureds in a Claim incur both Loss that is covered by the Policy and also loss which is not covered by this Policy, either because such Claim includes both covered and uncovered matters or because such Claim is made against both covered and uncovered parties, then coverage will be allocated as follows:

1.   100% of Costs, Charges and Expenses incurred by such Insureds on account of such Claim will be allocated as covered Loss, and

2.   any remaining loss incurred by such Insureds on account of such Claim will be allocated by the parties between covered Loss and uncovered loss using all reasonable efforts based upon the legal liabilities of each of the parties to such matters.

GT&C2

K.  **ARBITRATION**

Any dispute between the Insureds and Insurer arising in connection with or relating to this Policy shall be submitted to binding arbitration in accordance with the rules of the American Arbitration Association ("AAA") then in effect, except that the arbitration panel shall consist of one arbitrator selected by the Insureds, one arbitrator selected by Insurers, and a third independent arbitrator selected by the first two arbitrators.

L.  **SETTLEMENTS AND DEFENSE**

1.  No settlement shall be made or negotiated and no Costs, Charges and Expenses shall be incurred without Insurer's consent, such consent not to be unreasonably withheld. Insurer shall have the right to investigate and settle any Claim; provided however, no settlement shall be made without the consent of the Parent Company, such consent not to be unreasonably withheld.

2.  Insurer shall have the right and duty to defend any Claim and such right and duty shall exist even if any of the allegations are groundless, false or fraudulent. The Parent Company shall have the right to assume the duty to defend any Claim provided Insurers consent in writing to such assumption. Costs, Charges and Expenses incurred by Insurer, or by the Insureds when defending or investigating with the written consent of Insurer, shall be paid by Insurer as a part of, and not in addition to, Insurer's Limit of Liability set forth in Item C. of the Declarations for the applicable Coverage Section.

M.  **ASSISTANCE, COOPERATION AND SUBROGATION**

The Insureds agree to provide Insurer with such information, assistance and cooperation as Insurer reasonably may request, and they further agree that they shall not take any action which in any way increases Insurer's exposure under this Policy.

In the event of any payments under this Policy, Insurer shall be subrogated to the Insureds' rights of recovery therefrom against any person or entity. The Insureds shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents as necessary to enable Insurer effectively to bring suit in their name, and shall provide all other assistance and cooperation which Insurer may reasonably require.

N.  *ASSIGNMENTS AND ACTIONS AGAINST INSURERS*

No action shall lie against Insurers unless, as a condition precedent thereto, the Insureds shall have fully complied with all of the terms of this Policy, nor until the amount of the Insureds' obligation to pay shall have been fully and finally determined either by judgment against them or by written agreement between them, the claimant and Insurer. Nothing contained herein shall give any person or organization any right to join Insurer as a party to any Claim against the Insureds to determine their liability, nor shall Insurer be impleaded by the Insureds or their legal representative in any Claim. Assignment of interest under this Policy shall not bind Insurers unless their consent is endorsed hereon.

O.  .**ENTIRE AGREEMENT**

By acceptance of this Policy, the Insureds agree that this Policy embodies all agreements existing between them and Insurers or any of their agents relating to this Insurance. Notice to any agent or knowledge possessed by any agent or other person acting on behalf of Insurers shall not effect a waiver or a change in any part of this Policy or estop Insurers from asserting any right under the terms of this Policy, nor shall the terms be deemed waived or changed except by written endorsement or rider issued by Insurer to form part of this Policy.

P.  **SERVICE OF SUIT**

It is agreed that in the event of the failure of Insurer to pay any amount claimed to be due hereunder, Insurer, at the request of any person or entity insured hereunder, will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction. Nothing in this Clause constitutes or should be deemed to constitute a waiver of Insurer's right to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court, as permitted by the laws of the United States or of any state, territory, or district in the United States. It is further agreed that service of process in such suit may be made upon ACE Westchester Specialty Claims, 1133 Avenue of the Americas, 38th Floor, New York, NY 10036 and that in such suit instituted against any one of them upon this Policy, Insurer will abide by the final decision of such court or of any appellate court in the event of an appeal.

The above-named party is authorized and directed to accept service on behalf of Insurers in any such suit upon the request of any person or entity to enter a general appearance on behalf of Insurers in the event such a suit shall be instituted.

Further, pursuant to the applicable statute of any state, territory or district of the United States, Insurer shall designate the Superintendent, Commissioner or Director of Insurance or other officer specified for the purpose in the statute or any successor in office, as Insurer's true and lawful attorney, upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of any person or entity insured hereunder or any beneficiary hereunder arising out of this Policy, and hereby designate ACE Westchester Specialty Claims, 1133 Avenue of the Americas, 38th Floor, New York, NY 10036 as the party to whom such officer is authorized to mail such process.

GT&C-3

EMPLOYMENT PRACTICES COVERAGE SECTION

In consideration of the payment of premium, in reliance on the statements in the Application and subject to all of the provisions of the Policy and this Coverage Section, insurers and the Insureds agree as follows.

**A.   INSURING CLAUSE**

Insurers shall pay on behalf of the Insureds Loss resulting from any Claim first made during the Policy Period for a Wrongful Act.

**B.   DEFINITIONS**

The following terms, wherever used in this Coverage Section in boldface type, shall have the meanings indicated. Other terms, wherever used in this Coverage Section in boldface type, shall have the meanings indicated in Clause B. of the General Terms and Conditions section of this Policy.

1.   **Insureds** means the Company and any Insured Person.

2.   **Insured Persons** means all persons who were, now are or shall be:

   a)   the directors and officers of the Company,

   b)   any Employer, and

   c)   the functional equivalent of directors, officers and Employees in the event the Company is incorporated or domiciled outside the United States, including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy.

3.   **Benefits** means perquisites, fringe benefits, and payments in connection with an employee benefit plan and other payments, other than salary or wages, to or for the benefit of an employee arising out of the employment relationship.

4.   **Claim** means:

   a)   any written or oral demand for damages or other relief against any of the Insureds, and

   b)   any judicial, administrative or arbitration proceeding initiated against any of the Insureds in which they may be subjected to a binding adjudication of liability for damages or other relief, including:

      (i)   any proceeding before the Equal Employment Opportunity Commission or any similar federal, state or local governmental body, and

      (ii)   any appeal therefrom.

   brought by or on behalf of an Employer.

5.   **Continuity Date** means the date set forth in Item C. of the Declarations relating to this Coverage Section.

6.   **Costs, Charges and Expenses** means reasonable and necessary legal fees and expenses incurred by any of the Insureds in defense of any Claim and cost of attachment or similar bonds, but shall not include:

   a)   salaries, wages, overhead or benefit expenses associated with officers or employees of the Company, or

   b)   any amount incurred in defense of any Claim for which any other insurer has a duty to defend.

7.   **Employer** means all persons who were, now are or shall be:

   a)   employees of the Company, including voluntary, seasonal and temporary employees,

   b)   any individuals applying for employment with the Company, and

   c)   any individuals who are leased or hire contracted to perform work for the Company, or an independent contractor for the Company, but only if such individuals perform work or services solely for or on behalf of the Company.

8.   **Interrelated Wrongful Acts** means more than one Wrongful Act which have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions.

9.   **Loss** means damages, settlements, including front pay and back pay, and Costs, Charges and Expenses incurred by any of the Insureds, but shall not include:

   a)   taxes, criminal or civil fines or penalties imposed by law, or

   b)   matters deemed uninsurable under the law pursuant to which this Policy shall be construed, or

   c)   punitive or exemplary damages, except to the extent such damages are insurable under the law pursuant to which this Policy shall be construed or the law of the jurisdiction in which such damages are awarded, whichever legal venue is more favorable for the Insureds in deciding the insurability of such damages, or

   d)   non-monetary relief, or

   e)   amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract, or

EPL-1

13

f) disability, social security, workers compensation, medical insurance, retirement or pension benefits, or settlement amounts representing benefit payments, or

g) the costs to modify or adapt any building or property to be more accessible or accommodating to any disabled person, or

h) the cost of furnishing or conducting any program, procedure, or training, or

i) the cost of insuring or reinsuring employment.

10. **Retaliation** means any actual or alleged response of any of the Insureds to:

   a) the disclosure or threat of disclosure by an Employee to a superior or to any governmental agency of any act by any of the Insureds where such act is alleged to be a violation of any federal, state local or foreign law, whether common or statutory, or any rule or regulation promulgated thereunder, or

   b) the actual or attempted exercise by an Employee of any right that such Employee has under law, including rights under any worker's compensation law, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law relating to employee rights, or

   c) the filing of any claim under the Federal False Claims Act or any other federal, state, local or foreign "whistleblower" law, or

   d) any Employee work stoppage or slowdown.

11. **Wrongful Act** means any actual or alleged:

   a) violation of any federal, state, local or common law, prohibiting any kind of employment-related discrimination, or

   b) harassment, including any type of sexual or gender harassment as well as racial, religious, sexual orientation, pregnancy, disability, age, or national origin-based harassment and including workplace harassment by any non-employee, or

   c) abusive or hostile work environment, or

   d) wrongful discharge or termination of employment, whether actual or constructive, or

   e) breach of an actual or implied employment contract, or

   f) wrongful failure or refusal to hire or promote, or wrongful demotion, or

   g) wrongful failure or refusal to provide equal treatment or opportunities, or

   h) defamation, libel, slander, disparagement, false imprisonment, misrepresentation, malicious prosecution, or invasion of privacy, or

   i) wrongful failure or refusal to adopt or enforce adequate workplace or employment practices, policies or procedures, or

   j) wrongful, excessive or unfair discipline, or

   k) wrongful infliction of emotional distress, mental anguish, or humiliation, or

   l) Retaliation, or

   m) negligent hiring or negligent supervision of others in connection with a) through l) above, but only if employment related and claimed by or on behalf of any Employee and only if committed or allegedly committed by any of the Insureds in their capacity as such.

C. **EXCLUSIONS**

Insurer shall not be liable to make any payment under this Coverage Section in connection with any Claim:

1. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

   a) any Wrongful Act or any fact, circumstance or situation which has been the subject to any notice given prior to the Policy Period under any other similar insurance policy, or

   b) any other Wrongful Act, whenever occurring, which, together with a Wrongful Act which has been the subject of such prior notice, would constitute Interrelated Wrongful Acts;

2. to the extent it is insured under any other existing valid policy, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, and regardless of whether or not any Loss in connection with such Claim is collectible or recoverable under such other policy provided, however, this exclusion shall not apply to the amount of Loss which is in excess of the amount of any deductible and the limit of liability of such other policy where such Claim is otherwise covered by this Coverage Section;

3. for any actual or alleged violation of the Employee Retirement Income Security Act of 1974, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, all as amended or any rules or regulations promulgated thereunder, or similar provisions of any federal, state or local statutory or common law; provided, however, this exclusion does not apply to any such Claim alleging violation of the Equal Pay Act, or for Retaliation;

4. brought about or contributed to by any dishonest, fraudulent or criminal act or omission as determined by a judgment or other final adjudication;

5. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, any actual or alleged obligation of any of the Insureds pursuant to any workers compensation, unemployment insurance, social security, disability benefits or similar law; provided, however, this exclusion shall not apply to any such Claim for Retaliation;

14

EPL-2

6.  against any Subsidiary or any of the Insured Persons of a Subsidiary based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

   i)  any Wrongful Act occurring prior to the date such entity became a Subsidiary or subsequent to the date such entity ceased to be a Subsidiary, or

   b)  any Wrongful Act occurring while such entity was a Subsidiary which, together with a Wrongful Act occurring prior to the date such entity became a Subsidiary would constitute Interrelated Wrongful Acts;

7.  based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, any Wrongful Act actually or allegedly committed subsequent to a Takeover;

8.  based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

   a)  any prior and/or pending litigation or administrative proceeding, demand letter or formal or informal governmental investigation or inquiry including any investigation by the Department of Labor or the Equal Employment Opportunity Commission as of the Continuity Date, or

   b)  any fact, circumstance, situation, transaction or event underlying or alleged in such litigation or administrative proceeding, demand letter or formal or informal governmental investigation or inquiry including any investigation by the Department of Labor or the Equal Employment Opportunity Commission;

9.  based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, any Wrongful Act which any of the Insured Persons who were, now are, or shall be directors, officers, managers or supervisory employees, had knowledge of prior to the Continuity Date where such Insured Persons had reason to believe at the time that such Known Wrongful Act could reasonably be expected to give rise to such Claim; or

10.  for that portion of Loss which is covered under any other Coverage Section of this Policy.

No Wrongful Act of one or more Insureds shall be imputed to any other Insureds for the purpose of determining the applicability of the above Exclusions.

**D.    LIMIT OF LIABILITY AND RETENTIONS**

1.  Insurer shall be liable to pay the percentage of Loss set forth in Item K. of the Declarations relating to this coverage section in excess of the amount of the Retention up to the Limit of Liability under this Coverage Section, it being warranted that the remaining percentage of Loss shall be uninsured. In the event a Claim is made against both the Company and any of the Insured Persons, the larger retention identified in Item C. of the Declarations for this Coverage Section shall apply.

2.  The amount shown in Item C. of the Declarations pertaining to this Coverage Section shall be the maximum aggregate Limit of Liability of Insurer under this Coverage Section.

3.  More than one Claim involving the same Wrongful Act or Interrelated Wrongful Acts shall be deemed to constitute a single Claim and shall be deemed to have been made at the earliest of the following times:

   a)  the time at which the earliest Claim involving the same Wrongful Act or Interrelated Wrongful Acts is first made, or

   b)  the time at which the Claim involving the same Wrongful Act or Interrelated Wrongful Acts shall be deemed to have been made pursuant to Claim E.2. below.

4.  Payments of Loss by Insurer shall reduce the Limit of Liability under this Coverage Section.

5.  Insurer shall pay Costs, Charges and Expenses no more than once every 90 days.

**E.    NOTIFICATION**

1.  The Insureds shall, as a condition precedent to their rights to payment under this Coverage Section only, give to Insurer notice in writing of any written Claim as soon as practicable but in no event later than sixty (60) days after such Claim is first made.

2.  If, during the Policy Period or the Discovery Period, any of the Insureds first becomes aware of a specific Wrongful Act and if the Insureds, during the Policy Period or the Discovery Period, if purchased, gives written notice to Insurer as soon as practicable of:

   a)  the specific Wrongful Act, and

   b)  the consequences which have resulted or may result therefrom, and

   c)  the circumstances by which the Insureds first become aware thereof,

   then any Claim made subsequently arising out of such Wrongful Act shall be deemed for the purposes of this Coverage Section to have been made at the time such notice was first given to Insurer.

3.  Notice to Insurer shall be given to the firm shown under Item G. of the Declarations for this Policy.

EPL-3

15

## DIRECTORS & OFFICERS AND COMPANY
## COVERAGE SECTION

In consideration of the payment of premium, in reliance on the statements in the Application and subject to all of the provisions of the Policy and this Coverage Section, Insurer and the Insureds agree as follows.

### A. INSURING CLAUSES

1. Insurer shall pay on behalf of the Directors and Officers Loss resulting from any Claim first made against the Directors and Officers during the Policy Period for a Wrongful Act.

2. Insurer shall pay on behalf of the Company Loss which the Company is required or permitted to pay as indemnification to any of the Directors and Officers resulting from any Claim first made against the Directors and Officers during the Policy Period for a Wrongful Act.

3. Insurer shall pay on behalf of the Company Loss resulting from any Claim first made against the Company during the Policy Period for a Wrongful Act.

### B. DEFINITIONS

The following terms whenever used in this Coverage Section in boldface type, shall have the meaning indicated. Other terms, whenever used in this Coverage Section in boldface type, shall have the meanings indicated in Clause B. of the General Terms and Conditions section of this Policy.

1. Insureds mean the Company and the Directors and Officers.

2. Claim means:

   a) any written or oral demand for damages or other relief against any of the Insureds, and

   b) any judicial, administrative or arbitration proceeding initiated against any of the Insureds in which they may be subjected to a binding adjudication of liability for damages or other relief, including any appeal therefrom.

3. Continuity Date means the date set forth in Item C. of the Declarations relating to this Coverage Section.

4. Costs, Charges and Expenses means reasonable and necessary legal fees and expenses incurred by any of the Insureds in defense of any Claim and cost of attachment or similar bonds, but shall not include:

   a) salaries, wages, overhead or benefit expenses associated with officers or employees of the Company, or

   b) any amounts incurred in defense of any Claim for which any other insurer has a duty to defend.

5. Directors and Officers means all persons who were, now are, or shall be:

   a) directors, officers or employees of the Company, and

   b) the functional equivalent of directors or officers of the Company in the event the Company is incorporated or domiciled outside the United States,

   including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy.

6. Interrelated Wrongful Acts means more than one Wrongful Act which have as a common nexus any fact, circumstance, situation, event or transaction or series of facts, circumstances, situations, events or transactions.

7. Loss means damages, settlements and Costs, Charges and Expenses incurred by any of the Directors and Officers under Insuring Clauses 1. or 2., and the Company under Insuring Clause 3., but shall not include:

   a) that portion of any multiplied damages awarded which exceeds the amount multiplied,

   b) taxes, criminal or civil fines or penalties imposed by law, or

   c) matters deemed uninsurable under the law pursuant to which this Policy shall be construed, or

   d) punitive or exemplary damages, except to the extent such damages are insurable under the law pursuant to which this Policy shall be construed or the law of the jurisdiction in which such damages are awarded, whichever legal venue is most favorable for the Insureds in deciding the insurability for such damages, or

   e) the costs to modify or adapt any building or property to be more accessible or accommodating to any disabled person, or

   f) any amounts owed or paid to one or more securities holders of the Company under any written or express contract or agreement.

8. Outside Entity means:

   a) any non-profit organization which is exempt from taxation under the Internal Revenue Code (as amended), and

   b) any for-profit organization specifically identified by endorsement to this Policy.

D&O-1

16

g.    **Wrongful Act** means any actual or alleged error, omission, misleading statement, neglect, breach of duty or act by:

    a)    any of the Directors and Officers, while acting in their capacity as:

        (i)    a director, officer or employee of the Company or the functional equivalent to a director or officer of the Company in the event the Company is incorporated or domiciled outside the United States; and

        (ii)    a director, officer, trustee, governor, executive director or similar position of any Outside Entity where such service is with the knowledge and consent of the Company; and

    b)    with respect to Insuring Clause 3, of this Coverage Section only, the Company.

**C.    EXCLUSIONS**

1.    Insurer shall not be liable to make any payment under this Coverage Section in connection with any Claim:

    a)    for actual or alleged libel, slander, defamation, bodily injury, sickness, disease, death, false arrest, false imprisonment, assault, battery, mental anguish, emotional distress, invasion of privacy, or damage to or destruction of tangible property, including loss of use thereof;

    b)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

        (i)    any Wrongful Act or any fact, circumstance or situation which has been the subject of any notice given prior to the Policy Period under any other similar insurance policy, or

        (ii)    any other Wrongful Act, whenever occurring, which together with a Wrongful Act which has been the subject of such prior notice, would constitute Interrelated Wrongful Acts;

    c)    to the extent it is insured under any other existing valid policy, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, and regardless of whether or not any Loss in connection with such Claim is collectible or recoverable under such other policy; provided, however, this exclusion shall not apply to the amount of Loss which is in excess of the amount of any deductible and the limit of liability of such other policy where such Claim is otherwise covered by this Coverage Section;

    d)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving actual or alleged seepage, pollution or contamination of any kind provided, however, this exclusion shall not apply to any Claim brought directly, derivatively or otherwise by one or more securities holders of the Company;

    e)    for any actual or alleged violation of the Employee Retirement Income Security Act of 1974, as amended, or any rules or regulations promulgated thereunder, or similar provisions of any federal, state or local statutory or common law;

    f)    by, on behalf of, or at the direction of any of the Insureds, except and to the extent such Claim:

        (i)    is brought derivatively by a security holder of the Company who, when such Claim is first made, is acting independently of all of the Insureds,

        (ii)    is brought by any of the Insureds in the form of a cross-claim, third party claim or other proceeding for contribution or indemnity which is part of and results directly from a Claim not otherwise excluded by the terms of this Coverage Section, or

        (iii)    is brought by an employee of the Company who is not or was not a director or officer of the Company and where such Claim is brought by such employee only in their capacity as a security holder of the Company;

    g)    brought about or contributed to by:

        (i)    any dishonest, fraudulent or criminal act or omission by any of the Insureds, or

        (ii)    any personal profit by any of the Directors and Officers to which they were not legally entitled,

        as determined by a judgment or other final adjudication;

    h)    for the return by any of the Directors and Officers of any remuneration paid to them without the previous approval of the appropriate governing body of the Company or Outside Entity, which payment without such previous approval shall be held by a court to be in violation of law;

    i)    against any of the Directors and Officers of any Subsidiary or against any Subsidiary based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

        (i)    any Wrongful Act occurring prior to the date such entity became a Subsidiary or subsequent to the date such entity ceased to be a Subsidiary, or

        (ii)    any Wrongful Act occurring while such entity was a Subsidiary which, together with a Wrongful Act occurring prior to the date such entity became a Subsidiary, would constitute Interrelated Wrongful Acts;

    j)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any Wrongful Act actually or allegedly committed subsequent to a Takeover;

    k)    to the extent such Claim is based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the service of any of the Directors and Officers in any position or capacity in any entity other than the Company; provided, however, that this exclusion shall not apply to Loss resulting from any such Claim to the extent that:

        (i)    such Claim is based on the service of any of the Directors and Officers as a director, officer, trustee, governor, executive director or similar position of any Outside Entity where such service is with the knowledge and consent of the Company, and

D&O-2

17

(II)   such Outside Entity is not permitted or required by law to provide indemnification to such Directors and Officers, and

(III)   such Loss is not covered by insurance provided by any of the Outside Entity's insurer;

l)   based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

(i)   any prior and/or pending litigation as of the Continuity Date, or

(ii)   any fact, circumstance, situation, transaction or event underlying or alleged in such litigation,

regardless of the legal theory upon which such Claim is predicated;

m)   based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, any Wrongful Act which any of the Insureds had knowledge of prior to the Continuity Date where such Insureds had reason to believe at the time that such known Wrongful Act could reasonably be expected to give rise to such Claim;

n)   based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any employment or employment-related matters brought by or on behalf of a director, officer, or employee, including any voluntary, seasonal, temporary, leased or independent contracted employee of the Company;

o)   based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

(i)   any initial public offering undertaken and transacted by the Company, including all activities in connection therewith,

(ii)   the actual or alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934, rules or regulations of the Securities and Exchange Commission promulgated thereunder, any other federal, state, local or provincial statute relating to securities, or any rules or regulations promulgated thereunder, all as amended, for any Wrongful Act actually or allegedly committed subsequent to such initial public offering, or

(iii)   any equity or debt offering in excess of $50 million which is exempt from the registration requirements of the U.S. Securities and Exchange Commission; provided, however, that this subparagraph (iii) shall not apply if Insurer has agreed in writing to extend coverage for Wrongful Acts in connection with such offering, and the Insureds have paid the premium required by Insurer for such coverage extension; or

p)   for that portion of Loss which is covered under any other Coverage Section of this Policy.

2.   Insurer shall not be liable to make any payment under this Coverage Section in connection with any Claim made under Insuring Clause 3. against the Company;

a)   based upon, arising out of, directly or indirectly resulting from, in consequence of liability of, or in any way involving any written or express contract or agreement, entered into among and between the Company and another party, except and to the extent the Company would have been liable in the absence of such contract or agreement; or

b)   based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

(i)   any actual or alleged infringement, misappropriation, or violation of copyright, patent, service marks, trade marks, trade secrets, title or other proprietary or licensing rights or intellectual property of any product, technologies or services, or

(ii)   any goods or products manufactured, produced, processed, packaged, sold, marketed, distributed, advertised or developed by the Company;

provided, however that Exclusions a) and b), above, shall not apply to any such Claim brought directly, indirectly, or derivatively by one or more of the securities holders of the Company.

No Wrongful Act of one or more of the Insured s shall be imputed to any other Insureds for the purpose of determining the applicability of any of the above Exclusions.

D.   **LIMIT OF LIABILITY AND RETENTIONS**

1.   Insurer shall be liable to pay the percentage of Loss set forth in Item F. of the Declarations relating to this Coverage Section in excess of the amount of the applicable Retention up to the Limit of Liability under this Coverage Section, it being warranted that the remaining percentage of Loss shall be uninsured.

2.   The amount shown in Item C. of the Declarations relating to this Coverage Section shall be the maximum aggregate Limit of Liability of Insurer under this Coverage Section.

3.   More than one Claim involving the same Wrongful Act or Interrelated Wrongful Acts shall be deemed to constitute a single Claim and shall be deemed to have been made at the earliest of the following times:

a)   the time at which the earliest Claim involving the same Wrongful Act or Interrelated Wrongful Act is first made; or

b)   the time at which the Claim involving the same Wrongful Act or Interrelated Wrongful Acts shall be deemed to have been made pursuant to Clause E.2., below.

4.   In the event a Claim is covered in part and/or more than one of the Insuring Clauses set forth in this Coverage Section, the Retentions set forth in Item C. of the Declarations relating to this Coverage Section shall be applied separately to that part of the Loss resulting from each Claim covered by each Insuring Clause. The sum of the Retentions so applied shall constitute the Retention applicable to such Claim. The total Retention, as finally determined, shall in no event exceed the largest single Retention applicable to such Claim.

16

5.  The Retention applicable to Insuring Clause 2, shall apply to Loss resulting from any Claim if indemnification by the Company is required by law or is legally permissible to the fullest extent permitted by law, regardless of whether or not actual indemnification by the Company is made, except and to the extent such indemnification is not made by the Company solely by reason of its financial insolvency.

6.  Payments of Loss by Insurer shall reduce the Limit of Liability under this Coverage Section. Insurer shall pay Loss in the order in which Loss is incurred. If Loss payable under Insuring Clause 1, and one or more of the other Insuring Clauses is incurred contemporaneously, Insurer first shall pay Loss payable under Insuring Clause 1. The Named Insured may elect through its most senior ranking Directors and Officers to decline or defer payment under Insuring Clause 2, or Insuring Clause 3. Insurer shall have no obligation to pay Loss after exhaustion of the Limit of Liability regardless of whether the Named Insured has declined or deferred payment.

7.  Insurer shall pay Costs, Charges and Expenses no more than once every 90 days.

E.  **NOTIFICATION**

1.  The Insureds shall, as a condition precedent to their right to payment under this Coverage Section only, give Insurers notice in writing of any written Claim as soon as practicable, but in no event later than 60 days after the end of the Policy Period.

2.  If, during the Policy Period or the Discovery Period, any of the Insureds first becomes aware of a specific Wrongful Act and if the Insureds, during the Policy Period or the Discovery Period, if purchased, give written notice to Insurer as soon as practicable of:

    a)  the specific Wrongful Act, and

    b)  the consequences which have resulted or may result therefrom, and

    c)  the circumstances by which the Insureds first become aware thereof,

    then any Claim made subsequently arising out of such Wrongful Act shall be deemed for the purposes of this Coverage Section to have been made at the time such notice was first given to Insurer.

3.  Notice to Insurer shall be given to the firm shown under Item G. of the Declarations for this Policy.

D&O-4

| Policy No: | BMI20016061 | Endorsement No: 1 |
|---|---|---|
| Issued to: | TRI Commercial Real Estate Services, Inc | |
| Effective Date: | August 1, 2004 | |

## DELETE ARBITRATION PROVISION

IN CONSIDERATION of the premium charged for this Policy, it is hereby understood and agreed that Clause K. **ARBITRATION** of the General Terms and Conditions Coverage Section is deleted in its entirety.

ALL OTHER TERMS, conditions and limitations of said Policy shall remain unchanged.

GT&C102

| Policy No: | BMI20016061 | Endorsement No: 2 |
|---|---|---|
| Issued to: | TRI Commercial Real Estate Services, Inc | |
| Effective Date: | August 1, 2004 | |

### PROFESSIONAL SERVICES ERRORS & OMISSIONS EXCLUSION
(Carve Back Wording)

IN CONSIDERATION of the premium charged for this Policy, it is hereby understood and agreed that Clause C. EXCLUSIONS 1. of the Directors & Officers and Company Coverage Section is amended by the addition of the following:

q)     based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way relating to any act, error or omission in connection with performance of any professional services by or on behalf of any of the **Insureds** for the benefit of any other entity or person; provided, however, this exclusion shall not apply to any such **Claim** brought directly, derivatively or otherwise by one or more securities holders of the **Company** in their capacity as such.

ALL OTHER TERMS, conditions and limitations of said Policy shall remain unchanged.

D&O120
Rev 6/03

| Policy No: | BMI20016061 | Endorsement No: 3 |
|---|---|---|
| Issued to: | TRI Commercial Real Estate Services, Inc | |
| Effective Date: | August 1, 2004 | |

## SPLIT CONTINUITY DATE

IN CONSIDERATION of the premium charged for this Policy, it is hereby understood and agreed that Item C. Coverage Section Description(s): Directors & Officers and Company and Employment Practices Coverage Section Continuity Date of the Declarations is amended to read as follows:

Item C.    **Coverage Section Description(s):**

Employment Practice

| c) Continuity Date | August 1, 1999 | for any **Loss** payable as respects the first of the above Limit of Liability of $1,000,000. |
|---|---|---|
| | September 11, 2002 | for any **Loss** payable as respects the above Limit of Liability in excess of $1,000,000. |

Directors & Officers and Company

| c) Continuity Date | August 1, 1999 | for any **Loss** payable as respects the first of the above Limit of Liability of $1,000,000. |
|---|---|---|
| | September 11, 2002 | for any **Loss** payable as respects the above Limit of Liability in excess of $1,000,000. |

ALL OTHER TERMS, conditions and limitations of said Policy shall remain unchanged.









**ace usa**

## POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM
## INSURANCE COVERAGE

You should be aware that under the Terrorism Risk Insurance Act of 2002 ("The Act") effective November 26, 2002, any losses caused by certified acts of terrorism under your existing coverage may be partially reimbursed by the United States under a formula established by federal law (applicability is subject to the terms and conditions of each individual policy). The Act was specifically designed to address the ability of businesses and individuals to obtain property and casualty insurance for terrorism and to protect consumers by addressing market disruptions and ensure the continued availability of terrorism coverage.

Under the terms of The Act, you may now have the right to purchase insurance coverage for losses arising out of acts of terrorism, as defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States-to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property; or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Responsibility for Compensation under The Act is shared between insurance companies covered by The Act and the United States. Under the formula set forth in The Act, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible, which is paid by the insurance company providing the coverage.

We are providing you with the terrorism coverage required by The Act. The premium for the coverage is set forth below.

Name of Insured: TRI Commercial Real Estate Services, Inc
Policy No. BMI20016061

Terrorism Risk Insurance Act premium:  $290.28

23

**CALIFORNIA**

**NOTICE TO INSURED:**

**NOTICE:**

1. **THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.**

2. **THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT WHICH APPLIES TO CALIFORNIA LICENSED INSURERS.**

3. **THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW.  THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.**

4. **CALIFORNIA MAINTAINS A LIST OF ELIGIBLE SURPLUS LINE INSURERS APPROVED BY THE INSURANCE COMMISSIONER.  ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST.**

5. **FOR ADDITIONAL INFORMATION ABOUT THE INSURER YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER: 800-927-4357.**

**SL CA 2004**

24

38274

 **E Risk Services™**

Northwest Professional Center
227 Route 206 • Flanders, NJ 07836
Tel: (973) 252-5141 / (800) 689-2550
Fax: (973) 252-5146 / (800) 689-2839
www.ERiskServices.com
email: application@ERiskServices.com

**RENEWAL**

**APPLICATION FOR
BUSINESS AND MANAGEMENT
(BAM)
INDEMNITY INSURANCE**

**NOTICE:** THE POLICY FOR WHICH APPLICATION IS MADE, SUBJECT TO ITS TERMS, APPLIES ONLY TO ANY CLAIM OR OCCURRENCE (AS APPLICABLE IN THE COVERAGE SECTION FOR WHICH APPLICATION IS MADE) MADE AGAINST ANY OF THE ASSUREDS DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY AMOUNTS INCURRED AS COSTS, CHARGES AND EXPENSES (AS DEFINED IN THE COVERAGE SECTION FOR WHICH APPLICATION IS MADE), AND COSTS, CHARGES AND EXPENSES SHALL BE APPLIED TO THE RETENTIONS.

General Instructions for Completing This Application

1.   Please type or print in ink.

2.   Please read carefully and answer all questions. If a question is not applicable, so state.

3.   The Application must be signed by an executive officer.

4.   This Application and all exhibits shall be held in confidence.

5.   Please read the certificate for which application is made (the "Policy") prior to completing this Application.

6.   The terms as used herein shall have the meanings as defined in the Policy.

I.   General Information

1.   Name of Parent Company: *TRI Commercial Real Estate Services Inc.*

     Address: *1 California St #1100*
     _____(Number)_____(Street)_____
     *San Francisco   CA   94111*
     _____(City)_____(State)_____(Zip Code)_____

2.   Standard Industrial Classification Code (SIC): _____

3.   Nature of Operations: *Commercial Real Estate Brokerage & Property Management*

BAM 02/02

25

4. Has the Company been in business longer than three (3) years?   ☒ Yes  ☐ No

5. Is the Company public-held or a public reporting company under the Securities Exchange Act of 1934?   ☐ Yes  ☒ No

6. Does the Parent Company own more than three (3) subsidiaries? If yes, please provide details on a separate page.   ☐ Yes  ☒ No

7. Has the Company in the past 18 months been involved with any actual, negotiated or attempted merger, acquisition or divestment? If yes, please provide details on a separate page.   ☐ Yes  ☒ No

8. Does the Company contemplate transacting any mergers or acquisitions in the next 12 months where such merger or acquisition would involve more than 30% of the total assets of the Company? If yes, please provide details on a separate page.   ☐ Yes  ☐ No

**B. Financial Information**

1. Describe the following financial information of the Company for the most recent fiscal year-end.

   a) **Total Assets**
   - ☒ $0 to 5,000,000
   - ___ $5,000,001 to 25,000,000
   - ___ $25,000,001 to 100,000,000
   - ___ $100,000,001 to 250,000,000
   - ___ over $250,000,000

   b) **Gross Revenues**
   - ___ $0 to 5,000,000
   - ☒ $5,000,001 to 25,000,000
   - ___ $25,000,001 to 100,000,000
   - ___ $100,000,001 to 250,000,000
   - ___ over $250,000,000

   c) Net income ☒ or net loss ___ and applicable amount:
   - ☒ $0 to 500,000
   - ___ $500,001 to 1,000,000
   - ___ $1,000,001 to 3,000,000
   - ___ $3,000,001 to 5,000,000
   - ___ over $5,000,000

   d) Cashflow from operating activities positive ☒ or negative ___ and applicable amount:
   - ☒ $0 to 500,000
   - ___ $500,001 to 1,000,000
   - ___ $1,000,001 to 3,000,000
   - ___ $3,000,001 to 5,000,000
   - ___ over $5,000,000

2. Do the current liabilities exceed current assets? If yes, please provide details on a separate page.   ☐ Yes  ☒ No

3. Do long-term liabilities exceed 75% of total assets? If yes, please provide details on a separate page.   ☐ Yes  ☒ No

4. Will more than 50% of the total long-term liabilities mature within the next 18 months? If yes, please provide details on a separate page.   ☐ Yes  ☒ No

5. Has any auditor in the last 2 fiscal years rendered a "going concern" opinion for the financial statements of the Company? If yes, please provide details on a separate page.   ☐ Yes  ☒ No

HAN 02/02

 

III.    Other Information

1.    The undersigned declares that to the best of his/her knowledge the statements herein are true. Signing of this Application does not bind the undersigned to complete the insurance, but it is agreed that this Application shall be the basis of the contract should a Policy be issued, and this application will be attached to and become a part of such Policy, if issued. Insurer hereby is authorized to make any investigation and inquiry in connection with this Application as they may deem necessary.

2.    It is warranted that the particulars and statements contained in the Application for the proposed Policy and any materials submitted herewith (which shall be retained on files by Insurer and which shall be deemed attached hereto, as if physically attached hereto), are the basis for this proposed Policy and are to be considered as incorporated into and constituting a part of the proposed Policy.

3.    It is agreed that in the event there is any material change in the answers to the questions contained herein prior to the effective date of the Policy, the applicant will notify Insurer and, at the sole discretion of the Insurer, any outstanding quotations may be modified or withdrawn.

4.    It is agreed that in the event there is any misstatement or untruth in the answers to the questions contained herein, Insurer have the right to exclude from coverage any claim based upon, arising out of or in connection with such misstatement or untruth.

Signed:    _____
    Must Be Signed By an Executive Officer of the Parent Company

Name:    Andrew J Murphy
    Please Print or Type

Capacity:    CFO

Company:    TRI Commercial Real Estate

Date:    6    28    2004
    (Day)    (Month)    (Year)

Submitted
by:    _____
    (Agent)

Date:    7    12    -  04
    (Day)    (Month)    (Year)

For purposes of creating a binding contract of insurance by this application or in determining the rights and obligations under such contract in any court of law, the parties acknowledge that a signature reproduced by either facsimile or photocopy shall be the same force and effect as an original signature and that the original and any such copies shall be deemed an and the same document.

## Please fully complete and attach the Information for the Coverage Section (s) currently bound.

DAW 02/02

 

**Employment Practices Coverage Section Information**

Is the Parent Company seeking Employment Practices coverage?          ☒ Yes      ☐ No

If yes, please answer the following questions.

1.    Total number of employees (full-time and part-time).

| | |
|---|---|
| ___ 0 to 10 | ___ 151 to 225 |
| ___ 11 to 30 | ___ 226 to 300 |
| ☒ 31 to 50 | ___ 301 to 400 |
| ___ 51 to 75 | ___ 401 to 500 |
| ___ 76 to 100 | ___ over 500 |
| ___ 101 to 150 | ___ Exact number, if over 500 |

*PLUS ABOUT 80 AGENTS WHO ARE Independent Contractors*

Note:    When answering the above range of employees, multiply the number of part-time employee by a factor of .5 and add as number of full-time employees.

2.    Do more than 25% of all employees currently earn more than $50,000?          ☐ Yes      ☒ No

3.    Have more than 25% of the officers or management voluntarily left the employ of the Company or had employment with the Company terminated within the last 18 months?  If yes, please provide details on a separate page.          ☐ Yes      ☒ No

4.    Does the Company anticipate in the next 12 months, or has the Company transacted in the last 12 months, any plant, facility, branch or office closing, consolidations or layoffs affecting 20% or more of the employees of the Company?  If yes, please provide details on a separate page.          ☐ Yes      ☒ No

5.    Describe the internal controls the Company maintains for Employment Practices.

    a)    Have all management staff and officers attended training and education programs on sexual harassment within the last 18 months?          ☐ Yes      ☒ No

    b)    Does labor relations counsel review the employment policies/procedures at least annually?          ☒ Yes      ☐ No

    c)    Is there a separate Human Resources Department?          ☐ Yes      ☒ No

    d)    Does the Company publish and distribute an employee handbook to every employee?          ☒ Yes      ☐ No

    e)    Are there written procedures for handling employee complaints of discrimination or sexual harassment?          ☒ Yes      ☐ No

    f)    Are there written procedures for handling employee grievances or complaints?          ☒ Yes      ☐ No

DAM 02/02

 

**Directors & Officers and Company Coverage Section Information**

Is the Parent Company seeking Directors & Officers and Company coverage?      ☑ Yes      ☐ No

If yes, please answer the following questions.

1.  Do the Directors and Officers as a whole, directly or indirectly, own or control the voting rights of more than 50% of the outstanding securities of the Parent Company?      ☑ Yes      ☐ No

2.  Within the last 18 months, has the Company transacted or attempted a private debt or equity offering of securities?  If yes, please provide details on a separate page.      ☐ Yes      ☑ No

3.  Within the next 18 months does the Company anticipate any:

    a)  private debt equity offering of securities?  If yes, please provide details on a separate page.      ☐ Yes      ☑ No

    b)  public offering of securities?  If yes, please provide details on a separate page.      ☐ Yes      ☑ No

4.  Does the Company render any professional services for others for a fee or compensation? If yes, please provide details on a separate page.      ☑ Yes      ☐ No

    WE EARN FEES & COMMISSION ON COMMERCIAL BROKERAGE SERVICES AND FEES FOR PROPERTY MANAGEMENT

5.  Does the Company act as a general partner in any partnership?  If yes, please provide details on a separate page.      ☐ Yes      ☑ No

6.  Does the Company have any direct or indirect insurance operations?  If yes, please provide details on a separate page.      ☐ Yes      ☑ No

**Fiduciary Coverage Section Information**

rev 02/03

Is the Parent Company seeking Fiduciary Liability coverage?  ☐ Yes  ☑ No

If yes, please answer the following questions.

1.    Does the Company have more than five (5) plans to be covered under the proposed insurance?  If yes, please provide details on a separate page.    ☐ Yes  ☐ No

2.    Indicate the type of plans to be insured.

___ Pension   ___ Welfare Benefit   ___ Profit Sharing   ___ Employee Stock Ownership

3.    Total number of employees currently enrolled in all plans:

| | | | |
|---|---|---|---|
| ___ | 0 to 10 | ___ | 151 to 225 |
| ___ | 11 to 30 | ___ | 226 to 300 |
| ___ | 31 to 50 | ___ | 301 to 400 |
| ___ | 51 to 75 | ___ | 401 to 500 |
| ___ | 76 to 100 | ___ | over 500 |
| ___ | 101 to 150 | | Exact number, if over 500 |

4.    Total asset value of all plans combined for the most recent fiscal year:

___ $0 to 1,000,000
___ $1,000,001 to 5,000,000
___ $5,000,001 to 25,000,000
___ $25,000,001 to 100,000,000
___ over $100,000,000

5.    Do all of the plans conform to the standards of eligibility, participation, vesting and other provisions of the Employee Retirement Income Security Act of 1974, as amended?    ☐ Yes  ☐ No

6.    Are the plans reviewed at least annually to assure that there are no violations of any plan trust agreements, prohibited transactions or party in interest rules?    ☐ Yes  ☐ No

7.    Are any of the plans under funded by more than 30%?  If yes, please provide details on a separate page.    ☐ Yes  ☐ No

8.    Does the Company have any delinquent contributions to any plan?  If yes, please provide details on a separate page.    ☐ Yes  ☐ No

9.    Have any plans been terminated, suspended, merged or dissolved within the last 24 months?  If yes, please provide details on a separate page.    ☐ Yes  ☐ No

10.   Does the Company anticipate terminating, suspending, merging or dissolving any plans within the next 18 months?  If yes, please provide details on a separate page.    ☐ Yes  ☐ No

11.   Are more than 10% of the assets of any plan, other than an Employee Stock Ownership Plan, invested in any securities of or loan to the Company?  If yes, please provide details on a separate page.    ☐ Yes  ☐ No

RAM 03/02




Crime Coverage Section Information

Is the Parent Company seeking Crime coverage?　☐ Yes　☒ No

If yes, please answer the following questions.

1.　Total number of employees:

| | | | |
|---|---|---|---|
| ___ | 0 to 10 | ___ | 151 to 225 |
| ___ | 11 to 30 | ___ | 226 to 300 |
| ___ | 31 to 50 | ___ | 301 to 400 |
| ___ | 51 to 75 | ___ | 401 to 500 |
| ___ | 76 to 100 | ___ | over 500 |
| ___ | 101 to 150 | | Exact number, if over 500 ___ |

2.　Number of officers and employees who handle, have custody or maintain records of money, securities or other property:

- ___ 0 to 5
- ___ 6 to 15
- ___ 16 to 50
- ___ over 50

3.　Is there an annual audit or review performed by an independent CPA on the books and accounts, including a complete verification of all securities and bank balances?　☐ Yes　☐ No

4.　Are bank accounts reconciled by someone not authorized to deposit or withdraw from those accounts?　☐ Yes　☐ No

5.　Is counter signature of checks required?　☐ Yes　☐ No

6.　Is the applicant seeking Employee Benefit Plan Crime coverage?　☐ Yes　☐ No

7.　Are pre-authorized controls maintained for all programmers and operators?　☐ Yes　☐ No

8.　Do audit practices include tests to detect unauthorized programming changes?　☐ Yes　☐ No

9.　Are computerized check writing operations segregated from departments that authorize checks?　☐ Yes　☐ No

**Technology, Media, & Professional Services Coverage Section Information**

Is the Parent Company seeking Technology, Media & Professional Services coverage?  ☐ Yes  ☑ No

If yes, please answer the following questions

1.  How many years have you been in business:  ☐ 1  ☐ 2  ☐ 3  ☐ 4  ☐ 5  ☐ Greater than 5

2.  Limit of Liability desired:

☐ $1,000,000  ☐ $2,000,000  ☐ $3,000,000  ☐ $4,000,000  ☐ $5,000,000  ☐ Other _____

Deductible desired:  ☐ $5,000  ☐ $10,000  ☐ $25,000  ☐ $50,000  ☐ Other _____

3.  Describe in detail the professional services for which coverage is desired:

_____

_____

_____

_____

4.  a.   Is the Applicant engaged in any business other than as described in
         question 3?  If yes, please provide an explanation and estimated receipts.  ☐ Yes  ☐ No

    b.   What percentage of the Applicant's business involves subcontracting work to others? _____ %

5.  What industries are the professional services described in question 3 provided to (e.g., government,
    banking, medical, aviation, etc.)? _____

6.  Is the Applicant controlled or owned by, or associated or affiliated with, or does
    it own, any other firm business enterprise?  If yes, please attach an explanation.  ☐ Yes  ☐ No

7.  Are any significant changes in the nature or size of the Applicant's business
    anticipated over the next 12 months?  Or have there been any such changes in
    the past 12 months?  If yes, please attach an explanation (change in size of less
    than 25% need not be explained.)  ☐ Yes  ☐ No

8.  Please indicate the total annual gross revenues derived from the services described in Question 3 for the
    past two years and the projected revenues for the current year:

| Current Year | Last Year | Year Prior |
|---|---|---|
| $ _____ | $ _____ | $ _____ |

9.  a.   Number of all principals, partners, officers and professionals employees: _____

    b.   Average years of experience for the above mentioned for services requesting coverage: _____

         Number of all non-professional employees (clerks, secretaries, etc.) _____

10. Please provide your Internet address(es) and/or World Wide Web Address(es): _____

11. Has the Applicant obtained all necessary rights, licenses, releases and
    consents applicable to content created or provided by Applicant?  ☐ Yes  ☐ No

12. Does the Applicant edit or review content created or provided to the Applicant
    by others?  ☐ Yes  ☐ No

B49 02/02

13. Does the Applicant have an established procedure to safeguard against infringing upon copyrights/trademarks, etc. of others? If yes, please attach a copy of written description of procedure.　☐ Yes ☐ No

14. Does the Applicant verify that all necessary rights, licenses, releases and consents have been obtained by those parties providing consent?　☐ Yes ☐ No

15. Do those parties providing content to the Applicant indemnify the Applicant, in writing, for any claims arising out of the use of the content provided?　☐ Yes ☐ No

16. Prior to publishing content or releasing packaged or custom software/hardware, do you have an attorney facilitate a patent/copyright/trademark search? If yes, please give name of the attorney's firm: _____　☐ Yes ☐ No

17. Describe the Applicant's policies and procedures for removing controversial or potentially infringing material:

_____

_____

18. Do you have a safety procedure in place to prevent the transmission of viruses? If yes, please explain.　☐ Yes ☐ No

_____

_____

19. Are all of your PC's equipped with antivirus software? If yes, what brand?　☐ Yes ☐ No

_____

20. Are there firewalls in place as a part of your security system?　☐ Yes ☐ No

   a)　What firewall security do you employ? _____

   b)　Was it configured by professional personnel?　☐ Yes ☐ No

   c)　Did you alter it in any way before installing it?　☐ Yes ☐ No

21. What kind of safeguards do you have in place to prevent unauthorized persons from accessing your Web Sites or On-Line Service database? _____

_____

22. Have any principals, partners, officers or professional employees ever been the subject of reprimand or disciplinary or criminal actions by authorities as a result of their professional activities? If yes, please attach details.　☐ Yes ☐ No

23. Does any person to be insured have knowledge or information of any act, error or omission which might reasonably be expected to give rise to a claim against him or his predecessors in business? If yes, please attach details.　☐ Yes ☐ No

24. Have any errors and omissions claims been made against any proposed assured(s)? If yes, please attach details.　☐ Yes ☐ No

25. Has the Applicant been a party to any lawsuit or other legal proceedings within the past 5 years? If yes, please attach details.　☐ Yes ☐ No

RAN 68/88



Miscellaneous Professional Services Coverage Section Information

Is the Parent Company seeking Miscellaneous Professional Services coverage?  ☐ Yes  ☑ No

If yes, please answer the following questions.

1.  Describe in detail the professional services for which coverage is desired:

_____

_____

_____

2.  Is the applicant engaged in any business other than as described in question 1? ___ _____
    If yes, please attach an explanation and estimated receipts.

3.  What percentage of the applicant's business involves subcontracting work to others? _____ %

4.  List the total gross receipts for the past year which were derived from the services listed in question 1. In
    addition, please provide the projected receipts for the coming year in which insurance coverage is desired.

    **Year**                          **Gross Receipts**
    a.  Current Projected Year        $ _____
    b.  Prior Year                    $ _____

5.  a.  What is the number of all principals, partners, officers and professional employees directly
        engaged in providing services to clients? _____

    c.  Average years of experience for the above mentioned for services requesting coverage: _____

6.  Please provide the following:
    a.  Standard contract(s) used.
    b.  Descriptive or promotional brochures.
    c.  Website address.

7.  Have any principals, partners, officers or professional employees ever been
    the subject of reprimand or disciplinary or criminal actions by authorities as a
    result of their professional activities? If yes, please provide details on a
    separate page.                                                                ☐ Yes  ☐ No

8.  Does any person to be insured have knowledge or information of any act,
    error or omission which might reasonably be expected to give rise to a claim
    against him or his predecessors in business? If yes, please provide details on
    a separate page.                                                             ☐ Yes  ☐ No

9.  Have any professional liability claims ever been made against any proposed
    assured(s)? If yes, please provide details on a separate page.               ☐ Yes  ☐ No

XAM 35/62

# PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California, by WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER and am over the age of 18 and not a party to the within action. My business address is 555 South Flower Street, Suite 2900, Los Angeles, California 90071.

On **July 22, 2008,** I served the foregoing document described as **DECLARATION OF MICHAEL LEEST IN SUPPORT OF MOTION FOR SUMMARY JUDDGMENT** on all interested parties, through their respective attorneys of record in this action, by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

| | |
|---|---|
| Daniel L. Rottinghaus, Esq.<br>Paul W. Windust, Esq.<br>Berding & Weil LLP<br>3240 Stone Valley Road West<br>Alamo, CA 94507 | Attorneys for Plaintiff: ROBERT L. YOUNG<br>Phone: (925) 838-2090<br>Fax:    (925) 820-5592 |

    **XX** **(BY MAIL)** I caused such envelope(s) fully prepaid to be placed in the United States Mail at Los Angeles, California. I am "readily familiar" with the firm's practice of collection and processing correspondence or mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

    ___ **(BY PERSONAL SERVICE)** I caused such envelope(s) to be delivered by hand to the offices of the addressee(s).

    **XX** (BY E-MAIL) I caused such document to be served via E-mail at Paul W. Windust [pwindust@berding-weil.com]

JURISDICTION

**XX** (State) I declare under penalty of perjury that the above is true and correct.

Executed on **July 22, 2008,** at Los Angeles, California.

Irene Guzman-Buelna

3

**DECLARATION IN SUPPORT OF SUMMARY JUDGMENT MOTION**

682000.1