1  Herbert P. Kunowski (State Bar No. 150141)
   Darren Le Montree, Esq. (State Bar No. 198715)
2  **WILSON, ELSER, MOSKOWITZ,**
        **EDELMAN & DICKER LLP**
3  555 South Flower Street, Suite 2900
   Los Angeles, California 90071
4  Telephone:   (213) 443-5100
   Facsimile:    (213) 443-5101
5
   Attorneys for Defendants,
6  ILLINOIS UNION INSURANCE COMPANY
   d/b/a ACE WESTCHESTER SPECIALTY CLAIMS,
7  sued and served as ILLINOIS UNION INSURANCE COMPANY;
   ACE WESTCHESTER SPECIALTY CLAIMS
8

9

10              **UNITED STATES DISTRICT COURT**

11        **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

12

13  ROBERT L. YOUNG,                    )  Case No.:  C07-05711 SBA
                                        )
14        Plaintiff,                    )  **DECLARATION OF DARREN LE**
                                        )  **MONTREE IN SUPPORT OF**
15  v.                                  )  **MOTION FOR SUMMARY**
                                        )  **JUDGMENT**
16  ILLINOIS UNION INSURANCE            )
    COMPANY; ACE WESTCHESTER            )
17  SPECIALTY CLAIMS; and DOES 1        )
    through 50, inclusive,              )
18                                      )
          Defendants.                   )
19                                      )

20

21        I, Darren Le Montree, certify and declare as follows:

22        1.    I am a member of the law firm WILSON, ELSER, MOSKOWITZ,

23  EDELMAN & DICKER LLP, counsel of record for Illinois Union Insurance

24  Company ("Illinois Union") in the above-captioned matter.  I make the following

25  declaration based upon my personal knowledge.  If called to testify, I could and

    would attest to the following.

                                        1

2.     Attached hereto as Exhibit "1" is a true and correct copy of TRI Commercial Real Estate Service, Inc.'s Complaint filed in Alameda Superior Court on February 14, 2004 under Case No. RG 04141329.

3.     Attached hereto as Exhibit "2" is a true and correct copy of Raybern Food, Inc.'s Cross-Complaint filed in Alameda Superior Court on March 23, 2005 under Case No. RG 04141329.

4.     Attached hereto as Exhibit "3" is a true and correct copy of Raybern Food, Inc.'s First Amended Cross-Complaint filed in Alameda Superior Court on July 26, 2005 under Case No. RG 04141329.

5.     Attached hereto as Exhibit "4" is a true and correct copy of Robert L. Young's Cross-Complaint filed in Alameda Superior Court on August 24, 2005 under Case No. RG 04141329.

6.     Attached hereto as Exhibit "5" is a true and correct copy of TRI Commercial Real Estate, Inc. and John Fultz's Cross-Complaint filed in Alameda Superior Court on September 19, 2005 under Case No. RG 04141329.

7.     Attached hereto as Exhibit "9" is a true and correct copy of the Written Fee Contract produced by Robert L. Young in this action and marked as Bates Nos. RY0117 to RY0122.

8.     Attached hereto as Exhibit "10" is a true and correct copy of relevant portions of Robert L. Young's responses to Illinois Union's Special Interrogatories, served on or about May 27, 2008 in this action.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on July 22, 2008 at Los Angeles, California.

Darren Le Montree

2

*2975189*

1  ALBERT E. CORDOVA (State Bar No. 74283)
2  A Professional Law Corporation
   ALBERT E. CORDOVA - SBN074283
3  A Professional Law Corporation
   1299 Fourth St., Suite 202
4  San Rafael, California 94901
   Telephone: (415) 457-9656
5  Telefacsimile: (415) 453-6260

6

7  Attorneys for Plaintiff TRI COMMERCIAL REAL ESTATE
   SERVICES, INC., a California corporation
8

9              THE SUPERIOR COURT OF CALIFORNIA

10                   COUNTY OF ALAMEDA

11                                        RG04141329

12
   TRI COMMERCIAL REAL ESTATE       )   No.
13 SERVICES, INC., a California corporation )
   d/b/a Keystone Financial Group, Inc. )   **COMPLAINT FOR RECOVERY**
14                                    )   **OF BROKER'S COMMISSION**
                                      )
15            Plaintiff(s),           )   **[BREACH OF CONTRACT,**
                                      )   **CONSTRUCTIVE TRUST and**
16        vs.                         )   **DECLARATORY RELIEF]**
                                      )
17 RAYBERN FOODS, INC., a California  )
18 corporation; BERNARD J. VIGGIANO; and )
   DOES 1-20 inclusive               )
19                                    )
                                      )
20            Defendant(s).           )
                                      )
21 _____ )

22
         COMES NOW PLAINTIFF, TRI COMMERCIAL REAL ESTATE
23
   SERVICES, INC. (hereinafter referred to as "TRI"), who complains and alleges as
24
25 follows:

26

27                          1

28                          _____
                            COMPLAINT FOR DAMAGES AND DECLARATORY
                            RELIEF

EXHIBIT 1

3

FILED
ALAMEDA COUNTY

FEB 1 7 2004

CLERK OF THE SUPERIOR COURT
By _____ Deputy

## GENERAL ALLEGATIONS

1.  At all relevant times mentioned herein, Plaintiff TRI COMMERCIAL REAL ESTATE SERVICES, Inc., a California corporation d/b/a Keystone Financial Group, Inc. (hereinafter referred to as "TRI") was a corporation duly organized and existing under the laws of the State of California with its principal place of business located in the City and County of San Francisco, State of California.

2.  At all relevant times mentioned herein, Plaintiff TRI has been doing business, in part, under the fictitious business name of Keystone Financial Group, Inc.  Plaintiff has filed the statement and published the notice as required by California Business and Professions Code §§17910 through 17917.

3.  Plaintiff is, and at all times mentioned herein was, a real estate broker duly licensed by the State of California.

4.  Plaintiff is informed and believes and upon such information and belief alleges that at all relevant times mentioned herein Defendant RAYBERN FOODS, INC., a California corporation (hereinafter referred to as "RAYBERN") was a corporation duly organized and existing under the laws of the State of California with its principal place of business in the City of Hayward, County of Alameda, State of California.

2

COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

4

5.  Plaintiff is informed and believes and upon such information and belief alleges that at all relevant times mentioned herein Defendant BERNARD J. VIGGIANO (hereinafter referred to as "VIGGIANO") was a corporate officer and duly authorized representative acting on behalf of Defendant RAYBERN.

6.  Plaintiff is informed and believes and upon such information and belief alleges that at all relevant times mentioned herein VIGGIANO was the owner of a majority of the shares of stock of defendant corporation and was the controlling shareholder therein.

7.  There exists, and at all times herein mentioned there existed, a unity of interest and ownership between defendant VIGGIANO and defendant RAYBERN such that any individuality and separateness between said defendants have ceased, and defendant corporation is the alter ego of defendant VIGGIANO.

8.  Defendant RAYBERN is, and at all times herein mentioned was, a mere shell, instrumentality, and conduit through which defendant VIGGIANO carried on his business in the corporate name, exercising complete control and dominance of such business to such an extent that any individuality or separateness of defendant RAYBERN and defendant VIGGIANO does not, and at all times herein mentioned did not, exist.

9.  Plaintiff is informed and believes and thereon alleges that adherence to the fiction of the separate existence of the defendant corporation as an entity distinct from

3

5

1  defendant VIGGIANO would permit an abuse of the corporate privilege and would

2  sanction fraud or promote injustice in that VIGGIANO may divert funds due to

3
4  RAYBERN to his own use and/or may cause RAYBERN to circumvent its

5  obligations under the contract.

6      10.  Plaintiff is informed and believes that each defendant individually or

7
8  fictitiously sued herein acted in his, her, or its own right and also was or is the agent,

9  employee, representative or servant of each of the other defendants sued herein as to

10 each of the matters set forth herein, and that each such defendant, whether

11
12 individually or fictitiously named, was at all times acting within the scope and

13 purpose of such agency, employment, representation or service.  Alternatively, if the

14 acts of each such defendant were not authorized at the time, such acts were

15 subsequently ratified by the appropriate principal.  Any reference hereinafter to

16
17 "Defendants" shall mean "Defendants, and each of them".

18      11.  Plaintiff is ignorant of the true names and/or capacities, whether

19 individual, corporate, associate or otherwise, of defendants sued herein as Does 1

20
21 through 20, inclusive, and plaintiff is further ignorant of the appropriate charging

22 allegations and theories of liability with respect to said fictitiously named defendants,

23 and therefore plaintiff sues such defendants by such fictitious names.  Plaintiff is

24 further informed and believes, and on such information and belief alleges, that each

25
26 of the defendants designated herein as a Doe is legally responsible in some manner

27                                        4

28

6

for the events and happenings herein referred to, and proximately caused injury and damages thereby to the plaintiff as herein alleged.

12. At all times herein mentioned the individual known as John J. Fults was authorized and empowered by Plaintiff TRI as required under California Business and Professions Code §§10159 and 10211 to act, and acted, as the agent of Plaintiff TRI, and each and all of the things herein alleged to have been done by him were done in the capacity of and acting as agent for Plaintiff TRI.

## FIRST CAUSE OF ACTION
### [Breach of Contract as Against Defendants
### RAYBERN FOODS, INC. and BERNARD J. VIGGIANO]

13. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 12, inclusive, of this Complaint, as though fully set forth herein.

14. On or about May 7, 2001, RAYBERN employed TRI by an agreement in writing to act on RAYBERN's behalf as its sole and exclusive representative with respect to the contemplated solicitation, negotiation and arrangement of a business opportunity in the form of a business sale, merger, royalty agreement or strategic alliance with a third-party business entity. A copy of that written agreement (hereinafter referred to as the "Engagement Agreement") is attached to this Complaint as Exhibit "A", and is hereby incorporated herein by reference.

5

COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

15.  Pursuant to the terms and conditions of the aforementioned Engagement Agreement, Defendant RAYBERN promised and agreed, among other things, to pay a broker's commission, a.k.a. a "Success Fee", to Plaintiff TRI corresponding to a specified percentage of future royalty payments or the value thereof received by Defendant RAYBERN as a result of RAYBERN's consummation of a transaction as contemplated under the Engagement Agreement.

16.  Upon information and belief, Plaintiff alleges that Defendant RAYBERN successfully consummated a third-party transaction as originally contemplated under the Engagement Agreement on or about August 20, 2001.  A copy of the written agreement memorializing the contemplated third-party transaction (hereinafter referred to as the "License Agreement") is attached to this Complaint as Exhibit "B", and incorporated herein by reference.

17.  Plaintiff TRI has performed all of the duties and conditions required of it pursuant to the terms of the Engagement Agreement with the exception of those duties and conditions which were prevented or excused by Defendant RAYBERN.

18.  Upon information and belief, upon consummation of the third-party licensing transaction contemplated under the Engagement Agreement Plaintiff became entitled to receive monthly payments of commission amounts equal to the percentage share of the "Transaction Value" received by Defendant RAYBERN as specified on Page Two of the Engagement Agreement.

6

19.  Defendants have failed and refused to make any payment whatsoever to TRI of any monthly commission amounts as specified under the Engagement Agreement.

20.  Plaintiff is presently ignorant of the total amount of royalty payments received by Raybern pursuant to the third-party License Agreement as of the date of filing of this Complaint.  However, Plaintiff is informed and believes, and on that basis alleges, that Defendant RAYBERN did receive a royalty advance in the form of a credit in the amount of $350,000.00 immediately upon its execution of the License Agreement.

21.  As a result, Defendant RAYBERN is now indebted to Plaintiff TRI in an amount according to proof which as yet remains uncertain as of the date of filing of this Complaint.  Said amount is owed for and on account of broker's commissions earned by Plaintiff TRI pursuant to the Engagement Agreement.

22.  Defendants have failed and refused to pay any commissions to Plaintiff TRI although TRI has repeatedly made demand for such payment.  As a proximate result of defendant's breach of the Engagement Agreement, Plaintiff TRI has suffered, and continues to suffer, losses in an amount according to proof equal to the commissions owed under the Engagement Agreement.

WHEREFORE, Plaintiff prays judgment as set forth below.

7

9

## SECOND CAUSE OF ACTION

### [Constructive Trust as Against Defendants
### RAYBERN, VIGGIANO and DOES 1 TO 10]

23.  Plaintiff hereby realleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 18, inclusive, of this Complaint.

24.  Upon information and belief, Defendants have received monetary consideration in the form of at least one significant royalty advance as well as additional royalty payments subsequently generated pursuant to the License Agreement.  Upon information and belief, Plaintiff alleges that it is entitled to receive payment of no less than 2% of the value of all royalty amounts generated under the License Agreement pursuant to the terms and conditions of the Engagement Agreement, in consideration of the professional services rendered by TRI in the negotiation and procurement of the License Agreement.

25.  By virtue of the Defendants' failure and refusal to tender payment to Plaintiff of commissions rightfully earned under the Engagement Agreement, Defendants now hold funds belonging to Plaintiff TRI as constructive trustees in an amount to be proven at trial.

WHEREFORE, Plaintiff prays judgment as set forth below.

8

COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

10

### THIRD CAUSE OF ACTION
**[Declaratory Relief As Against All Defendants]**

26. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 12, inclusive, of this Complaint, as though fully set forth herein.

27. An actual controversy has arisen and now exists between Plaintiff and Defendants in that Plaintiff contends that it is entitled to receive payment of a specified percentage share of royalty amounts received by Defendants as consideration for professional services rendered in the negotiation and procurement of the License Agreement. Plaintiff is further informed and believes, and thereon alleges, that Defendants dispute the amounts due to Plaintiff pursuant to the terms and conditions of the Engagement Agreement.

28. By reason of the foregoing, there exists a justiciable controversy between Plaintiff and Defendants. Plaintiff is therefore entitled to have this Honorable Court decide the respective rights, duties and obligations of the Plaintiff as well as the respective rights, duties and obligations of the Defendants, and each of them, with respect to Plaintiff's right to recover the full amount of the Plaintiff's broker's commission due pursuant to the Engagement Agreement.

29. Plaintiff desires a judicial determination of the respective rights and duties of Plaintiff and the Defendants with respect to the damages claimed by Plaintiff in

9

this Complaint.  In particular, Plaintiff desires a judicial determination and declaration with respect to the Defendants' liability for the current damages claimed herein, as well as a judicial determination and declaration of the Defendants' obligation for payment of any future commissions which are determined to be due and owing to Plaintiff pursuant to the terms and conditions of the Engagement Agreement.

30.  Such a declaration is necessary and appropriate at this time in order that Defendants may ascertain their present rights and duties with respect to Plaintiffs' claim for unpaid commission amounts.  Furthermore, a judicial determination of Plaintiff's claims with respect to any future royalty amounts received by Defendants pursuant to the License Agreement is necessary and appropriate in order to avoid the multiplicity of actions that would result if Plaintiff were to be required to maintain a single court action now with respect to Plaintiff's current claims for unpaid commission amounts, and then to bring one (or more) separate court actions against the Defendants with respect to any commission amounts which may become due and owing to Plaintiff in the future.

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

10

COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

## FIRST CAUSE OF ACTION AGAINST DEFENDANTS
### RAYBERN, VIGGIANO and DOES 1 TO 10:

1. For recovery of a broker's commission due in an amount according to proof at trial, but in any event no less than the sum of $50,000.00;

2. For interest on a broker's commission due in an amount according to proof at trial at the prevailing legal rate from August 20, 2001;

3. For reasonable attorneys' fees according to proof and as permitted by law;

4. For costs of suit incurred herein; and

5. For such other and further relief as the court may deem proper.

## SECOND CAUSE OF ACTION AGAINST DEFENDANTS
### RAYBERN, VIGGIANO and DOES 1 TO 10:

1. For an Order declaring that Defendants RAYBERN, VIGGIANO and DOES 1 through 20, inclusive, hold a certain dollar amount according to proof at trial corresponding to 2% of the value of all royalty advances and royalty payments received by or for the benefit of Defendants under the License Agreement in constructive trust for Plaintiff;

2. For an Order compelling Defendants RAYBERN, VIGGIANO and DOES 1 through 20 to convey to Plaintiff a dollar amount according to proof at trial which is

11

13

held in constructive trust for Plaintiff and corresponding to 2% of all royalty advances and royalty payments received by Defendants under the License Agreement;

3. For an Order compelling Defendants RAYBERN, VIGGIANO and DOES 1 through 20 to accept and hold in trust for Plaintiff as a constructive trustee 2% of any future royalty proceeds received by the Defendants pursuant to the License Agreement;

4. For an Order compelling Defendants RAYBERN, VIGGIANO and DOES 1 through 20 to timely convey to Plaintiff TRI the percentage share of any future royalty proceeds received by Defendants and held in constructive trust by Defendants on Plaintiff's behalf in accordance with the terms and conditions of the Engagement Agreement;

5. For reasonable attorneys' fees according to proof and as permitted by law;

6. For costs of suit incurred herein;

7. For such other and further relief as the court may deem proper.

## THIRD CAUSE OF ACTION AGAINST DEFENDANTS RAYBERN, VIGGIANO and DOES 1 TO 20:

1. For a judicial determination and declaration of the parties' respective rights, obligations and duties with respect to the present monetary damages claimed by Plaintiff in this Complaint;

12

COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

14

2.  For a judicial determination and declaration of the parties' respective rights, obligations and duties with respect to future royalty payments received by Defendants pursuant to the License Agreement;

3.  For an Order directing Defendants to accept, hold in trust and disburse to Plaintiff any future royalty payments received under the License Agreement in accordance with the parties' Engagement Agreement;

4.  For reasonable attorneys' fees according to proof as permitted by law;

5.  For costs of suit herein incurred; and

6.  For such other and further relief as the court may deem proper.

Dated: February 12, 2003

Respectfully submitted,

ALBERT E. CORDOVA,
A Professional Law Corporation

By _____
ALBERT E. CORDOVA
Attorney for Plaintiff

13

COMPLAINT FOR DAMAGES AND DECLARATORY
RELIEF

15

# Phase II Engagement Agreement

Mr. Bernard J. Viggiano
Raybern Foods, Incorporated
311 West A Street
Hayward, CA 94541

Dear Mr. Viggiano,

This will confirm that TRI Merger and Acquisition Division, a division of TRI Commercial Real Estate Services, Inc., a California corporation (TRI) is hereby authorized to act as the sole and exclusive representative of Raybern Foods, Incorporated, its owners, shareholders and affiliates (collectively, Client) in seeking to arrange and negotiate the possible sale, merger, royalty agreement or strategic alliance with the identified prospect Irwin Miller or any of his affiliated companies (RBR Meatpackers, Inc., Riteway, Inc., Rose & Shore, Inc.) (collectively, Transaction). If Client chooses to expand the scope of TRI's services to other prospects or arrangements, Client and TRI will execute a separate agreement concerning those services.

Client shall have the sole and absolute right to accept or reject any offer received and fees shall be payable by Client to TRI only if Transaction is consummated.

The term of this agreement is for a period of twelve months from the date of your acceptance hereof. The Client may at any time accelerate the expiration of this agreement by giving TRI ninety days written notice via certified mail.

TRI shall employ appropriate resources to furnish materials describing Client's business to prospects, based on information supplied by Client, and to introduce such prospects to Client. TRI further agrees to participate in negotiations, assist during the diligence process and do all else that is reasonably necessary and within its capabilities to assist Client in attempting to effect said Transaction.

TRI makes no representation, expressed or implied, that it will effect a Transaction, as a result of services furnished under this agreement.  The duties of TRI shall not include legal or accounting services which shall be procured by the Client at its own expense.

For TRI's services in connection with the Transaction, Client agrees to pay TRI a Success Fee according to the schedule below. This Success Fee is fully earned by TRI if the Transaction contemplated above is consummated within fourteen months from the signing of this agreement. Client agrees to pay the Success Fee to TRI within thirty days of the times funds are received by Client by reason of the Transaction.

This agreement shall be interpreted under and governed by the laws of the State of California, and jurisdiction over any dispute shall be exclusively in the County of Alameda, California.

The Client recognizes and confirms that in representing Client's interest in effecting the above Transaction, TRI will be using and relying on information and data furnished by the Client and that TRI does not assume responsibility for the accuracy or completeness of the information. TRI will not undertake to independently verify the information.

The Client represents that all information to be furnished in conjunction with the proposed Transaction is true and complete in all material respects and contains no material omissions.

16

TRI and the Client agree that all information furnished by either party to the other, including information supplied by accountants, attorneys, agents and employees, shall be treated with complete confidentiality and not be discussed with third parties except as agreed and authorized by the other party in advance or as may be required by law.

Following consummation of the Transaction, TRI may only advertise its role in effecting the Transaction with the prior written consent of Client, and Client's approval of the content of such advertising.

The person(s) signing below on behalf of the Client represent(s) and warrant(s) that they have the authority to enter into this agreement on behalf of the Client.

SUCCESS FEE SCHEDULE:
   The Success Fee is to be paid in two separate periods. Period A is defined as the seven-year base period and begins immediately subsequent to the consummation of the Transaction. Period B is defined as the period beginning immediately subsequent to the completion of Period A.

SUCCESS FEE SCHEDULE PERIOD A:
   2% of the Transaction Value plus
   8% of the Transaction Value attributable to that portion of royalties realized at a rate above 20 cents per pound.

SUCCESS FEE SCHEDULE PERIOD B:
   1% of the Transaction Value

   The Success Fee in Period B shall expire when the Success Fees paid by client in Period B reach $150,000

Transaction Value is defined as the royalty received by Client under the Transaction, which royalty will be based on tonnage.

Notwithstanding the foregoing, if the consummated Transaction does not provide for more than $0.20 per pound for the first seven years, then TRI's total Success Fee shall be $50,000.00, and the above schedules shall not apply. In this case, the Success Fee shall be payable in equal monthly installments over one year or such longer period, as needed, if revenues received under the Transaction are insufficient to make the monthly payments in full.

ACCEPTED AND AGREED:

Rayhern Foods, Incorporated          TRI MERGER AND ACQUISITION DIVISION

By: _____       By: _____
   Authorized Representative              Authorized Representative

Page 2 of 3

Date: 5/4/01 _____     Date: _____ S-7-01

18

19

# AGREEMENT FOR LICENSING AND ACQUISITION OF PROPRIETARY RIGHTS, INTERESTS AND PROPERTY

**THIS AGREEMENT** is made as of August 20, 2001 ("Effective Date"), by and between RAYBERN FOODS, INC., a California corporation (hereinafter referred to as "Licensor" or "Raybern") and ROSE & SHORE, INC., a California corporation ("Licensee").

## RECITALS

1. <u>Licensee</u>. Licensee is engaged in business as a wholesale meat processor. Licensee's principal processing plant is located at 5151 Alcoa Avenue, Vernon, California 90058 ("Facility").

2. <u>Licensor</u>. Licensor is engaged in business as a wholesale meat processor, and is the exclusive owner of certain proprietary formulas and recipes (hereinafter, the "Recipes") and processes (hereinafter, the "Processes") which are used by Licensor in the processing and sale of pastrami, roast beef and humus (hereinafter, the "Products") to the chain of fast food restaurant franchises commonly known or referred to as "Togo's Eateries" or "Togo's Famous Sandwiches" (hereinafter, "Togo's"). Licensor has spent years developing its relationship with Togo's and the protection of that relationship and the consistency of quality of both Products and service is of the utmost concern to Licensor. One of the principal reasons for Licensor's successful business relationship with Togo's has been its exemplary and prompt customer service; it is of paramount importance to Licensor that such customer service be maintained at a high level.

3. <u>Exclusive Provider of the Togo's Products</u>. Licensor represents and warrants to Licensee that Licensor is, as of the Effective Date and shall be as of the Closing, the major if not exclusive provider of the Products to Togo's.

4. <u>Licensee's Facilities; Know-How</u>. Licensee possesses certain processing and technical facilities and know-how, and in reliance on the representations and warranties of Licensor and mutual promises and covenants set forth in this Agreement, intends to invest substantial capital to acquire and install additional equipment required to process the Products for sale.

5.  <u>License and Acquisition of Rights, Processes and Recipes</u>.  Licensee desires to license from Licensor the exclusive right to use the Processes and Recipes to process and sell the Products to Togo's anywhere in the world based on Product orders placed and/or arranged by Licensor with Licensee (the "Rights")..  Licensee further desires to acquire any and all interests that Licensor may have to the proprietary Processes and Recipes used by Licensor in making the Products, but subject to the terms and conditions of this Agreement.  In reliance on Licensee's know-how, the Facility, Licensee's personnel and on the representations and warranties of Licensee and the mutual promises and covenants it has made as are set forth in this Agreement, Licensor desires to license the Rights and to sell whatever interest it may have in the Recipes and Processes to Licensee, on the terms and conditions of this Agreement.

6.  <u>Responsibilities</u>.  The parties are to have the following responsibilities upon Closing:
    (A.)  Licensor shall market the Products.
    (B.)  Licensee shall process and package the Products and sell and arrange freight and delivery for the Products to Togo's and its distributors based on orders therefor placed by Licensor with Licensee.

**NOW THEREFORE**, in consideration of the mutual promises and covenants made herein, the parties agree as follows:

## ARTICLE I
## GRANT OF LICENSE AND LIMITATIONS THEREON

SECTION 1.01. <u>GRANT OF LICENSE OF PROCESSES AND RIGHTS</u>. As of the Closing Date (as set forth in Section 2.01 herein), Licensor shall license the Rights to Licensee on a nontransferable and exclusive basis, subject to and in consideration for all of the terms and conditions of this Agreement.

SECTION 1.02. <u>TITLE TO RECIPES RESERVED TO LICENSOR - 1ST 7 YEARS</u>. Licensee acknowledges and agrees that Licensor is and shall remain the owner of the Recipes and Processes for at least the first seven (7) years following the Closing Date of this Agreement.

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property        INITIALS: Licensor _____  Licensee _____

2

Further, in order to obtain a long-term supply agreement with Togo's, Licensee acknowledges and agrees that during the first seven (7) years of this Agreement, Licensor may have to convey or contract to convey some or all of its interests in the Recipes and Processes to Togo's as consideration for such long-term supply agreement ("Togo's Transfer Contingency").

SECTION 1.03. TRANSFER OF TITLE TO RECIPES, PROCESSES AND RIGHTS. At the commencement of the eighth (8th) year following the Closing Date of this Agreement ("Transfer Date"), the Recipes and the Processes shall be transferred from Licensor to Licensee free and clear of all liens, encumbrances and other restrictions, if and only if this Agreement has not been (i) terminated as herein provided, and only if (ii) Licensor has not previously conveyed or contracted to convey the Recipes and Processes to Togo's, or its successors and assigns, and only if (iii) Licensee is not then in default under or in breach of this Agreement, unless such default or breach is timely cured as herein provided (at which time such transfer shall occur). These three (3) occurrences are the only conditions to the transfer of the Recipes and Processes by Licensor to Licensee on the Transfer Date. When and if such title transfer does occur, Licensor will provide to Licensee all records, data, procedures, instructions, and specifications for the Recipes as are necessary for Licensee's ownership and use of the Recipes and Processes.

## ARTICLE II
## CONDITIONS AND THE CLOSING

SECTION 2.01. CONDITIONS TO CLOSING. The license to be issued by Licensor to Licensee is specifically conditioned on the satisfaction of all due diligence by both parties on or before September 7, 2001 (the "Closing Date" or the "Closing"). Each party may conduct whatever due diligence investigation they deem reasonably necessary to close the transaction contemplated by this Agreement, and each shall fully cooperate with the other to allow such due diligence investigation to be completed timely. The Due Diligence Statements referenced in Sections 2.03(b) and 2.04(a) must be executed and delivered by each party on or before the Closing Date, or this Agreement shall terminate.

    (a)    **Minimum Due Diligence Documents for Licensor.** Licensee shall, as of

the Effective Date, deliver to Licensor the following minimum documents and such other data documents and information that Licensor may reasonably request prior to the Closing:

      (i)    Financial Statements of Licensee and Rite-Way Meat Packers, Inc. and RBR Meat Company, Inc. for 1998 and the reviewed financial statements of Licensee and Rite-Way Meat Packers, Inc. and RBR Meat Company, Inc. for 1999, 2000 and 2001 year-to-date, specifically including a cash flow statement;

      (ii)    Tax returns of Licensee and Rite-Way Meat Packers, Inc. and RBR Meat Company, Inc. for 1998, 1999 and 2000;

      (iii)    A list of Licensee's Shareholders and those of and Rite-Way Meat Packers, Inc. and RBR Meat Company, Inc. indicating the number of Shares held by each Shareholder, or in lieu thereof, a certification under penalty of perjury that Irwin Miller owns the controlling interest of Licensee;

      (iv)    A list of all officers and directors of Licensee and Rite-Way Meat Packers, Inc. and RBR Meat Company, Inc.;

      (v)    The Corporate Identification Number of Licensee and Rite-Way Meat Packers, Inc. and RBR Meat Company, Inc.; and

      (vi)    A copy of the Articles of Incorporation and any Amendments thereto of Licensee and Rite-Way Meat Packers, Inc. and RBR Meat Company, Inc..

    (b)    **Minimum Due Diligence Documents for Licensee.**  Licensor shall, as of the Effective Date, deliver to Licensee the following minimum documents and such other data documents and information that Licensee may reasonably request prior to the Closing:

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property    INITIALS: Licensor _____ Licensee _____

4

      (i)     Sales records of Products for 1998, 1999, 2000 and 2001 year-to-date;

      (ii)     The pricing mechanisms or pricing formula for the Products, if any;

      (iii)     Licensor's sales and production data for the past two (2) years including Product yields.

    (c)   **Confidentiality**. All due diligence information exchanged hereunder shall be held in the strictest confidence by each party and shall not be disseminated in any manner without the express written consent of the party whose information is to be shared or disclosed. Notwithstanding the foregoing, each party may share such due diligence information with their respective attorneys, CPAs and financial and production consultants if reasonably necessary to complete due diligence hereunder; in such event, the receiving party shall be responsible for the maintenance of such confidences by each such advisor.

SECTION 2.02. THE CLOSING. The Closing will take place at the Law Offices of Robert L. Young, Two Walnut Creek Center, 200 Pringle Blvd., Suite 340, Walnut Creek, CA 94596, at 10 a.m. on September 7, 2001, or at such other time and place as Licensor and Licensee may agree in writing.

SECTION 2.03 LICENSOR'S OBLIGATIONS AT CLOSING. At the Closing Licensor shall deliver or cause to be delivered to Licensee:

    (a)    an executed Grant of License, granting the License of the Rights as herein specified. The form of the Grant of License shall be as is set forth in Exhibit "B", attached hereto and incorporated herein by this reference.

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property      INITIALS: Licensor _____ Licensee _____

(b)    a written statement that all due Diligence desired to be completed by Licensor has been completed or waived ("Licensor's Due Diligence Statement").

(c)    certified resolutions of Licensor's Board of Directors in form satisfactory to counsel for Licensee, authorizing the execution and performance of this Agreement and all actions to be taken by Licensor under this Agreement.

(d)    an original of the Manufacturing Agreement executed by Licensor as identified in Section 8.02(h).

SECTION 2.04 LICENSEE'S OBLIGATIONS AT CLOSING. At the Closing Licensee shall deliver or cause to be delivered to Licensor:

(a)    a written statement that all due diligence desired to be completed by Licensee has been completed or waived ("Licensee's Due Diligence Statement").

(b)    certified resolutions of Licensee's Board of Directors in form satisfactory to counsel for Licensor, authorizing the execution and performance of this Agreement and all actions to be taken by Licensee under this Agreement.

(c)    a good faith estimate of how long it will take Licensee to install all equipment necessary to perform its obligations hereunder, which is acceptable to Licensor.

(d)    an original of the Manufacturing Agreement executed by Licensee as identified in Section 8.02(h).

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property

INITIALS: Licensor _____ Licensee ____

6

## ARTICLE III
## OPERATIONAL OBLIGATIONS OF THE PARTIES

SECTION 3.01. LICENSOR'S RESPONSIBILITIES AND OBLIGATIONS. As of the Closing Date, Licensor shall license the Rights to Licensee and shall have the following additional responsibilities and obligations and/or provide the following enumerated items to Licensee on an exclusive basis subject to all the terms and conditions of this Agreement:

(a)    The Rights. The Rights shall be licensed free and clear of all liens, encumbrances and other restrictions, subject to the termination provisions of Article VIII herein.

(b)    Licenses, Permits and Authorizations. All licenses, permits, approvals, authorizations, consents and the like which are required for or relating in any respect to the processing, sale and distribution of the Products, and that are issued to Licensor by any governmental authority; and

(c)    Records and Procedures. Any and all records, data, procedures, systems, computer programs, computer data, models, instructions, production data, drawings, blueprints, plans, designs, specifications and software reasonably necessary to be used in connection with the making, processing and distribution of the Products.

(d)    "Spice Mix". For the first seven years of this Agreement and so long as title to the Recipes is reserved to Licensor, Licensor will make available to Licensee, at cost, and in sufficient quantity to insure the timely processing of all orders, the proprietary blend of spices required to be used in the processing of the Products (the "Spice Mix"). Licensor further agrees to maintain, or cause to be maintained, a sufficient quantity of the Spice Mix on hand to assure that Licensee can fill anticipated or actual orders expeditiously at all times during the course of this Agreement. Licensor has informed Licensee that the Spice Mix will be prepared by a national company under contract to Licensor and

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property          INITIALS: Licensor _____ Licensee _____

7

through whom Licensee will purchase the Spice Mix.

(e) Additional Assistance. In addition to any assistance which Licensor may have heretofore rendered to Licensee relating to the Rights, the Processes and Products, Licensor agrees that it will perform the following continuing services for the benefit of Licensee throughout the term of this Agreement:

(1) Instruction and Training. Licensor will instruct Licensee in all aspects of the processing of the Products by providing such instruction and training as Licensee may reasonably require.

(2) Continuing Promotion of Product. Licensor agrees to continue to use its best efforts to actively promote the distribution, sale, and use of the Products to Togo's. As used herein, "best efforts" means efforts at least equivalent to those expended by Licensor in the marketing and promotion of the Products to Togo's prior to the Closing Date of this Agreement. Licensee acknowledges that Licensor shall, after the Closing, continue to determine what activities it will take day in and day out in satisfying such obligations.

(3) Licensee Participation. While responsible for all marketing of the Products, Licensor shall permit Licensee to actively participate in all promotions and marketing of the Products and in any meetings, discussions or negotiations with representatives of Togo's. During the first seven (7) years of this Agreement Licensor shall make all decisions relating to the marketing of the Products to Togo's and any supply agreements therewith exercising sound business judgment; thereafter, such decisions shall be by mutual agreement between Licensor and Licensee. Notwithstanding the fact that Licensee is already a party to the Restrictive Agreement with Licensor as defined in 3.02(i) herein, both parties and each of their employees and agents so specified, from time-to-time, shall sign any further reasonably required Non-Disclosure and Confidentiality Agreement as required by the other party that specifically relates to such meetings, discussions,

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property        INITIALS: Licensor _____  Licensee _____ :

8.

negotiations and decisions. Licensee shall not hinder or interfere with Licensor's discharge of its marketing obligations hereunder, nor its ownership of the Rights, Recipes and Process.

**3.02. LICENSEE'S RESPONSIBILITIES AND OBLIGATIONS.**

As of the Closing Date, Licensee shall have the following responsibilities and obligations:

(a) Provide raw materials, labor and facilities. Licensee shall receive and fill orders for the Products, bill for and receive payment for the Products, and provide all raw materials (other than the Spice Mix), labor, supervision and production necessary to process all orders for the Products.

(b) Adherence to Production Standards. Licensee shall receive, process and fill orders for the Products in adherence to certain "Production Standards". As used herein, "Production Standards" are defined as:

(1) all applicable rules, regulations, and procedures promulgated by the United States Department of Agriculture or any other governmental body which has regulatory authority over Licensee, which are applicable to the Products and production thereof;

(2) all applicable internal policies and procedures established by Licensee governing its own production standards and procedures for the Products including adherence to its Hazard Analysis and Critical Control Point plan, its established Good Manufacturing Practices, its Standard Sanitation and Operating Procedures and such other quality control procedures that it may establish from time-to-time;

(3) all written production procedures for the Products established by mutual agreement of the parties from time-to-time; and

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property     INITIALS: Licensor _____ Licensee _____

9

(4) all quality control standards established by Raybern and/or Togo's from time-to-time with respect to the Products.

(c) <u>Timely Filling of Orders</u>. Licensee shall timely meet all production and shipping schedules for orders of the Product subject, however, to delays caused by:

(1) Product orders placed with Licensee without adequate lead time, such lead time to be established by mutual agreement of the parties from time-to-time, but Licensee shall make all reasonable attempts to satisfy said orders;

(2) Governmental orders or requirements, transportation conditions, labor or material shortages, strikes, riots, fires, as well as any other cause beyond Licensee's reasonable control; Licensor shall take all reasonable good faith efforts to deal with any such causes, including seeking alternative sources and facilities to immediately meet such delayed orders. In the event that Licensee fails to meet such obligation, Licensor shall have the right to do so for Licensee for the period of the delay in an effort to timely service Togo's and avoid loss of the Togo's account; and

(3) Licensor's failure to deliver an adequate amount of Spice Mix or any other delay caused by Licensor.

In all cases, Licensee shall use its best efforts to advise Licensor and Togo's distributors in advance of any inability to make full and timely delivery of the Products.

(d) <u>Use of Recipes</u>. All Products subject to this Agreement will be processed and packaged pursuant to only those recipes and ingredients and packaging materials specified by Licensor from time to time. Licensee will not allow these Products to be sold to anyone other than Togo's.

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property        INITIALS: Licensor _____ Licensee ⟨initials⟩

10

(e)   <u>Reasonable Access</u>.  In order to satisfy Licensor's obligations hereunder, and to satisfy Licensor that the Production Standards herein defined are being followed, Licensee shall provide Licensor with reasonable access during Licensee's normal working hours to Licensee's production facilities, including records, data, files and the like that involve or relate to production of the Products and the fulfillment of all Togo's orders, as Licensor shall determine, in its sole discretion, specifically including, but not limited to all quality control records and data.  Licensor shall provide Licensee with forty-eight (48) hours notice if Licensor wishes to have access to specific business records of Licensee that relate to the Products.  Licensee shall permit Licensor to maintain as many individuals on or at Licensee's facilities during business hours and at Licensor's sole cost and expense, as Licensor shall determine is necessary, in its sole discretion, to monitor and assure compliance with the Production Standards for the Products as herein defined ["Monitor(s)"].  Licensor may remove its Monitor(s) for a period of time, and then reinstate such person(s).  Licensor's representative(s) may be on the premises of the Facility everyday or no days.  In discharging Licensor's obligations pursuant to this Agreement, its President, Bernie Viggiano, and any Monitor Raybern hires, shall spend as little time or as much time in doing so as it shall solely determine.  In exercising its rights under this provision, Licensor shall not interfere in Licensee's operation of the Facility.  Because the Facility will be processing products of third parties, all Monitor(s) and Bernie Viggiano shall execute a Non-Disclosure and Confidentiality Agreement in such reasonable form and content as Licensee may require.

(f) <u>Work Space</u>.  Licensee shall provide a desk, telephone and computer work area for Licensee's Monitor(s) as provided in Section 3.02(e).

(g) <u>Recommendation</u>.  Licensee shall follow the recommendations of Licensor made from time to time as to the production of the Products.

(h) <u>Customer Service Representative</u>.  Licensee shall appoint a customer service person inside Licensee's organization to be responsible for and provide prompt customer

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property        INITIALS: Licensor _____ Licensee _dm_

11

service to all Togo's orders and to timely respond to emergencies or any special request of Togo's. Licensor shall train such person.

(i) Nonsolicitation. Licensee shall not solicit Togo's, its parent, subsidiaries, affiliates or key management personnel, nor contact, solicit, divert, or do business with the employees or customers of Licensor, all as provided in Section 6.04(d) and in the Mutual Non-Disclosure and Confidentiality Agreement entered into by and between the parties as of February 25, 2001 ("Restrictive Agreement"). The terms of the Restrictive Agreement are hereby extended to a date seven (7) years after the Closing Date or for as long as Licensor is due Royalty payments hereunder, whichever period is longer.

(j) Noninterference. Licensee shall at all times honor the relationship and any contractual agreements between Licensor and Licensee and do nothing to disturb such relationship and contracts. Further, Licensee shall only ship orders of Products through Togo's approved distributors of Products.

SECTION 3.03  BILLING PROCEDURE.  Commencing as of the Closing, Raybern shall bill for all Products sold by Licensor or Licensee and remit Licensee's share of all paid invoices therefore to Licensee within five (5) business days of receipt thereof until the earlier of such time as there are at least twenty thousand pounds (20,000 lbs.) of Product being produced and sold by Licensee per week for a fourteen (14) day continuous period or the date when all or substantially all of the Products are being manufactured by Licensee at the Facility, which in no event shall be later than six (6) months beyond the Closing Date (either such event is defined herein as the "Substantial Production Date").  After the Substantial Production Date, Licensee shall bill Togo's distributors direct under Licensee's name and remit Licensor's Royalties as herein provided.

## ARTICLE IV
## ROYALTY PAYMENTS

SECTION 4.01.  ROYALTY PAYMENTS.  In consideration for the License granted under this

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property        INITIALS: Licensor _____ Licensee _____

12

Agreement, and the subsequent transfer and acquisition by Licensee, of the Recipes and the Processes, subject, however, to Section 1.03 of this Agreement, Licensee shall pay to Licensor a royalty fee based upon a percentage of the "net margin" earned for the Products processed and sold by Licensee (net of returns and allowances) pursuant to the terms of this Agreement ("Royalty Fee"). While the Royalty Fee will be earned as otherwise provided herein, the first seven (7) year period applicable to computing such the Royalty Fee shall be extended by the length of time during which the the Royalty Fee is earned by Licensor prior to the Substantial Production Date. The Royalty Fee shall be calculated by multiplying the "Net Margin" earned on each Product sale by the percentages set forth below:

| PERCENTAGE OF NET MARGIN PAYABLE AS ROYALTY FEE | APPLICABLE PERIOD |
|---|---|
| 35.0% | Year 1 of this Agreement through year 7 of this Agreement |
| 17.5% | Year 8 of this Agreement through year 10 of this Agreement |
| 9.5% | Year 11 of this Agreement through the termination of this Agreement |

The Royalty Fee shall be paid by Licensee to Licensor as follows: On the 1st and 16th of each calendar month during the term hereof ("Royalty Determination Date"), Licensee shall calculate the Royalty Fee due hereunder based on the payments received by Licensee since the last Determination Date for Products sold to Togo's suppliers and shall remit payment thereof to Licensor within five (5) business days of such Royalty Determination Date. Each payment of the Royalty Fee shall be accompanied by copies of the customer invoice, any back up for deductions and the customer check. If the term hereof ends on a date ("Date of Termination") other than a Royalty Determination Date, Licensee shall calculate the Royalty Fee due Licensor as herein provided as of the Date of Termination and remit the same to Licensor within five (5) business days of such Date of Termination.

SECTION 4.02. "NET MARGIN" DEFINED. As used herein, the term "Net Margin" on

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property          INITIALS: Licensor _____ Licensee _____

13

each Product sale shall be determined by subtracting the cost of the Product ("Product Cost") from the net sales price paid on each Product sale. The Product Cost shall be determined by using the costing formulas for each Product, which are attached to this Agreement as **Exhibit "A"** and incorporated herein by this reference. The net sales price paid is the actual payment made by the customer for each invoice (less all deductions).

SECTION 4.03. **Product Cost; Adjustments.** The costing formulas for each Product set forth in **Exhibit "A"** consist of the raw material cost of the Product, the average product yield for the Product, all direct costs allocated to the Product (seasoning, packaging, other manufacturing and direct labor) and an estimate of the overall freight costs to ship all Product sold hereunder. The initial Product Cost for each Product shall be reviewed quarterly during the term of this Agreement and Product Cost adjustments shall be made for the subsequent three (3) month period based upon changes in the average raw material cost, average product yield, seasoning costs, packaging costs, other manufacturing costs, direct labor and average freight costs for the Product using the look back periods specified below:

| Review Date | Look Back Period | Effective Dates for Product Cost Changes |
|---|---|---|
| December 1 | September 1 – November 30 | January 1 to March 31 |
| March 1 | December 1 - February 28 | April 1 to June 30 |
| June 1 | March 1 - - May 31 | July 1 to September 30 |
| September 1 | June 1 – August 31 | October 1 to December 31 |

All quarterly Product Cost changes resulting from changes in the average raw material cost for the Product during the look back period shall be automatically calculated using the cost index specified for such Product in **Exhibit "A"**. All other Product Cost changes shall be subject to the mutual agreement of the parties and shall reflect actual changes in product yield, the cost of spices, packaging, freight and other direct expenses and any changes in production procedures or labor rates. In the event that a cost index used by the parties is no longer available or does not accurately reflect the cost paid for such raw materials, the parties can mutually agree to substitute a new index or a new formula based upon the existing index.

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property          INITIALS: Licensor_____ Licensee_____

14

SECTION 4.04. <u>ADVANCE AGAINST ROYALTIES</u>. The parties acknowledge that Licensor presently owes RBR Meat Company, Inc. ("RBR") and Rite-Way Meat Packers, Inc. ("Rite-Way"), affiliates of Licensee, a sum in excess of Three Hundred Fifty Thousand Dollars ($350,000). Once Togo's has approved all of the production of the Products at Licensee's Facility, in writing, if reasonably possible for Licensor to quickly obtain, and as a prepayment of the Royalty Payments to be due hereunder, RBR and Rite-Way will credit Licensor with the sum of Three Hundred Fifty Thousand Dollars ($350,000) against all sums due by Licensor to RBR and Rite-Way (the "Royalty Advance"). The Royalty Advance will be offset against first Royalties due and owing to Licensor by Licensee under this Agreement. All sums due from Licensor in excess of such Royalty Advance shall remain due and payable from Licensor to RBR and Rite-Way in the ordinary course of business.

Further, Licensee may also credit against any Royalties due Licensor hereunder the amount of any sums due Licensee by Licensor under the Manufacturing Agreement (executed by the parties as of August 20, 2001), which are not timely paid pursuant to such Manufacturing Agreement.

SECTION 4.05. <u>LIMITATIONS OF ROYALTY ADVANCE</u>. If, for any reason, including, but not limited to, termination of this Agreement as provided herein, or Togo's election to terminate its purchases of the Product from Licensee for a period exceeding thirty (30) days ("Non-Order Period"), and before the Royalty Advance is fully exhausted, any unused portion of the Royalty Advance balance remaining will be paid by Licensor to Licensee within ten (10) business days of the expiration of the Non-Order Period. This obligation, if remaining unsatisfied at the time of termination, shall remain independent of and survive the termination of this Agreement. If after the Non-Order Period has expired, Raybern has remitted to Licensee the Royalty Advance balance, and Togo's then resumes ordering the Products, Licensee shall reimburse Licensor for such Royalty Advance balance previously paid by Licensor to Licensee within forty (40) days of Togo's resumption of orders.

SECTION 4.06. <u>AUDIT RIGHTS</u>. Licensor reserves the right to audit (through its certified

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property        INITIALS: Licensor _____ Licensee _____

15

public accountants or its own employees or consultants) all of Licensee's books and records that relate to or affect the sale and shipment of the Products from time to time. Licensee shall fully cooperate with all such audit efforts. If any such audit reveals an error for the period audited ("Audit Period"), which caused an underpayment to Licensor of the Royalty Fee due for the Audit Period in excess of ten percent (10%), Licensee shall pay for the cost of such audit, otherwise Licensor shall pay and be responsible for its audit costs.

## ARTICLE V
## CONFIDENTIALITY AND NON-DISCLOSURE

SECTION 5.01. PROTECTION OF RECIPES, RIGHTS AND PROCESSES. Licensee and Licensor acknowledge that the Recipes, the Rights, and the Processes are confidential in nature and constitute trade secrets of Licensor in which the parties each maintain protectible interests. Subject to the provisions of Section 1.03 herein and the rights of Licensor under the Togo's Transfer Contingency, the parties, and each of them, agree not to sell, license, distribute, transfer, or, directly or indirectly, disclose or permit the sale, licensing, distribution, transfer, or disclosure of the Recipes or its contents, the Rights and the Processes to any other party either during the term of this Agreement or thereafter. For the purposes of this Agreement, all such information is to be considered Confidential Information.

SECTION 5.02. OTHER "CONFIDENTIAL INFORMATION". For the purposes of this Agreement, other "Confidential Information" which shall be subject to the non-disclosure provisions of this Article shall mean any information disclosed by one party to the other on an exclusive and confidential basis that relates to the Products and the Facility, including, but not limited to plans, designs, costs, prices, pricing schedules, pricing formulas, suppliers, finances, marketing plans, business opportunities, research, development, know-how, or personnel, or any other information related to, arising out of, or incidentally disclosed as a necessary consequence of entering into or the performance of this Agreement.

SECTION 5.03. LIMITATION ON CONFIDENTIAL INFORMATION. Confidential Information shall not include information that (a) is now or subsequently becomes generally available to the

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property          INITIALS: Licensor _____ Licensee

16

public through no fault or breach on the part of any party hereto; (b) is independently developed by either party without the use of any Confidential Information; or (c) such information is rightfully obtained from a third party who has the right to transfer or disclose that information.

SECTION 5.04. ADDITIONAL REQUIREMENTS RE NONDISCLOSURE. Neither party shall, without the written approval of the other party in each instance, or unless otherwise expressly permitted in this Agreement, use for its own benefit, publish or otherwise disclose to others, or permit the use by others for their benefit or to the detriment of a party, any Confidential Information. Notwithstanding the foregoing, a party may disclose Confidential Information if required by any judicial or governmental request, requirement or order; provided that the party take reasonable steps to give the other party sufficient prior notice of that request and for that party to contest that request, requirement or order.

SECTION 5.05. INJUNCTIVE RELIEF. The parties, and each of them, understand and acknowledge that any party's disclosure or misappropriation of any of the Confidential Information in violation of this Agreement may cause the other party irreparable harm, the amount of which may be difficult to ascertain and, therefore, agree that the aggrieved party shall have the right to apply to a court of competent jurisdiction for an order restraining any further disclosure or misappropriation, and for such other relief as that party shall deem appropriate. This right shall be in addition to the remedies otherwise available to an aggrieved party, at law or in equity.

ARTICLE VI
INDEMNITIES

SECTION 6.01. INDEMNIFICATION BY LICENSOR. Except as is expressly set forth in this Agreement, Licensee will not assume any liabilities or obligations of Licensor. Following the Closing Date, Licensor will indemnify and hold Licensee harmless from and against any and all of Licensor's liabilities and obligations pertaining to the ownership and use of the Rights, the Processes, the Recipes and the sale and distribution of the Products prior to the commencement of manufacture of the Products by Licensee, and including any sale or distribution of any

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property          INITIALS: Licensor _____ Licensee _____

17

Products manufactured or sold by Licensor subsequent to the commencement of the manufacture of Products by Licensee. Licensor shall continue to indemnify Licensee as to the Rights, the Processes and the Recipes after the Closing Date against the claims of third parties as to Licensee's interest in the Rights, Processes and Recipes, subject, however, to the provisions of Section 1.03 and the Togo's Transfer Contingency.

SECTION 6.02. INDEMNIFICATION BY LICENSEE. Licensor is not assuming any liability or obligation of Licensee. Following the Closing Date, Licensee will indemnify and hold Licensor harmless from and against any and all of Licensee's liabilities and obligations which pertain to Licensee's processing, sale and distribution of the Products and Licensee's use and future ownership of the Recipes, Processes and Rights which future ownership is specifically subject to the conditions of Section 1.03 of this Agreement.

SECTION 6.03. MUTUAL INDEMNIFICATION. The Parties, and each of them, hereby indemnify and hold each other harmless from and against all claims for broker's or finder's fees which each indemnifying Party has hired or may have hired with respect to their business arrangement or the matters set forth in this Agreement.

## ARTICLE VII
## WARRANTIES AND REPRESENTATIONS

SECTION 7.01. WARRANTY OF TITLE. Licensor warrants that it has good title to the Recipes, the Processes and the Rights, and has the right to license their use to Licensee free of any proprietary rights of any other party or any other encumbrance whatever.

SECTION 7.02. WARRANTY OF TITLE REMEDIES. Licensee shall notify Licensor of the assertion of any claim that the Rights, the Recipes, the Processes, or Licensee's use or acquisition thereof under this Agreement (subject to the conditions of Section 1.03) violates the trade secret, trademark, copyright, patent, or other proprietary right of any other party ("Claims"); and shall cooperate with Licensor in the investigation and resolution of any such Claim. Licensor shall defend Licensee against any and all such Claims. Licensor shall indemnify and hold Licensee

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property        INITIALS: Licensor _____ Licensee _____

18

harmless from any liability for damage, costs, or other loss incurred by Licensee in connection with any such Claim, including, but not limited to, lost profits, lost savings, or other incidental or consequential damages arising out of or related to any such Claim unless caused by Licensee. This indemnity is subject to Licensor's rights under the Togo's Transfer Contingency.

SECTION 7.03. ADDITIONAL WARRANTIES OF LICENSOR. Licensor further represents and warrants:

(a) Exclusive Provider of Products to Togo's. That Licensor is, as of the Effective Date and the Closing Date to the best of its knowledge, the sole and exclusive provider of the Products to Togo's.

(b) Provision of Spice Mix. That the Spice Mix for the processing of the Products will be made available to Licensee by Licensor, at cost, in sufficient quantities to allow Licensee to timely fulfill all orders for the Products.

(c) Duly Organized and Existing Corporation. That Licensor is a Corporation duly organized and existing under the laws of the State of California, has all the requisite corporate powers to carry on its business as conducted and as proposed to be conducted, and has power to enter this Agreement and to perform all acts contemplated by this Agreement.

(d) Litigation. There is no litigation, action, or proceeding pending or, to the knowledge of Licensor, threatened against the Licensor before any court or administrative agency which might result in any material adverse change in the business or condition of the Licensor or substantially affect its ability to enter into and perform this Agreement.

(e) No Other Restrictions. Licensor is not a party to any contract or agreement or subject to any charges or other restriction that will materially and adversely affect its ownership of the Recipes and Processes and the license or Rights or its business, property, assets, or financial condition. Neither the execution nor delivery of this

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property          INITIALS: Licensor _____  Licensee _____

19

Agreement, nor the performance of and compliance with the terms, provisions, and conditions of hereof will conflict with, or result in a breach of, any of the terms, provisions, or conditions of any charter, bylaw, mortgage, indenture, lease, instrument, franchise, permit, judgment, decree, order, statute, rule, regulation, or lawfully enforceable contract or agreement applicable to Licensor.

(f) <u>Taxes</u>. All tax returns and reports of Licensor required by law to be filed have been duly filed, and all taxes, assessments, fees and other governmental charges on the Licensor or any of its properties, assets, income, or franchises that are due and payable have been paid.

(g) <u>Consents Obtained</u>. All consents, approvals, and authorizations of, or registrations, declarations, or filings with, any governmental or public body or authority, and of all third parties, including, but not limited to, Togo's, which are required in connection with the valid execution, delivery, and performance of this Agreement, or in connection with any of the transactions incident to the licensing of the Rights, the Processes and the Recipes, and the sale of the Products in connection therewith have been procured or performed by Licensor.

(h) <u>Conveyance</u>. That Licensor has not previously conveyed the Rights, Processes and Recipes.

SECTION 7.04. <u>WARRANTIES OF LICENSEE</u>. Licensee represents and warrants:

(a) <u>Duly Organized and Existing Corporation</u>. That Licensee is duly organized and existing under the laws of the State of California, has all the requisite corporate powers to carry on its businesses as conducted and as proposed to be conducted, and has power to enter this Agreement and to perform all acts contemplated by this Agreement; and that Licensee is duly qualified to transact business and in good standing in each jurisdiction in which the nature of the business transacted by Licensee makes qualification necessary.

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property       INITIALS: Licensor _____ Licensee _____ ;

20

(b) <u>Litigation</u>. There is no litigation, action, or proceeding pending or, to the knowledge of Licensee, threatened against the Licensee before any court or administrative agency, which might substantially affect its ability to enter into and perform this Agreement.

(c) <u>No Other Restrictions</u>. Licensee is not a party to any contract or agreement or subject to any charges or other restriction that will materially and adversely affect its business, property, assets, or financial condition. Neither the execution nor delivery of this Agreement, nor the performance of and compliance with the terms, provisions, and conditions of hereof will conflict with, or result in a breach of, any of the terms, provisions, or conditions of any charter, bylaw, mortgage, indenture, lease, instrument, franchise, permit, judgment, decree, order, statute, rule, regulation, or lawfully enforceable contract or agreement applicable to Licensee.

(d) <u>Non-Solicitation</u>. Except as provided in this Agreement, Licensee shall not solicit Togo's, its parent, subsidiaries, or any affiliates or key management personnel without the express written authorization and approval of Licensor.  Nothing in this warranty and representation shall limit or modify the provisions of Section 3.02(i) hereof.

(e) <u>Taxes</u>. All tax returns and reports of Licensee required by law to be filed have been duly filed, and all taxes, assessments, fees and other governmental charges on the Licensee or any of its properties, assets, income, or franchises that are due and payable have been paid.

(f) <u>Consents Obtained</u>. All consents, approvals, and authorizations of, or registrations, declarations, or filings with, any governmental or public body or authority, and of all third parties, which are required in connection with the valid execution, delivery, and performance of this Agreement, or in connection with any of the transactions incident thereto, or License's production of the Products and the fulfillment of orders therefor have been procured or performed by Licensee.

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property          INITIALS: Licensor _____ Licensee _____

21

SECTION 7.05. MUTUAL REPRESENTATIONS AND WARRANTIES. The parties hereby represent and warrant, each to the other:

(a) Complete and Accurate Access to Books and Records. That at all times during the continuance of this Agreement, the parties shall keep accurate books of account concerning all matters relating to the Products and the sale of the Products to Togo's. The parties further represent and warrant that their books of account shall be open to examination by either party to this Agreement, upon reasonable notice, at any time, and agree to provide complete access to the books and records of each other concerning all matters relating to the Products and the sale of the Products to Togo's. The parties further warrant and represent that the books and records maintained and kept by each of them pertaining to such matters shall be complete and accurate and comply with generally accepted principles consistently applied.

(b) Warranties and Representations True and Complete. That none of the representations or warranties made by a party contains or will contain any untrue statement of a material fact or omit a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

## ARTICLE VIII
## TERMINATION

SECTION 8.01. CAUSE FOR TERMINATION. This Agreement may be terminated upon the occurrence of any of the following:

(a) Failure to Agree on Product Pricing or Costing Formulas. In the event the parties cannot agree upon the price to be charged for the Products or in the event that the parties cannot agree on revised costing formulas as contemplated by Section 4.03, Licensee may cancel this Agreement upon six (6) months written notice to Licensor.

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property        INITIALS: Licensor _____ Licensee _____

22

(b) <u>Event of Default by Party</u>. In the event of default by a party to this Agreement for any one of the enumerated conditions of default described hereinbelow, and that default is not cured within the time permitted by this Agreement.

(c) <u>Cessation of Product Purchases</u>. In the event that Togo's stops purchasing Products from Licensee for a period in excess of one hundred eight (180) days, either party may terminate this Agreement. If such cessation occurs during the first seven (7) years of this Agreement and one of the parties elects to terminate this Agreement pursuant to the provisions of this paragraph but Togo's then subsequently resumes making purchases of Products during such seven (7) year period, then this Agreement shall be deemed to not have terminated and each and every provision shall remain in full force and effect at such time as the purchases resume. In the event that such cessation occurs after the first seven (7) years of this Agreement and one of the parties elects to terminate this Agreement pursuant to the provisions of this paragraph but Togo's then subsequently resumes making purchases of Products, then this Agreement shall be deemed to not have terminated and each and every provision shall remain in full force and effect as of the date such purchases are resumed so long as the formulas and the recipes for the Products then being purchased by Togo's are substantially the same as the formulas and recipes for the Products prior to such cessation in ordering. If the Products then being purchased by Togo's have substantially changed, then applicable provisions of this Agreement shall not be reinstated and the Agreement shall remain terminated.

SECTION 8.02. <u>EVENTS OF DEFAULT - BY LICENSEE</u>. Licensee shall have committed an event of default, and this Agreement and the license granted hereunder shall terminate, if any of the following occur:

(a) <u>Continuing Failure to Adhere to Production Standards</u>. In the event that the Production Standards set forth in Section 3.02.(b) are not met on a regular, continuing and material basis during the term of this Agreement.

(1) <u>"Regular, Continuing and Material Basis" Defined</u>. The term "regular,

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property          INITIALS: Licensor _____ Licensee _____ .

23

continuing and material" means that due to Licensee's continuing poor Product quality resulting from Licensee's failure to adhere to the Production Standards, Licensor reasonably determines that there is a substantial and material likelihood that it may lose the business with Togo's if Product quality is not improved.

(2) Conditions for Issuance of Notice. In the event that the Production Standards are not being met on a continuing and material basis, Licensor shall notify Licensee in writing ("Notice of Non-Compliance"). The Notice of Non-Compliance may contain a writing from Togo's expressing dissatisfaction with the Products and the Notice of Non-Compliance shall nonetheless set forth the specific reason or reasons therefor.

(3) Opportunity to Cure. The Notice of Non-Compliance will provide Licensee with a fourteen (14) day period within which to cure any alleged non-compliance with the Production Standards. If such non-compliance is not cured or cannot be cured within such fourteen (14) day period, this Agreement shall terminate; provided, however, that if such non-compliance can be cured within a reasonable period of time after such fourteen (14) day period without loss of Togo's as a client, Licensee shall have such additional reasonable period of time to cure such non-compliance.

(b) Failure to Perform Obligations. Licensee fails or neglects to perform or observe any of its existing or future obligations under this Agreement, including, without limitation, (i) the timely payment of the Royalty Fee and any other sums due Licensor within ten (10) days after receipt of a written notice from Licensor that the payment is delinquent; (ii) Licensee fails to render to Togo's that level of service currently delivered by Raybern; (iii) Togo's terminates or threatens to terminate continuing orders for lack of proper service; or (iv) Togo's notifies Licensee or Licensor that it intends to cancel any supply agreement or threatens to do so pursuant to its terms because of Licensee's failure to comply therewith.

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property       INITIALS: Licensor _____ Licensee _____

24

43

(c) Acts in Derogation of Licensor's Agreement Rights.  Licensee attempts to use, license, transfer or convey the Processes, the Rights, the Recipes or the Confidential Information in any manner contrary to the terms of this Agreement or in derogation of Licensor's proprietary rights in the Processes, Rights, Confidential Information, or Recipes without the express written approval of Licensor.

(d)  Insolvency; Bankruptcy. Licensee becomes insolvent, makes an assignment of Licensee's business for the benefit of creditors, files for bankruptcy, is placed in a receivership, bankruptcy or similar proceeding involuntarily, or is a party to any action or proceeding seeking liquidation, reorganization or similar relief under any law.  However, if Licensee is placed in an involuntary receivership, bankruptcy or similar proceeding, Licensee will not be in default hereunder if such proceedings are dismissed with prejudice within sixty (60) days of the date that Licensee is ordered into such proceedings.

(e)  Unauthorized Disclosure.  Unauthorized disclosure of the Confidential Information to a third party.

(f)    Cessation of Business. Cessation of business by Licensee or any successor or assign to whom the Rights, the Processes and the Recipes have been transferred with Licensor's written approval.

(g) Material Misrepresentation.  Licensee makes a material misrepresentation or materially breaches any warranty herein.

(h) Default under Manufacturing Agreement. A default under the Manufacturing Agreement executed by and between Licensor and Licensee as of August 20, 2001 shall be deemed a default under this Agreement.

SECTION 8.03. EVENTS OF DEFAULT - BY LICENSOR. Licensor shall have committed an event of default, and this Agreement may be terminated, if any of the following occur:

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property        INITIALS: Licensor _____ Licensee _____

25

(a) <u>Failure to Perform Obligations</u>. If Licensor is found to be in material breach of any warranty made under this Agreement, or materially neglects to perform or observe any of its existing or future obligations under this Agreement, including, but not by way of limitation, the continued promotion and marketing of the Products to Togo's, as provided herein, or the failure to provide adequate quantities of the Spice Mix necessary to meet orders for the Products, and such breach or failure continues five (5) business days for any monetary breach and thirty (30) days for all other breaches after receipt of written notice from Licensee of the breach or failure.

(b) <u>Acts in Derogation of Licensee's Agreement Rights</u>. Licensor attempts to use, license, transfer or convey the Processes, the Rights, or the Recipes or the Confidential Information in any manner contrary to the terms of this Agreement.

(c) <u>Unauthorized Disclosure</u>. Licensor's direct and unauthorized disclosure of the Confidential Information to a third party.

(d) <u>Material Misrepresentation</u>. Licensor makes a material misrepresentation or materially breaches any warranty herein.

(e) <u>Default under Manufacturing Agreement</u>. A default under the Manufacturing Agreement executed by and between Licensor and Licensee as of August 20, 2001 shall be deemed a default under this Agreement.

SECTION 8.04. <u>EFFECT OF TERMINATION -- IF BY DEFAULT OF LICENSEE</u>. Licensee agrees that in the event of termination through its default, all licenses granted hereunder shall terminate, and Licensor's obligations under this Agreement shall cease and that Licensor may seek all remedies available to it in law and in equity.

SECTION 8.05. <u>EFFECT OF TERMINATION – IF BY DEFAULT OF LICENSOR</u>. Licensor agrees that in the event of termination through its default, Licensee may seek all remedies

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property        INITIALS: Licensor _____ Licensee _____ ,

26

45

available to it in law or in equity, and Licensee's obligations under this Agreement shall cease.

SECTION 8.056. FAILURE TO AGREE ON PRODUCT COSTS.   This Agreement provides that the parties will review the costs of production and the costs of the raw materials which are incorporated in the formulas set forth in **Exhibit "A"** to determine what adjustments, if any, should be made to the cost of each Product for the subsequent three (3) month period.  In the event that the parties can not agree on the product cost to be used for determining the Net Margin for such subsequent three (3) month period, Licensee shall have the right to terminate this Agreement by providing Licensor six (6) months prior written notice of such termination.  In such event, the product cost to be used by Licensee to determine the Net Margin for the intervening six (6) month period shall be the then existing formula in effect on the date such notice of termination is given adjusted by any changes in average meat raw material costs during the previous and subsequent three (3) month periods using the USDA index specified in **Exhibit "A"** for such Product.

## ARTICLE IX
## GENERAL TERMS AND CONDITIONS

SECTION 9.01. NOTICES. Unless otherwise provided in this Agreement, any notice required or permitted by this Agreement to be given to either party shall be deemed to have been duly given if in writing and delivered personally or mailed by first-class, registered, or certified mail, postage prepaid and addressed as follows:

To LICENSEE:        ROSE & SHORE, INC.
                    Attn: Irwin Miller, President
                    5151 Alcoa Avenue
                    Vernon, CA 90058
                    Fax: (323) 826-2150

With copy to:       Alan G. Novodor, Esq.
                    LAW OFFICES OF ALAN G. NOVODOR
                    335 N. Maple Drive, Suite 354
                    Beverly Hills, CA 90210-3857
                    Fax: (310) 271-2583

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property     INITIALS: Licensor _____ Licensee _____

27

| | |
|---|---|
| To Licensor: | RAYBERN FOODS, INC.<br>Attn: Bernard J. Viggiano, President<br>311 West "A" Street<br>Hayward, CA 94541<br>Fax: (510) 786-2710 |
| With copy to: | Robert L. Young, Esq.<br>LAW OFFICES OF ROBERT L. YOUNG, P.C.<br>Two Walnut Creek Center<br>200 Pringle Blvd., Suite 340<br>Walnut Creek, CA 94596<br>Fax: (925) 296-3399 |

SECTION 9.02. ASSIGNMENT OF CONTRACT. Licensee shall not assign nor otherwise transfer its rights under this Agreement, including the license granted hereunder, or to be obtained pursuant to this Agreement or assign this Agreement or its rights hereunder without the prior written consent of Licensor. Any attempt to make such an assignment by Licensee without the written consent of Licensor shall be void. Licensor reserves the right to assign its right to receive the Royalty Fee. However, Licensor may not delegate its duties hereunder without the written consent of Licensee.

SECTION 9.03. BINDING ON HEIRS AND ASSIGNS. This Agreement and each of its provisions shall be binding on the heirs, executors, administrators, successors, and assigns of each of the parties hereto.

SECTION 9.04. AMENDMENTS. Licensor and Licensee agree that this Agreement shall be modified only by a written agreement duly executed by persons authorized to execute agreements on their behalf.

SECTION 9.05. NONWAIVER. Licensor and Licensee agree that no failure to exercise, and no delay in exercising any right, power, or privilege hereunder on the part of either party shall operate as a waiver of any right, power, or privilege. Licensor and Licensee further agree that no single or partial exercise of any right, power, or privilege hereunder shall preclude its further

Agreement for Licensing and Acquisition of<br>Proprietary Rights, Interests and Property        INITIALS: Licensor _____ Licensee _____

28

47

exercise.

SECTION 9.06. ATTORNEYS' FEES. If any legal action or arbitration is necessary to enforce the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees as awarded by a court of competent jurisdiction, in addition to any other relief to which that party may be entitled. This provision shall be construed as applicable to the entire Agreement.

SECTION 9.07. SEVERABILITY. If any part of this Agreement is adjudged by any court of competent jurisdiction to be invalid, that judgment shall not affect or nullify the remainder of this Agreement, and the effect shall be confined to the part immediately involved in the controversy adjudged.

SECTION 9.08. SURVIVAL OF AGREEMENTS. Subject to the express limitations contained in this Agreement, all covenants, agreements, representations and warranties made in this Agreement shall survive the execution, delivery and termination of this Agreement and the consummation or performance of the transactions contemplated by this Agreement.

SECTION 9.09. GOVERNING LAW. This Agreement shall be deemed to have been made in, and shall be construed pursuant to, the laws of the State of California.

SECTION 9.10. FURTHER ASSURANCES. The parties hereto agree to cooperate fully with each other and to execute such further instruments, documents and agreements and to give such further written assurances, as may be reasonably requested by a party, to better evidence and consummate the transactions described herein and contemplated hereby, and to carry into effect the intents and purposes of this Agreement.

SECTION 9.11. ENTIRE AGREEMENT. Licensee and Licensor acknowledge and agree that this Agreement, the Manufacturing Agreement identified in Section 8.02(h) and the Continuing Guaranty identified in Section 9.14 herein are collectively the complete and exclusive statement of the mutual understanding of the parties, that they supersede and cancel all previous written and oral agreements and communications relating to the subject matter of this Agreement, and

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property          INITIALS: Licensor _____ Licensee _____

29

48

that any prior agreements, promises, negotiations, or representations not expressly set forth in this Agreement, the Manufacturing Agreement of the Continuing Guaranty are of no force or effect.

SECTION 9.12. COUNTERPARTS. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument, and whenever executed, shall be deemed executed by the parties on the date first above written.

SECTION 9.13. INCORPORATION.    All Recitals and Exhibits hereto are incorporated herein by this reference.

SECTION 9.14. GUARANTEE.    The obligations of Licensee under this Agreement have been guaranteed by Rite-Way Meat Packers, Inc. and RBR Meat Company, Inc. ("Guarantors") pursuant to a document styled "Continuing Guaranty" and executed by such Guarantors this same date.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

"LICENSOR"                         "LICENSEE"

**RAYBERN FOODS, INC.,**           **ROSE & SHORE, INC.**
A CALIFORNIA CORPORATION           A CALIFORNIA CORPORATION

BY: _____       BY: _____
    BERNARD J. VIGGIANO                 IRWIN MILLER
ITS: PRESIDENT                     ITS: PRESIDENT

Raybern/Licensing Agreementclean 8/28/01

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property       INITIALS: Licensor _____ Licensee _____

30

49

that any prior agreements, promises, negotiations, or representations not expressly set forth in this Agreement, the Manufacturing Agreement of the Continuing Guaranty are of no force or effect.

SECTION 9.12. COUNTERPARTS.  This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument, and whenever executed, shall be deemed executed by the parties on the date first above written.

SECTION 9.13. INCORPORATION.  All Recitals and Exhibits hereto are incorporated herein by this reference.

SECTION 9.14. GUARANTEE.  The obligations of Licensee under this Agreement have been guaranteed by Rite-Way Meat Packers, Inc. and RBR Meat Company, Inc. ("Guarantors") pursuant to a document styled "Continuing Guaranty" and executed by such Guarantors this same date.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

"LICENSOR"                              "LICENSEE"

RAYBERN FOODS, INC.,                    ROSE & SHORE, INC.
A CALIFORNIA CORPORATION                A CALIFORNIA CORPORATION

BY: _____                    BY: _____
      BERNARD J. VIGGIANO                     IRWIN MILLER
ITS: PRESIDENT                          ITS: PRESIDENT

Raybern/Licensing Agreementclean 8/28/01

Agreement for Licensing and Acquisition of
Proprietary Rights, Interests and Property      INITIALS: Licensor _____ Licensee _____

30