1  Daniel L. Rottinghaus, Esq., State Bar No. 131949
   Paul W. Windust, State Bar No. 167338
2  **BERDING & WEIL LLP**
   3240 Stone Valley Road West
3  Alamo, California 94507
   Telephone:  925/838-2090
4  Facsimile:  925/820-5592

5  Attorneys for Plaintiff
   ROBERT L. YOUNG
6

7

8              **UNITED STATES DISTRICT COURT**

9              **NORTHERN DISTRICT OF CALIFORNIA**

10

11  ROBERT L. YOUNG,                    No.  **C 07-05711 SBA**

12          Plaintiff,
                                        **DECLARATION OF ROBERT L.**
13      vs.                             **YOUNG IN SUPPORT OF**
                                        **MOTION FOR PARTIAL**
14  ILLINOIS UNION INSURANCE            **SUMMARY JUDGMENT**
    COMPANY; ACE WESTCHESTER
15  SPECIALTY CLAIMS; and DOES 1        **DATE:  August 26, 2008**
    through 50, inclusive,              **TIME:  1:00 p.m.**
16                                      **CTRM:  3**
            Defendants.
17                                      **[FRCP 56(a) and (b)]**

18

19      I, ROBERT L. YOUNG, hereby declare as follows:

20      1.    I am the Plaintiff in the above-entitled action.   I have personal

21  knowledge of the facts set forth in the declaration.  If called as a witness in this

22  matter, I could competently testify to the facts presented herein.   I make this

23  declaration in support of a motion for partial summary judgment.

24      2.    On October 18, 2001, I became a Director of TRI Real Estate

25  Services, Inc. ("TRI") and served in that capacity on the Board of Directors until

26  July 14, 2003 when I resigned.  I served as Secretary for TRI from October 1, 1996

27  until July 14, 2003 when I resigned.  As a condition to my becoming a Director of

28  TRI, I insisted that it obtain Directors and Officer's Insurance which would provide

1    me with a defense and indemnify me in the event I was ever sued in relation to my

2    duties and actions as a director or officer of TRI.

3         3.    TRI purchased Directors and Officers and Employment Practices

4    Insurance from Illinois Union Insurance Company, Policy Number BMI200116061

5    (the "Policy").  A true and correct copy of the Policy issued for the relevant time

6    period is attached hereto as Exhibit 1.

7         4.    Prior to my becoming a Director of TRI, I was hired by Raybern

8    Foods, Inc. ("Raybern") to provide legal counsel with respect to a business

9    transaction between Raybern and a company called Rose & Shore, Inc.  Raybern

10   was referred to me by TRI.  The business transaction was brokered by TRI under

11   an engagement agreement under which TRI was to earn a commission once the

12   transaction closed.  The Raybern/Rose & Shore transaction closed on September

13   16, 2001.  The engagement letter Raybern signed with me contained an existing

14   conflict or potential conflict of interest disclosure in connection with my having

15   represented TRI in the past and would likely do so in the future.

16        5.    In February 2004, TRI sued Raybern to recover unpaid commissions

17   due from the close of the Raybern/Rose & Shore transaction.  After over one year

18   of litigation, Raybern filed a Cross-Complaint in that action, naming me as a cross-

19   defendant.  A true and correct copy of the Cross-Complaint is attached hereto as

20   Exhibit 2.  That action alleged that I breached fiduciary duties, duties of care, and

21   failed to adequately protect Raybern's business interests respecting the Rose and

22   Shore transaction in my capacity as a director and officer of TRI.  I promptly

23   tendered the Cross-Complaint to IUI through its designated agent, ACE

24   Westchester Specialty Claims ("ACE").  I also demanded that TRI defend and

25   indemnify me pursuant to its obligations under the Corporations Code and its

26   Bylaws, but TRI summarily denied my request.

27        6.    On July 26, 2005, after my successful demurrer, Raybern filed a First

28   Amended Complaint again naming me as a cross-defendant.  A true and correct

1    copy of the First Amended Cross-Complaint is attached hereto as Exhibit 3.

2    Similar to the first version of the Cross-Complaint, Raybern alleged that as a

3    Director and Officer of TRI, I failed to adequately protect its business interests,

4    failed to monitor the Rose & Shore transaction, and failed to ensure that Raybern

5    achieved its business objectives in the transaction.

6        7.    I tendered the Cross-Complaint and First Amended Cross-Complaint

7    to IUI numerous times and never received a direct response from either IUI or

8    ACE.   My attorney tendered the Cross-Complaints on July 6, August 15, and

9    December 15, 2005, February 3, May 19, June 27, and November 30, 2006.   True

10   and correct copies of my tender letters are attached hereto as Exhibits 4-10,

11   respectively.

12       8.    In September 2005, I was named as a defendant in a Cross-Complaint

13   filed by TRI and John Fults, the TRI agent working on the Raybern/R&S

14   transaction.   A true and correct copy of the Fults' Cross-Complaint is attached

15   hereto as Exhibit 11.   The Fults' Cross-Complaint alleges that I provided legal

16   services to Raybern without TRI's consent and failed to disclose potential conflicts

17   of interest in that connection, despite the fact that Raybern was referred to me by

18   TRI.   Fults sued me for fraud, legal malpractice, indemnity and contribution.   IUI

19   never considered Fults' Cross-Complaint in denying me a defense.

20       9.    In May 2006, I learned from my attorney that ACE had provided a

21   copy of a denial of coverage letter dated July, 2005 that was directed to TRI.

22   Although I was mentioned in the letter, I never received a copy of the letter directly

23   from IUI or ACE.   Further, because the letter pre-dated the filing of the First

24   Amended Cross Complaint, it could not have considered the new allegations.

25       10.   On October, 5, 2006 (18 months after my initial tender), my attorney

26   received an acknowledgement of the claim from IUI's attorney.   Then, on

27   December 5, 2006, the day before a scheduled mediation, IUI's attorney denied

28   coverage for the claim and refused to provide me with a defense.

BERDING & WEIL LLP
3240 Stone Valley Road West
Alamo, California 94507

**DECLARATION OF ROBERT L. YOUNG IN SUPPORT OF MOTION FOR
PARTIAL SUMMARY JUDGMENT**

11.    Emotionally, physically, and financially exhausted from defending myself, I reluctantly agreed to settle the claims against me for $20,000 with a release of my defense and indemnity claims against TRI.

I declare under penalty of perjury of the laws of the United States the foregoing is true and correct.    Executed this 17th day of July, 2008 in Alamo, California.

ROBERT L. YOUNG

O:\WDOCS\0001\392\PLD\00474649.DOC

BERDING & WEIL LLP
3240 Stone Valley Road West
Alamo, California 94507

**DECLARATION OF ROBERT L. YOUNG IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

-4-

 

ace usa

Illinois Union Insurance Company

This Policy is issued by the stock insurance company listed above (herein "Insurer").

## DECLARATIONS

EACH OF THE COVERAGE SECTIONS OF THIS POLICY (EMPLOYMENT PRACTICES, DIRECTORS & OFFICERS AND COMPANY, FIDUCIARY, TECHNOLOGY, MEDIA AND PROFESSIONAL SERVICES AND MISCELLANEOUS PROFESSIONALSERVICES, WHICHEVER ARE APPLICABLE) IS WRITTEN ON A CLAIMS-MADE AND REPORTED BASIS.  EXCEPT AS OTHERWISE PROVIDED, THESE COVERAGE SECTIONS COVER ONLY ANY CLAIM FIRST MADE AND REPORTED AGAINST THE INSURED DURING THE POLICY PERIOD.  THE CRIME COVERAGE SECTION, IF APPLICABLE, APPLIES ONLY TO LOSS OCCURRING DURING THE POLICY PERIOD.

**Policy Number:**    BMI20016061

Item A.    Parent Company:        *TRI Commercial Real Estate Services, Inc*
           Principal Address:     One California, Suite 1200
                                  San Francisco, CA  94111

Item B.    Policy Period:  From:  <u>August 1, 2004</u>          To:  <u>August 1, 2005</u>
           12:01 a.m. Standard Time at the Principal Address Stated in Item A.

Item C.    Coverage Section Description(s):

### Employment Practices

   a)  Limit of Liability    $2,000,000    in the aggregate for this Coverage Section

   b)  Retention             $0            each **Claim** for all **Insured Persons**
                             $10,000       each **Claim** for the **Company**

   c)  Continuity Date       August 1, 1999

### Directors & Officers and Company

   a)  Limit of Liability    $2,000,000    in the aggregate for this Coverage Section

   b)  Retention             $0            each **Claim** all **Directors and Officers** under Insuring Clause 1.
                             $0            each **Claim** under Insuring Clause 2.
                             $0            each **Claim** under Insuring Clause 3.

   c)  Continuity Date       August 1, 1999

EXHIBIT

1

Item D.    Premium:  **$29,028**

Item E.    1.    Premium for **Discovery Period**:  100% of the total premium, as provided in Clause H. 1. of the General Terms and Conditions.

2.    Length of **Discovery Period**:  365 Days

Item F.    Insured Percentage:   100% of **Loss** in excess of any applicable retention.

Item G.    Notification under the Policy shall be given to:    ACE Westchester Specialty Claims
1133 Avenue of the Americas, 38th Floor
New York, NY  10036

Item H.    Form Numbers of Endorsements Attached at Policy Issuance: GT&C102, D&O120, SPEC101

**IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed by its President and Secretary and countersigned by a duly authorized representative of the Insurer.**

GEORGE D. MULLIGAN, Secretary            SUSAN RIVERA, President

**DATE:**    August 25, 2004

AUTHORIZED REPRESENTATIVE

CALIFORNIA

**NOTICE TO INSURED:**

**NOTICE:**

1. THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.

2. THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT WHICH APPLIES TO CALIFORNIA LICENSED INSURERS.

3. THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.

4. CALIFORNIA MAINTAINS A LIST OF ELIGIBLE SURPLUS LINE INSURERS APPROVED BY THE INSURANCE COMMISSIONER. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST.

5. FOR ADDITIONAL INFORMATION ABOUT THE INSURER YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER: <u>800-927-4357</u>.

SL CA 2004

A.  SEVERABILITY OF GENERAL TERMS AND CONDITIONS

Except for the General Terms and Conditions below or unless stated to the contrary in any Coverage Section, the terms and conditions of each Coverage Section apply only to that Coverage Section and shall not be construed to apply to any other Coverage Section.

B.  DEFINITIONS

The following terms, whenever used in this Policy (including each Coverage Section) in boldface type, shall have the meanings indicated.

1.  Application means:

   a)  the application for this Policy or any policy of which this Policy is a renewal, and

   b)  any materials submitted therewith, which shall be retained on file by Insurers and shall be deemed attached hereto, as if physically attached hereto.

2.  Company means:

   a)  the Parent Company, and

   b)  any Subsidiary.

3.  Takeover means:

   a)  the acquisition by any person or entity of more than 50% of the outstanding securities of the Parent Company representing the present right to vote for the election of directors,

   b)  the merger of the Parent Company into another entity such that the Parent Company is not the surviving entity, and

   c)  the Parent Company ceasing to be publicly-held.

4.  Discovery Period means the period described in Item E.2. of the Declarations and Clause H. below.

5.  Parent Company means the entity named in Item A. of the Declarations.

6.  Policy Period means the period from the effective date and hour of the inception of this Policy to the Policy expiration date and hour as set forth in Item B. of the Declarations, or its earlier cancellation date and hour, if any, or the end of the Discovery Period, if purchased.

7.  Subsidiary means any entity while more than 50% of the outstanding securities representing the present right to vote for the election of such entity's directors or managers are owned by the Parent Company, directly or indirectly, if such entity:

   a)  was so owned prior to the inception date of this Policy and was insured under a Policy issued by Insurer of which this Policy is a renewal,

   b)  was so owned on the inception date of this Policy, or

   c)  becomes so owned after the inception date of this Policy.

Other definitions particular to each Coverage Section are contained in the separate Definitions Clause in each Coverage Section.

C.  LIMITS OF LIABILITY AND RETENTIONS

The Limits of Liability and Retentions for each Coverage Section are separate Limits of Liability and Retentions pertaining to the Coverage Section for which they are shown. The application of a retention to Loss under one Coverage Section shall not reduce the retention under any other Coverage Section, and no reduction in the Limit of Liability applicable to one Coverage Section shall reduce the Limit of Liability under any other Coverage Section.

In the event that any Claim or more than one Claim arising from Interrelated Wrongful Acts shall be covered, in whole or in part, under two or more Insuring Clauses or more than one Coverage Section, the total applicable Retention shall not exceed the single largest applicable Retention. Such largest applicable Retention shall apply only once to such Claim.

D.  WARRANTY CLAUSE

It is warranted that the particulars and statements contained in the Application, a copy of which is attached hereto, are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy and of each Coverage Section.

By acceptance of this Policy, the Insureds agree:

1.  that the statements in the Application are their representations, that they shall be deemed material to the acceptance of the risk or the hazard assumed by Insurer under this Policy and that this Policy and each Coverage Section are issued in reliance upon the truth of such representations,

2.  that in the event the Application contains misrepresentations made with the actual intent to deceive, or contains misrepresentations which materially affect either the acceptance of the risk or the hazard assumed by Insurer under this Policy, this Policy and each and all Coverage Sections shall be void and of no effect whatsoever with respect to any of the Insureds who had actual knowledge of such misrepresentations, and

3.  that this Policy and each Coverage Section shall be deemed to be a single unitary contract and not a severable contract of insurance or a series of individual contracts with each or all of the Insureds.

E.    CANCELLATION CLAUSE

1.    By acceptance of this Policy, the Insureds hereby confer the exclusive power and authority to cancel this Policy on their behalf to the Parent Company. Such entity may cancel this Policy by surrender thereof to Insurer, or by mailing to Insurer written notice stating when thereafter cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the Policy Period. Delivery of such written notice shall be equivalent to mailing.

2.    This Policy may only be cancelled by Insurer for nonpayment of premium by mailing to the Parent Company written notice stating when, not less than 10 days thereafter, such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the Policy Period. Delivery of such written notice by Insurer shall be equivalent to mailing. If the foregoing notice period is in conflict with any governing law or regulation, then such period shall be amended to afford the minimum notice period permitted there under.

3.    If this Policy is cancelled, Insurer shall retain the pro rata proportion of the premium hereon. Payment or tender of any unearned premium by Insurer shall not be a condition precedent to the effectiveness of cancellation.

F.    SPOUSAL EXTENSION

Insurer agrees to extend coverage under each Coverage Section to all persons who were, now are, or shall be the lawful spouse of any natural person who is one of the Insureds solely to the extent such spouse is the subject of any Claim because of marriage to any such natural person Insured.

G.    COMPANY AUTHORIZATION CLAUSE

By acceptance of this Policy, the Insureds agree that the Parent Company will act on their behalf with respect to the giving of all notice to Insurer, the receiving of notice from Insurer, the payment of the premium and the receipt of any return premium.

H.    DISCOVERY PERIOD

1.    If this Policy is cancelled pursuant to Clause E.1., or if Insurer refuses to renew this Policy for reasons other than non-payment of premium or noncompliance with the terms and conditions of this Policy or if the Parent Company elects not to renew this Policy, then the Parent Company shall have the right, upon payment of an additional premium calculated at that percentage shown in Item E.1 of the Declarations of the total premium for this Policy, to an extension of the coverage granted by this Policy with respect to any Claim first made during the period of time set forth in Item E.2 of the Declarations after the effective date of such cancellation or, in the event of such refusal to renew, after the Policy expiration date, but only with respect to any Wrongful Act committed before such date.

2.    The quotation of a different premium, retention or limit of liability for renewal does not constitute a cancellation or refusal to renew for the purposes of this Clause.

3.    As a condition precedent to the right to purchase the Discovery Period, the total premium for the Policy must have been paid. The right to purchase the Discovery Period shall terminate unless written notice, together with full payment of the premium for the Discovery Period, is received by Insurer within 30 days after the effective date of cancellation, or, in the event of a refusal to renew, within 30 days after the Policy expiration date. If such notice and premium payment is not so given to Insurer, there shall be no right to purchase the Discovery Period.

4.    In the event of the purchase of the Discovery Period, the entire premium therefore shall be deemed earned at its commencement.

5.    The exercise of the Discovery Period shall not in any way increase the limit of Insurer's liability under any Coverage Section.

I.    RUN-OFF COVERAGE

In the event of a Takeover.

1.    The Parent Company shall have the right, upon payment of an additional premium calculated at 125% of the total premium for this Policy, to an extension of the coverage granted by this Policy with respect to any Claim first made during the period of six calendar years after the effective date of the Takeover, but only with respect to any Wrongful Act committed before such date; provided, however, that the additional premium shall be reduced by the amount of the unearned premium from the date of the Takeover through the expiration date set forth in Item B. of the Declarations.

2.    If this extension of coverage is elected and purchased then:

a)    Clause E., above, is deleted in its entirety, and

b)    Clause H., above, is deleted in its entirety, and

c)    the maximum aggregate Limit of Liability of Insurers under this Policy for this extension of coverage shall be an amount twice that shown in Item C. of the Declarations for each Coverage Section. The maximum aggregate Limit of Liability of Insurer in connection with any one Claim shall be the amount shown in Item C. of the Declarations relating to that Coverage Section and subject to the Limit of Liability and Retentions Clause of each Coverage Section.

J.    ALLOCATION

In the event any of the Insureds in a Claim incur both Loss that is covered by the Policy and also loss which is not covered by this Policy, either because such Claim includes both covered and uncovered matters or because such Claim is made against both covered and uncovered parties, then coverage will be allocated as follows:

1.    100% of Costs, Charges and Expenses incurred by such Insureds on account of such Claim will be allocated as covered Loss, and

2.    any remaining loss incurred by such Insureds on account of such Claim will be allocated by the parties between covered Loss and uncovered loss using all reasonable efforts based upon the legal liabilities of each of the parties to such matters.

GT&C-2

K.    ARBITRATION

Any dispute between the Insureds and Insurers arising in connection with or relating to this Policy shall be submitted to binding arbitration in accordance with the rules of the American Arbitration Association ("AAA") then in effect, except that the arbitration panel shall consist of one arbitrator selected by the Insureds, one arbitrator selected by Insurers, and a third independent arbitrator selected by the first two arbitrators.

L.    SETTLEMENTS AND DEFENSE

1.    No settlement shall be made or negotiated and no Costs, Charges and Expenses shall be incurred without Insurer's consent, such consent not to be unreasonably withheld. Insurer shall have the right to investigate and settle any Claim; provided however, no settlement shall be made without the consent of the Parent Company, such consent not to be unreasonably withheld.

2.    Insurer shall have the right and duty to defend any Claim and such right and duty shall exist even if any of the allegations are groundless, false or fraudulent. The Parent Company shall have the right to assume the duty to defend any Claim provided Insurers consent in writing to such assumption. Costs, Charges and Expenses incurred by Insurer, or by the Insureds when defending or investigating with the written consent of Insurer, shall be paid by Insurer as a part of, and not in addition to, Insurer's Limit of Liability set forth in Item C. of the Declarations for the applicable Coverage Section.

M.    ASSISTANCE, COOPERATION AND SUBROGATION

The Insureds agree to provide Insurer with such information, assistance and cooperation as Insurer reasonably may request, and they further agree that they shall not take any action which in any way increases Insurer's exposure under this Policy.

In the event of any payments under this Policy, Insurer shall be subrogated to the Insureds' rights of recovery therefore against any person or entity. The Insureds shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents as necessary to enable Insurer effectively to bring suit in their name, and shall provide all other assistance and cooperation which Insurer may reasonably require.

N.    ASSIGNMENTS AND ACTIONS AGAINST INSURERS

No action shall lie against Insurers unless, as a condition precedent thereto, the Insureds shall have fully complied with all of the terms of this Policy, nor until the amount of the Insureds' obligation to pay shall have been fully and finally determined either by judgment against them or by written agreement between them, the claimant and Insurer. Nothing contained herein shall give any person or organization any right to join Insurer as a party to any Claim against the Insureds to determine their liability, nor shall Insurer be impleaded by the Insureds or their legal representative in any Claim. Assignment of interest under this Policy shall not bind Insurers unless their consent is endorsed hereon.

O.    ENTIRE AGREEMENT

By acceptance of this Policy, the Insureds agree that this Policy embodies all agreements existing between them and Insurers or any of their agents relating to this insurance. Notice to any agent or knowledge possessed by any agent or other person acting on behalf of Insurers shall not effect a waiver or a change in any part of this Policy or estop Insurers from asserting any right under the terms of this Policy, nor shall the terms be deemed waived or changed except by written endorsement or rider issued by Insurer to form part of this Policy.

P.    SERVICE OF SUIT

It is agreed that in the event of the failure of Insurer to pay any amount claimed to be due hereunder, Insurer, at the request of any person or entity insured hereunder, will submit to the jurisdiction of any court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction. Nothing in this Clause constitutes or should be deemed to constitute a waiver of Insurer's right to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court, as permitted by the laws of the United States or of any state, territory, or district in the United States. It is further agreed that service of process in such suit may be made upon ACE Westchester Specialty Claims, 1133 Avenue of the Americas, 38th Floor, New York, NY 10036 and that in such suit instituted against any one of them upon this Policy, Insurer will abide by the final decision of such court or of any appellate court in the event of an appeal.

The above-named party is authorized and directed to accept service on behalf of Insurers in any such suit upon the request of any person or entity to enter a general appearance on behalf of Insurers in the event such a suit shall be instituted.

Further, pursuant to the applicable statute of any state, territory or district of the United States, Insurer shall designate the Superintendent, Commissioner or Director of Insurance or other officer specified for the purpose in the statute or any successor in office, as Insurer's true and lawful attorney, upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of any person or entity insured hereunder or any beneficiary hereunder arising out of this Policy, and hereby designate ACE Westchester Specialty Claims, 1133 Avenue of the Americas, 38th Floor, New York, NY 10036 as the party to whom such officer is authorized to mail such process.

GT&C-3

BAM 02/02

EMPLOYMENT PRACTICES COVERAGE SECTION

In consideration of the payment of premium, in reliance on the statements in the Application and subject to all of the provisions of the Policy and this Coverage Section, Insurers and the Insureds agree as follows.

**A.    INSURING CLAUSE**

Insurers shall pay on behalf of the Insureds Loss resulting from any Claim first made during the Policy Period for a Wrongful Act.

**B.    DEFINITIONS**

The following terms, whenever used in this Coverage Section in boldface type, shall have the meanings indicated. Other terms, whenever used in this Coverage Section in boldface type, shall have the meanings indicated in Clause B. of the General Terms and Conditions section of this Policy.

1. **Insureds** means the Company and any Insured Person.

2. **Insured Persons** means all persons who were, now are or shall be:

    a) the directors and officers of the Company,

    b) any Employees, and

    c) the functional equivalent of directors, officers and Employees in the event the Company is incorporated or domiciled outside the United States, including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy.

3. **Benefits** means perquisites, fringe benefits, and payments in connection with an employee benefit plan and other payment, other than salary or wages, to or for the benefit of an employee arising out of the employment relationship.

4. **Claim** means:

    a) any written or oral demand for damages or other relief against any of the Insureds, and

    b) any judicial, administrative or arbitration proceeding initiated against any of the Insureds in which they may be subjected to a binding adjudication of liability for damages or other relief, including:

        (i) any proceeding before the Equal Employment Opportunity Commission or any similar federal, state or local governmental body, and

        (ii) any appeal therefrom,

    brought by or on behalf of an Employee.

5. **Continuity Date** means the date set forth in Item C. of the Declarations relating to this Coverage Section.

6. **Costs, Charges and Expenses** means reasonable and necessary legal fees and expenses incurred by any of the Insureds in defense of any Claim and cost of attachment or similar bonds, but shall not include:

    a) salaries, wages, overhead or benefit expenses associated with officers or employees of the Company, or

    b) any amounts incurred in defense of any Claim for which any other Insurer has a duty to defend.

7. **Employees** means all persons who were, now are or shall be:

    a) employees of the Company, including voluntary, seasonal and temporary employees,

    b) any individuals applying for employment with the Company, and

    c) any individuals who are leased or are contracted to perform work for the Company, or are independent contractors for the Company, but only if such individuals perform work or services solely for or on behalf of the Company.

8. **Interrelated Wrongful Acts** means more than one Wrongful Act which have as a common nexus any fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions.

9. **Loss** means damages, settlements, including front pay and back pay, and Costs, Charges and Expenses incurred by any of the Insureds, but shall not include:

    a) taxes, criminal or civil fines or penalties imposed by law, or

    b) matters deemed uninsurable under the law pursuant to which this Policy shall be construed, or

    c) punitive or exemplary damages, except to the extent such damages are insurable under the law pursuant to which this Policy shall be construed or the law of the jurisdiction in which such damages are awarded, whichever legal venue is most favorable for the Insureds in deciding the insurability of such damages, or

    d) non-monetary relief, or

    e) amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract, or

EPL-1

    f)    disability, social security, workers compensation, medical insurance, retirement or pension benefits, or settlement amounts representing benefit payments, or

    g)    the costs to modify or adapt any building or property to be more accessible or accommodating to any disabled person, or

    h)    the cost of instituting or conducting any program, procedure, or training, or

    i)    the cost of locating or reinstating employment.

10.    **Retaliation** means any actual or alleged response of any of the **Insureds** to:

    a)    the disclosure or threat of disclosure by an **Employee** to a superior or to any governmental agency of any act by any of the **Insureds** where such act is alleged to be a violation of any federal, state, local or foreign law, whether common or statutory, or any rule or regulation promulgated thereunder, or

    b)    the actual or attempted exercise by an **Employee** of any right that such **Employee** has under law, including rights under any worker's compensation law, the Family and Medical Leave Act, the Americans with Disabilities Act or any other law relating to employee rights, or

    c)    the filing of any claim under the Federal False Claims Act or any other federal, state, local or foreign "whistleblower" law, or

    d)    any **Employee** work stoppage or slowdown.

11.    **Wrongful Act** means any actual or alleged:

    a)    violation of any federal, state, local or common law, prohibiting any kind of employment-related discrimination, or

    b)    harassment, including any type of sexual or gender harassment as well as racial, religious, sexual orientation, pregnancy, disability, age, or national origin-based harassment and including workplace harassment by any non-employee, or

    c)    abusive or hostile work environment, or

    d)    wrongful discharge or termination of employment, whether actual or constructive, or

    e)    breach of an actual or implied employment contract, or

    f)    wrongful failure or refusal to hire or promote, or wrongful demotion, or

    g)    wrongful failure or refusal to provide equal treatment or opportunities, or

    h)    defamation, libel, slander, disparagement, false imprisonment, misrepresentation, malicious prosecution, or invasion of privacy, or

    i)    wrongful failure or refusal to adopt or enforce adequate workplace or employment practices, policies or procedures, or

    j)    wrongful, excessive or unfair discipline, or

    k)    wrongful infliction of emotional distress, mental anguish, or humiliation, or

    l)    **Retaliation**, or

    m)    negligent hiring or negligent supervision of others in connection with a) through l) above, but only if employment related and claimed by or on behalf of any **Employee** and only if committed or allegedly committed by any of the **Insureds** in their capacity as such.

**C.    EXCLUSIONS**

**Insurer** shall not be liable to make any payment under this Coverage Section in connection with any **Claim**:

1.    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

    a)    any **Wrongful Act** or any fact, circumstance or situation which has been the subject to any notice given prior to the **Policy Period** under any other similar insurance policy, or

    b)    any other **Wrongful Act**, whenever occurring, which, together with a **Wrongful Act** which has been the subject of such prior notice, would constitute **Interrelated Wrongful Acts**;

2.    to the extent it is insured under any other existing valid policy, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, and regardless of whether or not any **Loss** in connection with such **Claim** is collectible or recoverable under such other policy; provided, however, this exclusion shall not apply to the amount of **Loss** which is in excess of the amount of any deductible and the limit of liability of such other policy where such **Claim** is otherwise covered by this Coverage Section;

3.    for any actual or alleged violation of the Employee Retirement Income Security Act of 1974, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, all as amended, or any rules or regulations promulgated thereunder, or similar provisions of any federal, state or local statutory or common law; provided, however, this exclusion does not apply to any such **Claim** alleging violations of the Equal Pay Act, or for **Retaliation**;

4.    brought about or contributed to by any dishonest, fraudulent or criminal act or omission as determined by a judgment or other final adjudication;

5.    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, any actual or alleged obligation of any of the **Insureds** pursuant to any workers compensation, unemployment insurance, social security, disability benefits or similar law; provided, however, this exclusion shall not apply to any such **Claim** for **Retaliation**;

6. against any Subsidiary or any of the Insured Persons of a Subsidiary based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

    a) any Wrongful Act occurring prior to the date such entity became a Subsidiary or subsequent to the date such entity ceased to be a Subsidiary, or

    b) any Wrongful Act occurring while such entity was a Subsidiary which, together with a Wrongful Act occurring prior to the date such entity became a Subsidiary would constitute Interrelated Wrongful Acts;

7. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, any Wrongful Act actually or allegedly committed subsequent to a Takeover;

8. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

    a) any prior and/or pending litigation or administrative proceeding, demand letter or formal or informal governmental investigation or inquiry including any investigation by the Department of Labor or the Equal Employment Opportunity Commission as of the Continuity Date, or

    b) any fact, circumstance, situation, transaction or event underlying or alleged in such litigation or administrative proceeding, demand letter or formal or informal governmental investigation or inquiry including any investigation by the Department of Labor or the Equal Employment Opportunity Commission;

9. based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, any Wrongful Act which any of the Insured Persons who were, now are, or shall be directors, officers, managers or supervisory employees, had knowledge of prior to the Continuity Date where such Insured Persons had reason to believe at the time that such known Wrongful Act could reasonably be expected to give rise to such Claim; or

10. for that portion of Loss which is covered under any other Coverage Section of this Policy.

No Wrongful Act of one or more Insureds shall be imputed to any other Insureds for the purpose of determining the applicability of the above Exclusions.

**D.    LIMIT OF LIABILITY AND RETENTIONS**

1. Insurer shall be liable to pay the percentage of Loss set forth in Item F. of the Declarations relating to this coverage section in excess of the amount of the Retention up to the Limit of Liability under this Coverage Section, it being warranted that the remaining percentage of Loss shall be uninsured. In the event a Claim is made against both the Company and any of the Insured Persons, the largest retention identified in Item C. of the Declarations for this Coverage Section shall apply.

2. The amount shown in Item C. of the Declarations relating to this Coverage Section shall be the maximum aggregate Limit of Liability of Insurer under this Coverage Section.

3. More than one Claim involving the same Wrongful Act or Interrelated Wrongful Acts shall be deemed to constitute a single Claim and shall be deemed to have been made at the earliest of the following times:

    a) the time at which the earliest Claim involving the same Wrongful Act or Interrelated Wrongful Acts is first made, or

    b) the time at which the Claim involving the same Wrongful Act or Interrelated Wrongful Acts shall be deemed to have been made pursuant to Clause E.2., below.

4. Payments of Loss by Insurer shall reduce the Limit of Liability under this Coverage Section.

5. Insurer shall pay Costs, Charges and Expenses no more than once every 90 days.

**E.    NOTIFICATION**

1. The Insureds shall, as a condition precedent to their rights to payment under this Coverage Section only, give to Insurer notice in writing of any written Claim as soon as practicable but in no event later than sixty (60) days after such Claim is first made.

2. If, during the Policy Period or the Discovery Period, any of the Insureds first becomes aware of a specific Wrongful Act and if the Insureds, during the Policy Period or the Discovery Period, if purchased, given written notice to Insurer as soon as practicable of:

    a) the specific Wrongful Act, and

    b) the consequences which have resulted or may result therefrom, and

    c) the circumstances by which the Insureds first become aware thereof,

then any Claim made subsequently arising out of such Wrongful Act shall be deemed for the purposes of this Coverage Section to have been made at the time such notice was first given to Insurer.

3. Notice to Insurer shall be given to the firm shown under Item G. of the Declarations for this Policy.

In consideration of the payment of premium, in reliance on the statements in the Application and subject to all of the provisions of the Policy and this Coverage Section, Insurer and the Insureds agree as follows.

A. **INSURING CLAUSES**

    1.    Insurer shall pay on behalf of the Directors and Officers **Loss** resulting from any **Claim** first made against the Directors and Officers during the Policy Period for a **Wrongful Act**.

    2.    Insurer shall pay on behalf of the **Company Loss** which the **Company** is required or permitted to pay as indemnification to any of the Directors and Officers resulting from any **Claim** first made against the Directors and Officers during the Policy Period for a **Wrongful Act**.

    3.    Insurer shall pay on behalf of the **Company Loss** resulting from any **Claim** first made against the **Company** during the Policy Period for a **Wrongful Act**.

B. **DEFINITIONS**

The following terms whenever used in this Coverage Section in boldface type, shall have the meaning indicated. Other terms, whenever used in this Coverage Section in boldface type, shall have the meanings indicated in Clause B. of the General Terms and Conditions section of this Policy.

    1.    **Insureds** mean the **Company** and the Directors and Officers.

    2.    **Claim** means:

        a)    any written or oral demand for damages or other relief against any of the Insureds, and

        b)    any judicial, administrative or arbitration proceeding initiated against any of the Insureds in which they may be subjected to a binding adjudication of liability for damages or other relief, including any appeal therefrom.

    3.    **Continuity Date** means the date set forth in Item C. of the Declarations relating to this Coverage Section.

    4.    **Costs, Charges and Expenses** means reasonable and necessary legal fees and expenses incurred by any of the Insureds in defense of any **Claim** and cost of attachment or similar bonds, but shall not include:

        a)    salaries, wages, overhead or benefit expenses associated with officers or employees of the **Company**, or

        b)    any amounts incurred in defense of any **Claim** for which any other insurer has a duty to defend.

    5.    **Directors and Officers** means all persons who were, now are, or shall be:

        a)    directors, officers or employees of the **Company**, and

        b)    the functional equivalent to directors or officers of the **Company** in the event the **Company** is incorporated or domiciled outside the United States,

    including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy.

    6.    **Interrelated Wrongful Acts** means more than one **Wrongful Act** which have as a common nexus any fact, circumstance, situation, event or transaction or series of facts, circumstances, situations, events or transactions.

    7.    **Loss** means damages, settlements and **Costs, Charges and Expenses** incurred by any of the Directors and Officers under Insuring Clauses 1. or 2., and the **Company** under Insuring Clause 3., but shall not include:

        a)    that portion of any multiplied damages awarded which exceeds the amount multiplied,

        b)    taxes, criminal or civil fines or penalties imposed by law, or

        c)    matters deemed uninsurable under the law pursuant to which this Policy shall be construed, or

        d)    punitive or exemplary damages, except to the extent such damages are insurable under the law pursuant to which this Policy shall be construed or the law of the jurisdiction in which such damages are awarded, whichever legal venue is most favorable for the Insureds in deciding the insurability for such damages, or

        e)    the costs to modify or adapt any building or property to be more accessible or accommodating to any disabled person, or

        f)    any amounts owed or paid to one or more securities holders of the **Company** under any written or express contract or agreement.

    8.    **Outside Entity** means:

        a)    any non-profit organization which is exempt from taxation under the Internal Revenue Code (as amended), and

        b)    any for-profit organization specifically identified by endorsement to this Policy.

9.    Wrongful Act means any actual or alleged error, omission, misleading statement, neglect, breach of duty or act by:

    a)    any of the Directors and Officers, while acting in their capacity as:

        (i)    a director, officer or employee of the Company or the functional equivalent to a director or officer of the Company in the event the Company is incorporated or domiciled outside the United States; and

        (ii)    a director, officer, trustee, governor, executive director or similar position of any Outside Entity where such service is with the knowledge and consent of the Company; and

    b)    with respect to Insuring Clause 3. of this Coverage Section only, the Company.

## C.    EXCLUSIONS

1.    Insurer shall not be liable to make any payment under this Coverage Section in connection with any Claim:

    a)    for actual or alleged libel, slander, defamation, bodily injury, sickness, disease, death, false arrest, false imprisonment, assault, battery, mental anguish, emotional distress, invasion of privacy, or damage to or destruction of tangible property, including loss of use thereof;

    b)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

        (i)    any Wrongful Act or any fact, circumstance or situation which has been the subject of any notice given prior to the Policy Period under any other similar insurance policy, or

        (ii)    any other Wrongful Act, whenever occurring, which together with a Wrongful Act which has been the subject of such prior notice, would constitute Interrelated Wrongful Acts;

    c)    to the extent it is insured under any other existing valid policy, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, and regardless of whether or not any Loss in connection with such Claim is collectible or recoverable under such other policy; provided, however, this exclusion shall not apply to the amount of Loss which is in excess of the amount of any deductible and the limit of liability of such other policy where such Claim is otherwise covered by this Coverage Section;

    d)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving actual or alleged seepage, pollution or contamination of any kind; provided, however, this exclusion shall not apply to any Claim brought directly, derivatively or otherwise by one or more securities holders of the Company;

    e)    for any actual or alleged violation of the Employee Retirement Income Security Act of 1974, as amended, or any rules or regulations promulgated thereunder, or similar provisions of any federal, state or local statutory or common law;

    f)    by, on behalf of, or at the direction of any of the Insureds, except to the extent such Claim:

        (i)    is brought derivatively by a security holder of the Company who, when such Claim is first made, is acting independently of all of the Insureds,

        (ii)    is brought by any of the Insureds in the form of a cross-claim, third party claim or other proceeding for contribution or indemnity which is part of and results directly from a Claim not otherwise excluded by the terms of this Coverage Section, or

        (iii)    is brought by an employee of the Company who is not or was not a director or officer of the Company and where such Claim is brought by such employee only in their capacity as a security holder of the Company;

    g)    brought about or contributed to by:

        (i)    any dishonest, fraudulent or criminal act or omission by any of the Insureds, or

        (ii)    any personal profit by any of the Directors and Officers to which they were not legally entitled,

    as determined by a judgment or other final adjudication;

    h)    for the return by any of the Directors and Officers of any remuneration paid to them without the previous approval of the appropriate governing body of the Company or Outside Entity, which payment without such previous approval shall be held by a court to be in violation of law;

    i)    against any of the Directors and Officers of any Subsidiary or against any Subsidiary based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

        (i)    any Wrongful Act occurring prior to the date such entity became a Subsidiary or subsequent to the date such entity ceased to be a Subsidiary, or

        (ii)    any Wrongful Act occurring while such entity was a Subsidiary which, together with a Wrongful Act occurring prior to the date such entity became a Subsidiary, would constitute Interrelated Wrongful Acts;

    j)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any Wrongful Act actually or allegedly committed subsequent to a Takeover;

    k)    to the extent such Claim is based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the service of any of the Directors and Officers in any position or capacity in any entity other than the Company; provided, however, that this exclusion shall not apply to Loss resulting from any such Claim to the extent that:

        (i)    such Claim is based on the service of any of the Directors and Officers as a director, officer, trustee, governor, executive director or similar position of any Outside Entity where such service is with the knowledge and consent of the Company, and

(ii)    such Outside Entity is not permitted or required by law to provide indemnification to such Directors and Officers, and

(iii)    such Loss is not covered by insurance provided by any of the Outside Entity's insurer;

l)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

     (i)    any prior and/or pending litigation as of the Continuity Date, or

     (ii)    any fact, circumstance, situation, transaction or event underlying or alleged in such litigation,

   regardless of the legal theory upon which such Claim is predicated;

m)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, any Wrongful Act which any of the Insureds had knowledge of prior to the Continuity Date where such Insureds had reason to believe at the time that such known Wrongful Act could reasonably be expected to give rise to such Claim;

n)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any employment or employment-related matters brought by or on behalf of a director, officer, or employee, including any voluntary, seasonal, temporary, leased or independent contracted employee of the Company;

o)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

     (i)    any initial public offering undertaken and transacted by the Company, including all activities in connection therewith,

     (ii)    the actual or alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934, rules or regulations of the Securities and Exchange Commission promulgated thereunder, any other federal, state, local or provincial statute relating to securities, or any rules or regulations promulgated thereunder, all as amended, for any Wrongful Act actually or allegedly committed subsequent to such initial public offering, or

     (iii)    any equity or debt offering in excess of $50 million which is exempt from the registration requirements of the U.S. Securities and Exchange Commission; provided, however, that this subparagraph (iii) shall not apply if Insurer has agreed in writing to extend coverage for Wrongful Acts in connection with such offering, and the Insureds have paid the premium required by Insurer for such coverage extension; or

p)    for that portion of Loss which is covered under any other Coverage Section of this Policy.

2.    Insurer shall not be liable to make any payment under this Coverage Section in connection with any Claim made under Insuring Clause 3. against the Company:

     a)    based upon, arising out of, directly or indirectly resulting from, in consequence of liability of, or in any way involving any written or express contract or agreement, entered into among and between the Company and another party, except and to the extent the Company would have been liable in the absence of such contract or agreement; or

     b)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

         (i)    any actual or alleged infringement, misappropriation, or violation of copyright, patent, service marks, trade marks, trade secrets, title or other proprietary or licensing rights or intellectual property of any products, technologies or services, or

         (ii)    any goods or products manufactured, produced, processed, packaged, sold, marketed, distributed, advertised or developed by the Company,

   provided, however that Exclusions a) and b), above, shall not apply to any such Claim brought directly, indirectly, or derivatively by one or more of the securities holders of the Company.

No Wrongful Act of one or more of the Insured s shall be imputed to any other Insureds for the purpose of determining the applicability of any of the above Exclusions.

D.    **LIMIT OF LIABILITY AND RETENTIONS**

1.    Insurer shall be liable to pay the percentage of Loss set forth in Item F. of the Declarations relating to this Coverage Section in excess of the amount of the applicable Retention up to the Limit of Liability under this Coverage Section, it being warranted that the remaining percentage of Loss shall be uninsured.

2.    The amount shown in Item C. of the Declarations relating to this Coverage Section shall be the maximum aggregate Limit of Liability of Insurer under this Coverage Section.

3.    More than one Claim involving the same Wrongful Act or Interrelated Wrongful Acts shall be deemed to constitute a single Claim and shall be deemed to have been made at the earliest of the following times:

     a)    the time at which the earliest Claim involving the same Wrongful Act or Interrelated Wrongful Act is first made; or

     b)    the time at which the Claim involving the same Wrongful Act or Interrelated Wrongful Acts shall be deemed to have been made pursuant to Clause E.2., below.

4.    In the event a Claim is covered in part under more than one of the Insuring Clauses set forth in this Coverage Section, the Retentions set forth in Item C. of the Declarations relating to this Coverage Section shall be applied separately to that part of the Loss resulting from such Claim covered by each Insuring Clause. The sum of the Retentions so applied shall constitute the Retention applicable to such Claim. The total Retention, as finally determined, shall in no event exceed the largest single Retention applicable to such Claim.

5.  The Retention applicable to Insuring Clause 2, shall apply to Loss resulting from any Claim if indemnification by the Company is required by law or is legally permissible to the fullest extent permitted by law, regardless of whether or not actual indemnification by the Company is made, except and to the extent such indemnification is not made by the Company solely by reason of its financial insolvency.

6.  Payments of Loss by Insurer shall reduce the Limit of Liability under this Coverage Section.  Insurer shall pay Loss in the order in which Loss is incurred.  If Loss payable under Insuring Clause 1, and one or more of the other Insuring Clauses is incurred contemporaneously, Insurers first shall pay Loss payable under Insuring Clause 1.  The Named Insured may elect through its most senior ranking Directors and Officers to decline or defer payment under Insuring Clause 2, or Insuring Clause 3.  Insurer shall have no obligation to pay Loss after exhaustion of the Limit of Liability regardless of whether the Named Insured has declined or deferred payment.

7.  Insurer shall pay Costs, Charges and Expenses no more than once every 90 days.

E.  NOTIFICATION

1.  The Insureds shall, as a condition precedent to their rights to payment under this Coverage Section only, give Insurers notice in writing of any written Claim as soon as practicable, but in no event later than 60 days after the end of the Policy Period.

2.  If, during the Policy Period or the Discovery Period, any of the Insureds first becomes aware of a specific Wrongful Act and if the Insureds, during the Policy Period or the Discovery Period, if purchased, give written notice to Insurer as soon as practicable of:

   a)  the specific Wrongful Act, and

   b)  the consequences which have resulted or may result therefrom, and

   c)  the circumstances by which the Insureds first become aware thereof,

   then any Claim made subsequently arising out of such Wrongful Act shall be deemed for the purposes of this Coverage Section to have been made at the time such notice was first given to Insurer.

3.  Notice to Insurer shall be given to the firm shown under Item G. of the Declarations for this Policy.

D&O-4

| Policy No: | **BMI20016061** | Endorsement No: 1 |
|---|---|---|
| Issued to: | TRI Commercial Real Estate Services, Inc | |
| Effective Date: | August 1, 2004 | |

### DELETE ARBITRATION PROVISION

IN CONSIDERATION of the premium charged for this Policy, it is hereby understood and agreed that Clause K. **ARBITRATION** of the General Terms and Conditions Coverage Section is deleted in its entirety.

ALL OTHER TERMS, conditions and limitations of said Policy shall remain unchanged.

GT&C102

| | | |
|---|---|---|
| **Policy No:** | **BMI20016061** | **Endorsement No:** 2 |
| **Issued to:** | TRI Commercial Real Estate Services, Inc | |
| **Effective Date:** | August 1, 2004 | |

## PROFESSIONAL SERVICES ERRORS & OMISSIONS EXCLUSION
### (Carve Back Wording)

IN CONSIDERATION of the premium charged for this Policy, it is hereby understood and agreed that Clause C. EXCLUSIONS 1. of the Directors & Officers and Company Coverage Section is amended by the addition of the following:

q)    based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way relating to any act, error or omission in connection with performance of any professional services by or on behalf of any of the **Insureds** for the benefit of any other entity or person; provided, however, this exclusion shall not apply to any such **Claim** brought directly, derivatively or otherwise by one or more securities holders of the **Company** in their capacity as such.

ALL OTHER TERMS, conditions and limitations of said Policy shall remain unchanged.

D&O120
Rev 6/03

| Policy No: | BMI20016061 | Endorsement No: 3 |
|---|---|---|

**Issued to:**    TRI Commercial Real Estate Services, Inc

**Effective Date:**    August 1, 2004

## SPLIT CONTINUITY DATE

IN CONSIDERATION of the premium charged for this Policy, it is hereby understood and agreed that Item C. Coverage Section Description(s): Directors & Officers and Company and Employment Practices Coverage Section Continuity Date of the Declarations is amended to read as follows:

Item C.          **Coverage Section Description(s):**

Employment Practice

c)  Continuity Date    August 1, 1999    for any **Loss** payable as respects the first
                                         of the above Limit of Liability of $1,000,000.
                       September 11, 2002  for any **Loss** payable as respects the above
                                         Limit of Liability in excess of $1,000,000.

Directors & Officers and Company

c)  Continuity Date    August 1, 1999    for any **Loss** payable as respects the first
                                         of the above Limit of Liability of $1,000,000.
                       September 11, 2002  for any **Loss** payable as respects the above
                                         Limit of Liability in excess of $1,000,000.

ALL OTHER TERMS, conditions and limitations of said Policy shall remain unchanged.





**ace usa**

### POLICYHOLDER DISCLOSURE
### NOTICE OF TERRORISM
### INSURANCE COVERAGE

You should be aware that under the Terrorism Risk Insurance Act of 2002 ("The Act") effective November 26, 2002, any losses caused by certified acts of terrorism under your existing coverage may be partially reimbursed by the United States under a formula established by federal law (applicability is subject to the terms and conditions of each individual policy). The Act was specifically designed to address the ability of businesses and individuals to obtain property and casualty insurance for terrorism and to protect consumers by addressing market disruptions and ensure the continued availability of terrorism coverage.

Under the terms of The Act, you may now have the right to purchase insurance coverage for losses arising out of acts of terrorism, as defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States-to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property; or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Responsibility for Compensation under The Act is shared between insurance companies covered by The Act and the United States. Under the formula set forth in The Act, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible, which is paid by the insurance company providing the coverage.

We are providing you with the terrorism coverage required by The Act. The premium for the coverage is set forth below.

Name of Insured: TRI Commercial Real Estate Services, Inc
Policy No. BMI20016061

Terrorism Risk Insurance Act premium:  $290.28

1    LAW OFFICES OF KYRA A. SUBBOTIN
     KYRA A. SUBBOTIN State Bar No. 104944
2    2625 Alcatraz Avenue, No. 152
     Berkeley, CA 94705
3    Telephone: (510) 923-0451
     Facsimile (510) 923-0565
4
     Attorney for Defendants Raybern Foods, Inc.
5    and Bernard J. Viggiano

6

7

8                    SUPERIOR COURT OF CALIFORNIA

9                        COUNTY OF ALAMEDA

10

11

12   TRI COMMERCIAL REAL ESTATE          )   Case No.  RG 04141329
     SERVICES, INC.,                     )
13              Plaintiff,               )   CROSS-COMPLAINT AGAINST TRI
                                         )   COMMERCIAL REAL ESTATE
14        vs.                            )   SERVICES, INC., JOHN FULTS,
                                         )   AND ROBERT L. YOUNG,
15   RAYBERN FOODS, INC., BERNARD        )   INDIVIDUALLY AND DBA LAW
     J. VIGGIANO, and DOES 1-20          )   OFFICES OF ROBERT L. YOUNG
16                                       )
                Defendants.              )
17   _____)
                                         )   Trial Date: July 22, 2005
18   RAYBERN FOODS, INC.,                )
                                         )
19              Cross-complainant,       )
                                         )
20        vs.                            )
                                         )
21   TRI COMMERCIAL REAL ESTATE          )
     SERVICES, INC., JOHN FULTS,         )
22   ROBERT L. YOUNG, individually and   )
     dba LAW OFFICES OF ROBERT           )
23   YOUNG                               )
                                         )
24              Cross-defendants.        )
     _____)
25

26        Cross-complainant Raybern Foods, Inc. (Raybern) alleges as follows:

27                        **GENERAL ALLEGATIONS**

28        1.  TRI Commercial Real Estate Services, Inc. (TRI) is and at all relevant

EXHIBIT

2

41461.1

1   times was a California corporation that had its principal place of business in San

2   Francisco and is the plaintiff in this action.

3        2.  John Fults is and at all relevant times was a licensed real estate agent

4   and independent contractor affiliated with TRI.  At all relevant times, Fults held

5   himself out as president of Keystone Financial , a different corporation than TRI

6   and one for which Fults served as president.  Fults held himself out to Raybern as

7   someone with superior financial knowledge and abilities and significant experience

8   in handling the type of transactions that form the basis of this lawsuit.

9        3.  Cross-complainant is informed and believes and thereon alleges that

10   Robert L. Young was at all relevant times an officer and director of TRI and, with

11   respect to certain actions alleged herein, acted as its agent and within the course

12   and scope of his obligations as an officer and director of TRI.  Raybern is further

13   informed and believes that Robert L. Young was at all times a member of the

14   California bar and a practicing attorney holding himself out as having expertise in

15   the type of transactions that form the basis of this lawsuit.

16        4.  Cross-complainant is informed and believes and thereon alleges that

17   Robert L. Young, a California lawyer, was the owner and sole proprietor of the Law

18   Offices of Robert L. Young, a professional corporation at various times relevant

19   herein.  Young and the Law Offices of Robert L. Young  provided advice and

20   services to Raybern in connection with the transactions between Raybern and Rose

21   & Shore.

22        5.  The acts set forth herein occurred within the jurisdiction of this Court and

23   are related to and part of the series of transactions forming the basis of the TRI's

24   complaint.

25

26        **FIRST CAUSE OF ACTION - BREACH OF FIDUCIARY DUTY**

27              (Against Robert Young, Fults, and TRI)

28      6.  In early 2001, Raybern retained TRI, through its purported agent, John

41461.1

1  Fults, to represent Raybern in connection with negotiations toward the formation of
2  a strategic business alliance with another entity, Rose & Shore.  In that capacity
3  Fults and TRI were acting as fiduciaries to Raybern and owed Raybern the highest
4  duty of honesty and loyalty.  At the time Raybern retained TRI, it did not know of
5  or understand the true relationship between Young and TRI or between Fults and
6  TRI, and the cross-defendants did not disclose said relationships to Raybern.

7      7.  TRI, through its purported agent Fults, then undertook to have Raybern
8  hire Young to perform services of a legal and/or business nature for Raybern.

9      8.  Raybern hired Young and the Law Offices of Robert L. Young on or about
10  May 10, 2001, at TRI and Fults's recommendation.  At the time Raybern hired
11  Young and commenced payment for his services, Raybern did not know that Young
12  was, in fact, an officer and/or director of TRI.  Neither TRI, nor Fults, nor Young
13  disclosed that fact, and none of them disclosed that Fults had a prior and ongoing
14  personal and/or professional relationship with Young.

15      9.  The services performed by TRI by and through Young, its officer and
16  director, resulted in the consummation of a transaction upon which TRI now is
17  seeking damages.  The services that Young provided included legal services as well
18  as services which TRI/Fults had already agreed to provide Raybern in exchange for
19  a commission from the Raybern/Rose & Shore transactions.  Raybern was billed for
20  and paid Young substantial fees for his services.

21      10.  During the course of his representation of Raybern, Young failed to
22  adequately protect Raybern's financial interests in the transactions with Rose &
23  Shore and likewise failed to adequately protect Raybern when TRI's purported
24  agent, John Fults, announced that he intended to withdraw from further
25  representation of Raybern.

26      11.  Young, Fults, and TRI's actions breached their respective fiduciary
27  duties to Raybern, resulting in damages to Raybern in an amount to be proven at
28  trial.

- 3 -

41461.1

## SECOND CAUSE OF ACTION - PROFESSIONAL NEGLIGENCE

### (Robert Young/Law Offices of Robert L. Young)

12. Cross-complainant realleges paragraphs 1 through 10 as though fully set forth herein.

13. Young's services on behalf of Raybern fell below the standard of care for legal professionals in that he failed to adequately disclose his relationship with TRI and likewise failed to protect his client's interests vis a vis TRI when TRI's agent withdrew from representing Raybern. Young's negotiations for and drafting of Raybern's contracts with Rose & Shore failed to adequately protect Raybern's long-term financial interests in its relationship with Rose & Shore.

14. Young's disclosures and services fell below the standard of care for legal professionals and proximately cause damage to Raybern, for which Raybern seeks recovery herein.

## THIRD CAUSE OF ACTION - NEGLIGENCE

### (All Defendants)

15. Cross-complainant realleges paragraphs 1 through 10 as though fully set forth herein.

16. Cross-defendants and each of them owed Raybern a duty of care to protect the financial interests of Raybern in the series of transactions in which defendants were involved. Cross-defendants breached their duty of care to Raybern, resulting in past and future financial losses.

## FOURTH CAUSE OF ACTION - PROMISSORY FRAUD

### (Fults; TRI)

17. Cross-complainant realleges paragraphs 1 through 10 as though fully set forth herein.

18. TRI, through its purported agent Fults, knowingly misrepresented its

- 4 -

41461.1

background and skill in brokering deals of the sort that Raybern and Rose & Shore were contemplating.  Furthermore, they misrepresented the nature of the services they would be providing; neither TRI nor Fults intended to provide due diligence through the life of the Raybern/Rose & Shore contract, despite the fact that Raybern needed those services and had expressly obtained TRI/Fults's agreement to provide such services in exchange for its commission.

19.  In entering into an agreement with TRI/Fults, Raybern relied on TRI and Fults's representations as to the degree of skill and type of services it would be providing in connection with the negotiation of the Raybern/Rose & Shore transaction.   Raybern's reliance on cross-defendants' representations was reasonable.

20.  As a result of Raybern's reliance on TRI and Fults's representations, Raybern suffered consequential damages in an amount to be proven at trial.

21.  TRI/Fults intentional conduct was undertaken with aim of causing Raybern injury and was sufficient to support an award of punitive damages pursuant to Civil Code §3294.

### PRAYER FOR RELIEF

Wherefore cross-defendant prays for relief as follows:

1.  For compensatory damages according to proof;

2.  For a disgorgement of all professional fees paid to Robert Young and the Law Offices of Robert L. Young in connection with professional services rendered in connection with the transactions underlying this lawsuit;

3.  For punitive damages according to proof;

4.  For costs of suit herein; and

5.  For such other and further relief as the Court deems just and proper.

41461.1

Dated: March 18, 2005

LAW OFFICES OF KYRA SUBBOTIN

By: _____
     Kyra A. Subbotin

## DEMAND FOR JURY TRIAL

Cross-complainant Raybern Foods, Inc. hereby demands a jury trial of all claims asserted herein.

Dated: March 18, 2005

LAW OFFICES OF KYRA SUBBOTIN

By: _____
     Kyra A. Subbotin

- 6 -

41461.1

**FILED BY FAX**
ALAMEDA COUNTY

July 26, 2005

CLERK OF
THE SUPERIOR COURT
By Rosanne Case, Deputy

CASE NUMBER:
**RG04141329**

1  LAW OFFICES OF KYRA A. SUBBOTIN
   KYRA A. SUBBOTIN State Bar No. 104944
2  2625 Alcatraz Avenue, No. 152
   Berkeley, CA 94705
3  Telephone: (510) 923-0451
   Facsimile (510) 923-0565
4
   Attorney for Defendants Raybern Foods, Inc.
5  and Bernard J. Viggiano

6

7

8              SUPERIOR COURT OF CALIFORNIA

9                  COUNTY OF ALAMEDA

10

11
   TRI COMMERCIAL REAL ESTATE          )   Case No. RG 04141329
12 SERVICES, INC.,                      )
                                        )
13          Plaintiff,                  )   **FIRST AMENDED CROSS-**
                                        )   **COMPLAINT AGAINST TRI**
14     vs.                              )   **COMMERCIAL REAL ESTATE**
                                        )   **SERVICES, INC., JOHN FULTS,**
15 RAYBERN FOODS, INC., BERNARD         )   **AND ROBERT L. YOUNG,**
   J. VIGGIANO, and DOES 1-20           )   **INDIVIDUALLY AND DBA LAW**
16                                      )   **OFFICES OF ROBERT L. YOUNG**
           Defendants.                  )
17 _____ )
                                        )
18 RAYBERN FOODS, INC.,                 )
                                        )
19          Cross-complainant,          )
                                        )
20     vs.                              )
                                        )
21 TRI COMMERCIAL REAL ESTATE           )
   SERVICES, INC., JOHN FULTS,          )
22 ROBERT L. YOUNG, individually and    )
   dba LAW OFFICES OF ROBERT            )
23 YOUNG                                )
                                        )
24          Cross-defendants.           )
25 _____

26    Cross-complainant Raybern Foods, Inc. (Raybern) alleges as follows:

27                    <u>GENERAL ALLEGATIONS</u>

28    1.  TRI Commercial Real Estate Services, Inc. (TRI) is and at all relevant

**EXHIBIT**

3

1    times was a California corporation that had its principal place of business in San

2    Francisco and is the plaintiff in this action. TRI provides professional brokerage

3    services to client throughout the state of California and within the jurisdiction of

4    this Court.

5        2.  Cross-complainant is informed and believes and thereon alleges that John

6    Fults (Fults) is and at all relevant times was a licensed real estate agent and

7    independent contractor affiliated with TRI.  At all relevant times, Fults held

8    himself out as president of Keystone Financial , a different corporation than TRI

9    and one for which Fults served as president.  The exact nature of the relationship

10   between Keystone Financial and TRI is as yet unknown.  Fults held himself out to

11   Raybern as someone with superior financial knowledge and abilities and significant

12   experience in handling the type of transactions that form the basis of this lawsuit.

13       3.  Cross-complainant is informed and believes and thereon alleges that

14   Robert L. Young (Young) was an officer and director of TRI and, as such, had a

15   degree of control over or influence on TRI's actions herein.  With respect to certain

16   actions alleged herein, Young acted as TRI's  agent and within the course and scope

17   of his position as an officer and/or director of TRI.  Raybern contends that in failing

18   to disclose his role as an officer and director of TRI, Young placed his interests as an

19   officer and/or director of TRI above his professional obligations to Raybern.

20   Raybern is further informed and believes that Robert L. Young was at all times a

21   member of the California bar and a practicing attorney claiming expertise in the

22   type of transactions that form the basis of this lawsuit.  Raybern is informed and

23   believes and thereon alleges that Young was an undisclosed business associate of

24   Fults and served as an advisor to various business entities owned and/or controlled

25   by Fults.

26       4.  Cross-complainant is informed and believes and thereon alleges that

27   Robert L. Young, a California lawyer, was the owner and sole proprietor of the Law

28   Offices of Robert L. Young, a professional corporation at various times relevant

41461.1

1   herein. Young and the Law Offices of Robert L. Young  provided advice and

2   services to Raybern in connection with the transactions between Raybern and Rose

3   & Shore as well as other business matters during the same time period that the

4   Rose & Shore transactions were being negotiated.  In such a capacity, Young and

5   the Law Offices of Robert L. Young owed a fiduciary duty to Raybern.

6           5.  The acts set forth herein occurred within the jurisdiction of this Court and

7   are related to and part of the series of transactions forming the basis of the TRI's

8   complaint.

9

10                **FIRST CAUSE OF ACTION - BREACH OF FIDUCIARY DUTY**

11                          (Against Fults, and TRI)

12          6.  In early 2001, Raybern retained TRI, through its purported agent, John

13  Fults, to represent Raybern in connection with negotiations toward the formation of

14  a strategic business alliance with another entity, Rose & Shore. The purpose of

15  that alliance, among other things, was to allow Rose & Shore to take over the

16  manufacturing of certain products, including products that were provided to

17  Raybern's major client, Togo's Eateries, Inc. (Togo's) and to ultimately allow

18  Raybern to close its Hayward manufacturing plant.   In agreeing to represent

19  Raybern in the transactions with Rose & Shore, Fults and TRI were acting as

20  fiduciaries to Raybern and owed Raybern the highest duty of honesty and loyalty in

21  negotiating the business alliance with Rose & Shore.  At the time Raybern retained

22  TRI, it did not know of or understand the true relationship between  TRI and Fults,

23  nor did it understand the full relationship between TRI and its then-officer/director

24  Young, who was also involved in the negotiation of the Rose & Shore contracts and

25  who subsequently represented Raybern in other unrelated business transactions..

26          7.  TRI, through its purported agent Fults, then urged Raybern to hire Young

27  to perform services of a legal and business nature for Raybern.  On Fults'

28  recommendation, Raybern did hire Young in May 2001 and continued to pay Young

1    for his services through at least November 2002. Raybern paid Young professional

2    fees in excess of $51,000 in connection with the Rose & Shore transactions, and also

3    paid Young for services in connection with at least two other business matters in

4    which Young provided advice to Raybern.

5         8. TRI, and its purported agent Fults, breached their fiduciary duty to

6    Raybern by failing to disclose Fults's background and experience and for failing to

7    disclose the relationships between TRI, Young, and Fults. Specifically, Raybern

8    would not have engaged Fults had it known of Fults's true business background

9    and Fults's own legal troubles, including a personal bankruptcy and threatened or

10   ongoing litigation involving allegations of breach of fiduciary. TRI and Fults

11   likewise breached their fiduciary duty to Raybern by failing and refusing to fulfill

12   their promise to monitor Rose & Shore's performance and payments under its

13   contract with Raybern and by withdrawing from the transaction before it was

14   finalized. TRI and Fults breached their fiduciary obligations to Raybern by failing

15   to insure that Raybern's goal – tying the August 20, 2001 licensing agreement

16   between Rose & Shore and Raybern to continued performance by Rose & Shore

17   under a separate Manufacturing Agreement executed that same date – was

18   achieved. Instead, the Manufacturing Agreement, which involved the manufacture

19   of sandwich products for customers other than Togo's, contained a provision

20   allowing Rose & Shore to terminate the agreement upon eight months' notice and in

21   the absence of default by Raybern. Rose & Shore has, in fact, exercised its right to

22   terminate the Manufacturing Agreement and has continued to operate under the

23   Licensing Agreement. Finally, TRI and Fults breached their fiduciary duty by

24   failing to disclose that the attorney they were recommending to represent Raybern

25   was, in fact, a business associate of Fults and an officer and director of TRI, and

26   therefore had a vested interest in ensuring that the Rose & Shore transaction was

27   consummated so that TRI would receive a commission.

28        9. As a proximate result of TRI and Fult's breach of its fiduciary duty to

1    Raybern, Raybern has incurred damages, including but not limited to  (1) fees paid

2    to Young for certain negotiating services that should have been performed by TRI

3    and Fults under their agreement with Raybern; (2) fees paid to Young for services

4    which benefitted TRI and not Raybern; (3) attorneys fees incurred in an attempt to

5    prevent Rose & Shore's unilateral withdrawal from the Manufacturing Agreement;

6    and (4) costs incurred in connection with monitoring the Rose & Shore relationship,

7    as Fults had promised he would do but failed to do; and (5) costs relating to re-

8    opening of Raybern's Hayward facility as a result of Rose & Shore's termination of

9    the Manufacturing Agreement without cause.

10

11    <u>**SECOND CAUSE OF ACTION - BREACH OF FIDUCIARY DUTY**</u>

12    (Against Robert L. Young, Law Offices of Robert L. Young)

13    10.  Raybern realleges paragraphs 1-5 and paragraph 7 as though fully set

14    forth herein.

15    11.  Raybern hired Young and the Law Offices of Robert L. Young

16    (collectively "Young") on or about May 10, 2001, at TRI and Fults's

17    recommendation.  At the time Raybern hired Young and commenced payment for

18    his services, Raybern did not know that Young was, in fact, an officer and/or

19    director of TRI.  Neither TRI, nor Fults, nor Young disclosed that fact, and none of

20    them disclosed that Fults had a prior and ongoing personal and/or professional

21    relationship with Young and that Young had also served as an agent of other

22    business entities owned or controlled by Fults.

23    12.  As Raybern's attorney, Young owed his client a fiduciary duty to disclose

24    all relevant facts regarding his relationship with TRI and Fults.  Specifically, he

25    had an obligation to inform Raybern that he was then serving as an officer and/or

26    director of TRI and therefore had conflicting fiduciary duties.  He likewise had an

27    obligation to inform Raybern of his relationship to Fults and his knowledge of Fults'

28    business background and experience.  Further, he had a duty to protect Raybern's

- 5 -

41461.1

1   interest when Fults withdrew from the Rose & Shore transactions and to take all

2   steps available to protect Raybern in connection with that withdrawal.

3       13.  During the course of his representation of Raybern, and in the interest of

4   effecting a transaction that would result in a commission to TRI, the company upon

5   whose board he served, Young failed to disclose his relationships with TRI and

6   Fults, and he failed adequately to protect Raybern's financial interests in the

7   transactions with Rose & Shore.  Specifically, Young failed to insure that the

8   Manufacturing Agreement was tied to the Licensing Agreement; Instead the

9   Manufacturing Agreement had a provision allowing Rose & Shore to terminate the

10  Manufacturing Agreement even absent default by Raybern and yet continue to

11  operate under the more lucrative Licensing Agreement.  Young likewise breached

12  his fiduciary duty to Raybern by failing to include language in the Licensing

13  Agreement making it clear that Fults had the obligation to and would be

14  monitoring the Rose & Shore financials through the life of the Raybern/Rose &

15  Shore contract, an issue now in dispute in this lawsuit. Young likewise failed to

16  take steps to protect Raybern's interest upon learning that Fults refused to continue

17  performing under his contract with Raybern.  Finally, when Raybern asked Young

18  to review a listing agreement between TRI and Raybern – an agreement that would

19  result in a commission to TRI upon sale of Raybern's Hayward property – Young

20  again failed to disclose his true relationship with TRI.

21      14.  Young's breach of his fiduciary duty to his client, Raybern, proximately

22  resulted in damage to Raybern.  Specifically, Raybern paid Young over $51,000 in

23  attorneys fees which, under the law involving undisclosed conflicts of interest, he

24  had no obligation to pay.  Raybern has also been forced to incur attorneys fees to

25  defend this action which would not have been brought had Young properly advised

26  Raybern upon Fults's withdrawal from the underlying transaction.  Raybern has

27  also had to retain an attorney in connection with Rose & Shore's withdrawal from

28  the Manufacturing Agreement – a withdrawal that should have been prohibited

- 6 -

41461.1

1  absent a default by Raybern.  Finally, as a result of Young's failure to draft a

2  Manufacturing Contract that ensured Rose & Shore's continued performance,

3  Raybern has incurred substantial costs to reopen its Hayward processing plant to

4  accommodate the business heretofore handled by Rose & Shore under the

5  Manufacturing Contract, yet is unable to withdraw from the Licensing Agreement.

6

7  <u>THIRD CAUSE OF ACTION - PROFESSIONAL NEGLIGENCE</u>

8  (Robert Young/Law Offices of Robert L. Young)

9  15.  Cross-complainant realleges paragraphs 1 through 5, 7, and 10-14 as

10  though fully set forth herein.

11  16.  Young's services on behalf of Raybern fell below the standard of care for

12  legal professionals in that he failed to adequately fully disclose his relationship with

13  TRI, in direct contravention of the Professional Rules of Conduct.  Young likewise

14  failed to protect his client's interests vis a vis TRI when TRI's agent withdrew from

15  representing Raybern by either negotiating a novation of the Fults/Raybern

16  contract or disclosing his ongoing conflict and referring Raybern to other counsel.

17  As a result, Raybern is now forced to defend this action.  Young's negotiations and

18  drafting of Raybern's contracts with Rose & Shore likewise fell below the standard

19  of care in that they did not adequately protect Raybern or accomplish Raybern's

20  stated goal of ensuring that Rose & Shore would be handling all of its

21  manufacturing, not just that implicated in the Licensing Agreement.  Raybern

22  made clear that it was closing its Hayward facility and, as a consequence, Rose &

23  Shore should not be given an opportunity to  unilaterally repudiate its obligations

24  under the Manufacturing Agreement while maintaining the more lucrative business

25  that was the subject of the Licensing Agreement.  In drafting the Manufacturing

26  Agreement and providing Rose & Shore with the ability to withdraw from the

27  contract even absent default by Raybern, Young failed to protect his client's goals.

28  17. Young's breach of his professional duty to his client, Raybern,

- 7 -

41461.1

1   proximately resulted in damage to Raybern. Specifically, Raybern has been forced

2   to incur attorneys fees to defend this action. Raybern has also had to retain an

3   attorney in connection with Rose & Shore's withdrawal from the Manufacturing

4   Agreement – a withdrawal that should have been prohibited absent a default by

5   Raybern.     Finally, as a proximate result of Young's failure to draft a

6   Manufacturing Contract that ensured Rose & Shore's continued performance,

7   Raybern has incurred substantial costs to reopen its Hayward processing plant to

8   accommodate the business heretofore handled by Rose & Shore under the

9   Manufacturing Contract. Finally, as a proximate result of Young's breach of his

10  obligation to fully disclose his relationship with TRI and Fults, Raybern has

11  incurred fees paid to Young, and hereby seeks disgorgement of those fees.

12

13          **FOURTH CAUSE OF ACTION - NEGLIGENCE**

14                      (All Defendants)

15      18. Cross-complainant realleges paragraphs 1 through 9, 11 through 14, and

16  16 through 17, as though fully set forth herein.

17      19. Cross-defendants and each of them owed Raybern a duty of ordinary care

18  to protect the financial interests of Raybern in the series of transactions in which

19  defendants were involved. Raybern reasonably relied on the professional expertise

20  of TRI, Fults, and Young in protecting his interests in the transactions with Rose

21  & Shore and ensuring that Raybern's goal of shifting its manufacturing business

22  to Rose & Shore was accomplished. As outlined above, cross-defendants and

23  each of them, breached their duty of care to Raybern. As a proximate result of

24  Young's failure to draft a Manufacturing Contract that ensured Rose & Shore's

25  continued performance, Raybern has incurred substantial costs to reopen its

26  Hayward processing plant to accommodate the business heretofore handled by Rose

27  & Shore under the Manufacturing Contract. Finally, as a proximate result of

28  Young's breach of his obligation to fully disclose his relationship with TRI and

41461.1

1    Fults, Raybern has incurred fees paid to Young, and hereby seeks disgorgement of

2    those fees.

3

4                    ### FIFTH  CAUSE OF ACTION - PROMISSORY FRAUD

5                              (Fults; TRI)

6        20.  Cross-complainant realleges paragraphs 1 through 5 as though fully set

7    forth herein.

8        21.  TRI, through its purported agent Fults, knowingly misrepresented its

9    background and skill in brokering deals of the sort that Raybern and Rose & Shore

10   were contemplating.  Furthermore, they misrepresented the nature of the services

11   they would be providing; neither TRI nor Fults intended to provide due diligence

12   through the life of the Raybern/Rose & Shore contract, despite the fact that Raybern

13   needed those services and had expressly obtained TRI/Fults's agreement to provide

14   such services in exchange for its commission.

15       22.  In entering into an agreement with TRI/Fults, Raybern reasonably relied

16   on TRI and Fults's representations as to the degree of skill and type of services it

17   would be providing in connection with the negotiation of the Raybern/Rose & Shore

18   transaction.

19       23.  As a result of Raybern's reliance on TRI and Fults's representations,

20   Raybern suffered consequential damages in that TRI and Fults did not adequately

21   protect Raybern's interests in the Rose & Shore transactions and Raybern has had

22   to provide its own due diligence and has had to continue to negotiate the terms of

23   its deal with Rose & Shore, at substantial cost to Raybern.

24       24.  TRI/Fults intentional conduct was undertaken with fraud and with the

25   aim of causing Raybern injury and was sufficient to support an award of punitive

26   damages pursuant to Civil Code §3294.

27

28

41461.1

## PRAYER FOR RELIEF

Wherefore cross-defendant prays for relief as follows:

1.  For compensatory damages according to proof;

2.  For a disgorgement of all professional fees paid to Robert Young and the Law Offices of Robert L. Young in connection with professional services rendered to Raybern;

3.  For punitive damages according to proof;

4.  For costs of suit herein; and

5.  For such other and further relief as the Court deems just and proper.

Dated: July 25, 2005

                    LAW OFFICES OF KYRA SUBBOTIN

                    By: _____
                         Kyra A. Subbotin

## DEMAND FOR JURY TRIAL

Cross-complainant Raybern Foods, Inc. hereby demands a jury trial of all claims asserted herein.

Dated: July 25, 2005

                    LAW OFFICES OF KYRA SUBBOTIN

                    By: _____
                         Kyra A. Subbotin

- 10 -

41461.1

## PROOF OF SERVICE
[C.C.P. § 1013, C.R.C.§ 2008, F.R.C.P. Rule 5]

I, Kyra A. Subbotin, state:

I am a citizen of the United States. My business address is 2625 Alcatraz Avenue, No. 152, Berkeley, California 94705. I am employed in the city of Berkeley, County of Alameda, where this mailing occurs. I am over the age of eighteen years and not a party to this action. On the date set forth below, I served **FIRST AMENDED CROSS-COMPLAINT** on the following person(s) in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

Albert E. Cordova, Esq.                          Frederick Hagen, Esq.
1299 Fourth Street, Suite 202               Berding & Weil
San Rafael, CA 94901                           3240 Stone Valley Road West
Facsimile: 415 453-6260                        Alamo, CA 94507

⌧    BY FIRST CLASS MAIL - I am readily familiar with my firm's practice for collection and processing of correspondence for mailing with the United States Postal Service, to-wit, that correspondence will be deposited with the United States Postal Service this same day in the ordinary course of business. I sealed said envelope and placed it for collection and mailing this date, following ordinary business practices.

__    BY FACSIMILE - I caused said document to be transmitted by Facsimile machine to the number indicated after the address(es) noted above pursuant to a written agreement between counsel for the parties in this action.

__    BY HAND DELIVERY - I caused said document to be hand delivered to the person(s) noted above.

__    BY OVERNIGHT MAIL - I caused said document to be placed with an overnight mailing service for delivery the following business day.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed this date at Berkeley, California.

Dated: July 26, 2005

_Kyra A. Subbotin_

52533.1

1   Clifford R. Horner, Esq., State Bar No. 154353
    Terrence A. Meyerhoff, Esq., State Bar No. 176701
2   **BERDING & WEIL LLP**
    3240 Stone Valley Road West
3   Alamo, California 94507
    Telephone:    925/838-2090
4   Facsimile:    925/820-5592

5   Attorneys for Cross-Defendant/Cross-Complainant
    Robert Young, individually and dba
6   Law Offices of Robert Young

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  IN AND FOR THE COUNTY OF ALAMEDA

10

11  TRI COMMERCIAL REAL ESTATE                No. RG 04141329
    SERVICES, INC.,
12                                            **DECLARATION OF EDWARD WELCH IN**
                  Plaintiff,                  **SUPPORT OF MOTION FOR SUMMARY**
13                                            **JUDGMENT OR IN THE ALTERNATIVE**
          vs.                                 **ADJUDICATION AGAINST TRI**
14                                            **COMMERCIAL REAL ESTATE**
    RAYBERN FOODS, INC., BERNARD J.           **SERVICES, INC.**
15  VIGGIANO, and DOES 1-20

16                Defendants,

17  _____/      Date:       August 28, 2006
18  RAYBERN FOODS, INC.,                      Time:       9:00 a.m.
                                              Dept:       31
19                Cross-Complainant           Judge:      The Honorable Winifred Smith
                                              Reservation No.:  R594827
20        vs.

21  TRI COMMERCIAL REAL ESTATE
    SERVICES, INC., JOHN FULTS, ROBERT L.
22  YOUNG, individually and dba LAW OFFICES
    OF ROBERT YOUNG,
23
                  Cross-Defendants.
24  _____/

25        I, Edward Welch, declare as follows:

26        1.    I am the past President of TRI Commercial Real Estate Services, Inc. ("TRI").  I

27  held this position during all times relevant to this lawsuit, e.g. from the date of execution of TRI's

28  Amended and Restated Bylaws on January 29, 1996 (the "TRI Bylaws") to and including

BERDING & WEIL, LLP
3240 Stone Valley Road West
Alamo, California 94507

DECLARATION OF EDWARD WELCH IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR IN
THE ALTERNATIVE ADJUDICATION AGAINST TRI COMMERCIAL REAL ESTATE SERVICES, INC                    -1-

1    December 31, 2002.

2        2.    As TRI's President, I reviewed, edited and approved, and instructed TRI's

3    secretary, Charles J. Shaffer, to execute and certify the TRI Bylaws.

4        3.    A key provision in the TRI Bylaws was Section 29, which Section provides that

5    TRI will defend and indemnify any of its officers or directors against any claims made or actions

6    filed against them by reason of their having served as a director or officer of TRI.

7        4.    Mr. Young expressed to me that he would not serve as an officer or director of

8    TRI without such an indemnity provision obligating TRI to defend and indemnify Young against

9    such actions.

10       5.    I have reviewed Paragraph 3 of Raybern Foods, Inc.'s ("Raybern") First Amended

11   Cross-Complaint against Young, and especially the allegation that "Cross-Complainant is

12   informed and believes and thereon alleges that Robert L. Young (Young) was an officer and

13   director of TRI and, as such, had a degree of control over or influence on TRI's actions herein.

14   With respect to certain actions alleged herein, Young acted as TRI's agent and within the course

15   and scope of his position as an officer and/or director of TRI. Raybern contends that in failing to

16   disclose his role as an officer and director of TRI, Young placed his interests as an officer and/or

17   director of TRI above his professional obligations to Raybern."

18       6.    It was my intent as President of TRI that TRI's Bylaws provide defense and

19   indemnity protection from TRI to its present and past officers and directors, including Young,

20   against the above types of allegations made by Raybern against Young in the lawsuit instigated

21   by TRI against Raybern.

22       I declare under penalty of perjury under the laws of the State of California that the

23   foregoing is true and correct.

24

25   Dated:    June 14, 2006

26                              _____
                                      Edward Welch

27

28

BERDING & WEIL, LLP
2175 N. California Blvd West
Alamo, California 94507

DECLARATION OF EDWARD WELCH IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR IN
THE ALTERNATIVE ADJUDICATION AGAINST TRI COMMERCIAL REAL ESTATE SERVICES, INC



**BERDING & WEIL LLP**

ATTORNEYS AT LAW

ALAMO, CA
SCOTTSDALE, AZ

July 6, 2005

ACE Westchester Specialty Claims
1133 Avenue of the Americas
38th Floor
New York, NY  10036

| | | |
|---|---|---|
| Re: | The Insureds: | **TRI Commercial Real Estate Services, Inc. and its Officers and Directors, including Robert L. Young** |
| | The Policy: | **Illinois Union Insurance Co., Policy No. BMI20016061 ("Directors & Officers Insurance Policy")** |
| | Lawsuit: | ***TRI vs. Raybern Foods, Inc. et al.* Alameda County Superior Court, Case No. RG04141329 ("Matter")** |

Dear Gentlepeople:

We represent Robert L. Young ("Young") in connection with the above-referenced Matter. Enclosed is a copy of the Cross-Complaint that was filed against Young by Raybern Foods, Inc. in such Matter ("Cross-Complaint"). The Cross-Complaint alleges that Young was an officer and director of TRI Commercial Real Estate Services, Inc. ("TRI") during the relevant time period when the alleged events occurred that form the basis of the Cross-Complaint. Illinois Union Insurance Company ("IUIC") issued the above Directors & Officers policy, a copy of which is enclosed, which insures TRI and Young against the damages alleged in the Cross-Complaint.

We hereby tender to IUIC the defense of Young in this Matter and demand indemnity of Young by IUIC from and against any and all liability arising from the Matter, and all events and occurrences upon which the Matter is based, specifically including, but not limited to, all damages and attorneys' fees and costs Young incurs.

This tender and demand was also made by this law firm to TRI immediately after the Cross-Complaint was served on Mr. Young, but TRI refused to accept the tender. We also asked TRI to tender the Matter to IUIC; to our knowledge, it has not done so.



EXHIBIT

4

July 6, 2005
Page 2

Please be advised that litigation is ongoing. We view the Cross-Complaint against Young as a sham and have demurred to the Cross-Complaint. Our Demurrer was sustained with Leave to Amend. An Amended Cross-Complaint is due to be filed on or before August 12, 2005. As a result of the filing of the Cross-Complaint, the trial date was vacated and has not been reset. Should Cross-Complainant's Amended Cross-Complaint ever state a cause of action, a responsive pleading will be filed and discovery will ensue.

It is in the interest of the insureds, TRI and Mr. Young, and IUIC that IUIC immediately assume the defense of Mr. Young and fully defend and indemnify him as demanded above. Please advise of the name of counsel whom you are appointing to defend Mr. Young and ask such counsel to contact me immediately.

Sincerely,

**BERDING & WEIL LLP**

Clifford R. Horner
chorner@berding-weil.com

CRH:ar
Enclosures
cc:    Albert E. Cordova, Esq.

**BERDING & WEIL LLP**
ATTORNEYS AT LAW



**BERDING & WEIL LLP**

ATTORNEYS AT LAW

ALAMO, CA
PHOENIX, AZ

December 15, 2005

ACE Westchester Specialty Claims
1133 Avenue of the Americas
38th Floor
New York, NY 10036

| | | |
|---|---|---|
| Re: | The Insureds: | **TRI Commercial Real Estate Services, Inc. and its Officers and Directors, including Robert L. Young** |
| | The Policy: | **Illinois Union Insurance Co., Policy No. BMI20016061 ("Directors & Officers Insurance Policy")** |
| | Lawsuit: | *TRI vs. Raybern Foods, Inc. et al.* **Alameda County Superior Court, Case No. RG04141329 ("Matter")** |

Dear Gentlepeople:

We represent Robert L. Young ("Young") in connection with the above-referenced Matter. On July 6, 2005, we wrote to you, enclosing a copy of the Cross-complaint ("Cross-complaint") filed against Mr. Young by Raybern Foods, Inc. In our letter of July 6, 2005, we tendered to Illinois Union Insurance Co, under the above-referenced policy, the defense of Mr. Young as relates the Cross-complaint, and demanded therein that Illinois Union Insurance Co indemnity Mr. Young for any and all liability arising out of the Cross-complaint. To date, Illinois Union Insurance Co. has not responded to this tender. A response to our tender is long overdue.

We are enclosing a copy of the First Amended Cross-complaint ("First Amended Cross-complaint"), dated July 26, 2005, that Raybern Foods, Inc. filed in this matter. By way of this letter, we tender to Illinois Union Insurance Co., and hereby demand that Illinois Union Insurance Co. defend and indemnify Mr. Young against and for any and all liability arising out of or related to the First Amended Cross-complaint, including but not limited to all damages and attorneys' fees and associated costs Mr. Young has incurred and will incur in the future. This firm tendered to TRI Commercial Real Estate Services, Inc. the First Amended Cross-complaint for defense and indemnity on August 15, 2005. We requested in that letter that TRI Commercial Real Estate Services, Inc. also tender to Illinois Union Insurance Co. In a letter of August 17, 2005 it has refused to do so.

**EXHIBIT**

**5**

December 15, 2005
Page 2

---

Like the Cross-Complaint, the First Amended Cross-complaint alleges that Mr. Young was an officer and director of TRI Commercial Real Estate Services, Inc. during the relevant time period when the alleged acts or alleged failure to act occurred, which alleged acts or failure to act form the basis of the Raybern Foods, Inc.'s First Amended Cross-complaint. Illinois Union Insurance Company issued the above Directors & Officers policy, a copy of which is enclosed, which insures TRI Commercial Real Estate Services and Mr. Young against the damages alleged in the First Amended Cross-complaint.

A trial date has been set in this matter for April 28, 2006. Please be advised, therefore, that costs associated with the litigation are expected to rise significantly over the next few months, as discovery is completed, depositions are taken, mediation is scheduled, and the date for trial approaches. It is our view, after considered analysis, that the First Amended Cross-complaint against Mr. Young is baseless and without merit.

Certainly, it is in the interests of everyone, not the least of which Illinois Union Insurance Co., that you assume the defense of Mr. Young and fully indemnify him as demanded herein. In that respect, we request a reply to the tender of this date and a response to our tender of July 6, 2005. We request a response to our tenders no latter than the end of the year. Because the issues in the initial Cross-complaint and First Amended Cross-complaint are almost identical, and Illinois Union Insurance Co. has already had over six months to consider those issues, the proposed timetable is entirely reasonable.

If Illinois Union Insurance Co. decides, as it should, that it is required to defend and indemnify Mr. Young in this matter, then we kindly request that you advice us immediately of the name and phone number of defense counsel whom you are appointing.

Sincerely,

**BERDING & WEIL LLP**

Terrence A. Meyerhoff
tmeyerhoff@berding-weil.com

TAM/jsw
Enclosures
cc:    Albert E. Cordova, Esq.



# BERDING & WEIL LLP

**ATTORNEYS AT LAW**

ALAMO, CA
PHOENIX, AZ

February 3, 2006

ACE Westchester Specialty Claims
1133 Avenue of the Americas
38th Floor
New York, NY 10036

|  |  |  |
|---|---|---|
| **Re:** | The Insureds: | **TRI Commercial Real Estate Services, Inc. and its Officers and Directors, including Robert L. Young** |
| | The Policy: | **Illinois Union Insurance Co., Policy No. BMI20016061 ("Directors & Officers Insurance Policy")** |
| | Lawsuit: | *TRI vs. Raybern Foods, Inc. et al.* **Alameda County Superior Court, Case No. RG04141329 ("Matter")** |

Dear Gentlepeople:

We represent Robert L. Young ("Young") in connection with the above-referenced Matter. We have written to you on two occasions, on July 6, 2005, and December 15, 2005 tendering this matter to you. To date, Illinois Union Insurance Co. has not responded to these tender. This is unacceptable. An insurer has a duty to respond to an insured's tender and must inform the insured whether it intends to defend under a reservation of rights, deny defense, and/or seek a declaration of its rights and responsibilities under the insurance contract. *Matsushita Elec. Corp. of Am. v. Home Indem. Co.*, 1994 U.S. Dist. LEXIS 12333; *Centennial Ins. Co. v. United States Fire Ins. Co.*, (2001) 88 Cal. App. 4th 105 Illinois Union Insurance Co has not even acknowledged these multiple tenders.

Please respond to our previous tenders consistent with your obligations under the policy and the law.

Sincerely,

BERDING & WEIL LLP

Terrence A. Meyerhoff
tmeyerhoff@berding-weil.com

cc:    Albert E. Cordova, Esq.

**EXHIBIT**

6

# BERDING & WEIL LLP

ALAMO, CA
PHOENIX, AZ

May 19, 2006

Mr. Joseph Ferrari, Esq.
Claims Department
E-Risk Services, LLC
227 Route 206
Building #2
Flanders, NJ  07836

Re:    **Robert L. Young and TRI Commercial Real Estate Services, Inc.**
    **(collectively, "Insured")**
    **Directors & Officers Policy**
    **Illinois Union Insurance Company ("Carrier")**
    **Continuity Date:  August 1, 1999**
    **First E-Risk Certificate #90001415**
    **Last Policy #BMI20024368**

Dear Mr. Ferrari:

    We represent Mr. Robert L. Young, a former officer and director of TRI Commercial Real Estate Services, Inc. ("TRI").  The Insureds were sued via a Cross-complaint for Breach of Fiduciary Duty, Professional Negligence, Negligence and Promissory Fraud on March 15, 2005. A First Amended Cross-complaint was filed on July 26, 2005 ("Amended Cross-Complaint"). Copies of the Cross-Complaint and Amended Cross-complaint are enclosed.  You will note that even though the Cross-Complaint sets forth a cause of action for professional negligence against Mr. Young (as an attorney), each and every other cause of action refers to and bases its claims on the fact that Mr. Young was an officer and director of TRI.  Even the cause of action for professional negligence is based upon facts revolving around Mr. Young's capacities, duties and obligations as an officer and director of TRI.

    This law firm tendered the defense to TRI and to the Carrier (to the designated entity and address for claims, e.g., ACE Westchester Specialty Claims) and asked for indemnity pursuant to all relevant policies ("Tender").  TRI has maintained continuation coverage.  The Tenders to TRI were made on March 15, 2005, April 13, 2005, and August 15, 2005.  The Tenders to Illinois Union Insurance Company were made on July 6, 2005 and December 15, 2005.  Copies of each such Tender are enclosed.  TRI has refused to accept such Tender. We also wrote to the carrier on February 3, 2006, requesting that the carrier respond to the tenders and reminding the carrier of its obligation to respond to a tender (a copy of that letter is also enclosed).  **Illinois Union**

**EXHIBIT**

**7**

Mr. Joseph Ferrari
May 19, 2006
Page 2

**Insurance Company has not responded at all to any of the Tenders or otherwise communicated with us.**

Prior to the filing of the Cross-complaint and subsequent Amended Cross-complaint, TRI sued Raybern Foods, Inc. ("Raybern") for commissions earned by TRI with respect to a merger and acquisition transaction representing Raybern. TRI's Complaint was filed on February 17, 2004. Mr. Young represented Raybern in the relevant transaction that is the basis of that lawsuit, having been referred to Raybern by TRI.

Prior to the filing of the Cross-complaint against the Insureds, a trial had been scheduled for April 15, 2005. As a result of the filing of the Cross-complaint by Raybern against the Insureds, Demurrers and additional Cross-Complaints (by Young and TRI against one another) were filed and the trial date was rescheduled for April 28, 2006. Subsequent to the filing of the Cross-complaint through and including April 28, 2006, various motions were filed and heard and expansive discovery ensued, all at the sole cost and expense of Mr. Young personally. The total defense costs incurred by Mr. Young to date are approximately $ _____.

The trial was continued by the court from April 28, 2006 to September 29, 2006. Motions for Summary Judgment will be filed by Mr. Young against both TRI and Raybern, causing Mr. Young to yet incur additional attorneys' fees and costs.

It has been 10 months since the first Tender to Illinois Union Insurance Co. **There has been no response from such Carrier at all.** Under these circumstances and applicable law, even if the Carrier would have otherwise been able to eventually prevail on the indemnity claim of Mr. Young (which we do not suggest), its refusal to at least accept the Tender under a reservation of rights (indeed, it has not responded at all) has now subjected it to not only all of Mr. Young's attorneys fees and costs he has incurred and will incur in defending the subject matter, but to an indemnity obligation to Mr. Young and to a potential claim for bad faith and punitive damages.

Mr. Ferrari, on May 15, 2006 Mr. Young spoke with Kirk Denebeim, a partner at ECM Surplus Lines, the broker who first placed the policy through E-Risk in 1999. Mr. Denebeim indicated that ECM was no longer the broker of record. He suggested that we contact you as the attorney and person in charge of claims for E-Risk. He indicated to Mr. Young that you were a reasonable person and that we should visit with you before filing suit. Mr. Denebeim was quite shocked that Illinois Union Insurance Co. had not, at least, accepted the Tender under a reservation of rights. He was apparently even more surprised to hear there had been no response at all!



Mr. Joseph Ferrari
May 19, 2006
Page 3


      Please call me of Clifford Horner so we may discuss this matter.

            Very truly yours,

            BERDING & WEIL LLP

            Terrence A. Meyerhoff
            tmeyerhoff@berding-weil.com

TAM:kdd



ALAMO, CA
PHOENIX, AZ

ATTORNEYS AT LAW

June 27, 2006

**VIA FACSIMILE AND U.S. MAIL**

George Glavas
ACE Westchester Westchester Specialty Group
1133 Avenue of the Americas, 38th Floor
New York, New York 10036

      Re:    **Robert L. Young and TRI Commercial Real Estate Services, Inc.**
                **(collectively, "Insured")**
                **Directors & Officers Policy**
                **Illinois Union Insurance Company ("Carrier")**
                **Continuity Date:  August 1, 1999**
                **First E-Risk Certificate #90001415**
                **Last Policy #BMI20024368**

Dear Mr. Glavas:

      Thank you for forwarding the letter from Ace Westchester to Andrew Murbach dated July 6, 2005, denying coverage as to the claim TRI tendered as to the above-referenced policy.

      On May 22, 2006, I wrote to Mr. Joseph Ferrari of E-Risk Services, LLC to inform him that Ace Westchester had never responded to this law firm's various tenders, including those sent on July 6, 2005 and December 15, 2005.  You called me in response to my letter on May 30th, and informed me that Ace Westchester had written to TRI Commercial Real Estate Services on July 6, 2005 denying coverage as to the original Cross-complaint filed in case styled *TRI Commercial Real Estate Services v. Raybern Foods*.

      I indicated to you during our conversation that we had not (and still have not) received a response from the carrier or Ace Westchester regarding our December 15, 2005 tender of the First Amended Cross-complaint filed in *TRI Commercial Real Estate Services v. Raybern Foods*. (The First Amended Cross-complaint was filed on July 26, 2005 and thus after the only denial letter prepared by Ace Westchester.)  When I informed you of this, you promised that Ace Westchester would respond within one month's time to this law firm's December 15, 2005 tender of the First Amended Cross-complaint filed in *TRI Commercial Real Estate Services v. Raybern Foods*.



EXHIBIT

8

George Glavas
Ace Westchester Specialty Group
Page 2
June 27, 2006

      As agent for the carrier, you are obligated to timely respond to any tenders.  Please provide a response to this firm's December 15, 2005 tender of the First Amended Cross-complaint filed in *TRI Commercial Real Estate Services v. Raybern Foods*.

Very truly yours,

BERDING & WEIL LLP

Terrence A. Meyerhoff
tmeyerhoff@berding-weil.com

BERDING & WEIL LLP
ATTORNEYS AT LAW



**BERDING & WEIL LLP**

ATTORNEYS AT LAW

ALAMO, CA
PHOENIX, AZ

August 11, 2006

**VIA OVERNIGHT MAIL**

George Glavas
ACE Westchester Specialty Group
1133 Avenue of the Americas, 38th Floor
New York, New York 10036

Re:     **Robert L. Young and TRI Commercial Real Estate Services, Inc.**
        **(collectively, "Insured")**
        **Directors & Officers Policy**
        **Illinois Union Insurance Company ("Carrier")**
        **Continuity Date: August 1, 1999**
        **First E-Risk Certificate #90001415**
        **Last Policy #BMI20024368**

Dear Mr. Glavas:

      As you are aware, this office represents Mr. Robert L. Young in the above-referenced matter. By way of letters dated July 6, 2005, December 15, 2005, February 3, 2006, May 19, 2006, and June 27, 2006, this office has repeatedly tendered to Illinois Union Insurance Company (through its designated entity for claim notification ACE Westchester Specialty Claims) ("IUIC," "Carrier" or "Insurer") the claims made against Mr. Young in the First Amended Cross-Complaint filed on July 26, 2005 ("FACC"), by Raybern Foods ("Raybern") , in the above-referenced lawsuit. Copies of these letters, the FACC, and the Declaration of Edward Welch in Support of Mr. Young's recently filed Motion for Summary Judgment ("Welch Declaration") are attached hereto for your reference. It has now been well over a year since Mr. Young's initial tender, yet IUIC has utterly failed to respond to any of these tenders. We consider IUIC's unexplained and inexcusable failure to respond to be in bad faith, as it is indicative of IUIC's breach of its duty to respond to a tender, duty to investigate a claim, and duty to defend under Directors and Officers Policy No. BMI20016061, effective for claims made between August 1, 2004, through August 1, 2005 ("D&O Policy"), covering Mr. Young for the claims made against him in the FACC.



EXHIBIT

9

Mr. George Glavas
August 11, 2006
Page 2

The first, and most obvious source of IUIC's breach of its duties relates to its complete failure to respond to the many tenders Mr. Young has made of this claim since July, 2005. California Department of Insurance Regulation §2695.5 states in relevant part:

> (b) Upon receiving any communication from a claimant, regarding a claim, that reasonably suggests that a response is expected, every licensee shall immediately, but in no event more than fifteen (15) calendar days after receipt of that communication, furnish the claimant with a complete response based on the facts as then known by the licensee.

> and

> (e) Upon receiving notice of claim, every insurer shall immediately, but in no event more than fifteen (15) calendar days later, do the following unless the notice of claim received is a notice of legal action:

> (1) acknowledge receipt of such notice to the claimant . . .;

> (2) provide to the claimant necessary forms, instructions, and reasonable assistance, including but not limited to, specifying the information the claimant must provide for proof of claim;

> (3) begin any necessary investigation of the claim.

As it has now been more than a year since the initial tender, IUIC has obviously failed to comply with any of the above-stated regulations. In addition to the statutory duty to respond, California case law also establishes that an insurer has a duty to respond to an insured's tender. See *Centennial Ins. Co. v. United States Fire Ins. Co.*, (2001) 88 Cal. App. 4th 105.

As referenced above, the tender of a claim to the insurer also triggers the insurer's duty to investigate that claim. An insurer has a fundamental duty to investigate claims, and this duty must be exercised thoroughly. *Egan v. Mutual of Oamaha Ins. Co.* (1979) 24 Cal.3d 809, 819. This includes a duty to "fully inquire in to all possible bases that might support the insured's claim . . ." *Id* at 819. In its failure to respond to Mr. Young's tender, IUIC has obviously breached this duty as well.

Finally, IUIC has breached its duty to defend Mr. Young in the lawsuit brought against him. California Civil Code §2778 states, in relevant part:



BERDING & WEIL LLP
ATTORNEYS AT LAW

Mr. George Glavas
August 11, 2006
Page 3

> In the interpretation of a contract of indemnity, the following rules are to be
> applied, unless a contrary intention appears: . . . (4) The person indemnifying is
> bound, on request of the person indemnified, to defend actions or proceedings
> brought against the latter in respect to the matters embraced by the indemnity, but
> the person indemnified has the right to conduct such defense, if he chooses to do
> so . . .

The D&O Policy clearly contemplates the payment of defense costs as a covered expense and does not contain any language expressing a clear intention that IUIC would *not* assume a duty to defend, as is required by California Civil Code §2778 in order to avoid such a duty. *Gribaldo, Jacobs, Jones & Associates v. Agrippina Versicherunges A. G.* (1970) 3 Cal. 3d 434. In fact, IUIC's defense obligations are quite broad under the D&O Policy given that Mr. Young is not required to obtain the consent of the Carrier prior to incurring any legal expenses and IUIC has agreed to cover one hundred percent of the defense costs incurred by Mr. Young, regardless of whether incurred defending against covered or uncovered portions of the claim – Section J of the General Terms and Conditions provides with regard to legal expenses:

> "In the event [Mr. Young] in a Claim incur[s] both Loss that is covered by the
> Policy and also loss which is not covered, either because such Claim includes
> both covered and uncovered matters or because such Claim is made against both
> covered and uncovered parties, then coverage will be allocated as follows: 100%
> of Costs, Charges and Expenses incurred by such Insureds on account of such
> Claim will be allocated as covered Loss. . ."

Even if a court were ultimately to conclude that the D&O Policy does not impose a "duty to defend" on IUIC, California courts would alternatively find that the D&O Policy imposes on IUIC a "duty to reimburse defense costs" as those costs are incurred. The D&O Policy is a liability-based D&O policy, as opposed to an indemnity-based D&O policy, by virtue of its insuring agreement, which states that IUIC will "pay on behalf of . . ." As such, the D&O Policy requires reimbursement to Mr. Young for legal expenses *as they are incurred. Gon v. First State Insurance Co.* (9th Cir. 1989) 871 F.2d 863; *Save Mart Supermarkets v. Underwriters at Lloyd's London, et al.* (1994) 843 F. Supp. 597.

Normally, the distinction between a duty to defend and a duty to reimburse defense costs as they are incurred is that, with the latter, an insurer is normally obligated to pay only those defense costs incurred in defending against covered portions of the claim. *Id.* However, as stated above, under the D&O Policy, IUIC has agreed to cover *all* defense costs incurred pursuant to section J of the General Terms of Conditions, and is therefore not permitted to argue for such an allocation. In this case, therefore, there is no practical distinction between a duty to defend and a duty to reimburse defense costs as incurred. Moreover, regardless of whether



BERDING & WEIL LLP
ATTORNEYS AT LAW

Mr. George Glavas
August 11, 2006
Page 4

characterized as a duty to defend or a duty to reimburse defense costs, one of the benefits Mr. Young is entitled to under the D&O Policy is the benefit of not having to incur the expense of defending a claim himself, and IUIC has clearly denied Mr. Young that benefit.

As I am sure you are aware, insurance contracts carry an implied covenant of good faith and fair dealing, the breach of which is actionable under the contract and in tort. *Foley v. Interactive Data Corp.* (1988) 47 Cal. 3d 654, 683; *California Shoppers, Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal. App. 3d 1, 54. A breach of the any of the duties discussed above can constitute a breach of the implied covenant of good faith and fair dealing. See e.g., *Egan, supra,* 24 Cal. 3d. at 817 [duty to investigate is bad faith as a matter of law;] *Amato v. Mercury Cas. Co.* (1997) 53 Cal. App. 4th 825. By breaching these duties, IUIC has subjected itself to liability for: (1) the defense costs incurred by Mr. Young, as owed to him pursuant to the terms of the D&O Policy; (2) any settlement or judgment against Mr. Young, regardless of whether actually covered by the D&O Policy (*Gray v. Zurich Ins. Co.* (1966) 65 Cal. 2d 263); (3) punitive damages (*Silberg v. California Life Ins. Co.* (1974) 11 Cal. 3d 452); and (4) all attorneys fees incurred by Mr. Young to compel payments due under the D&O Policy (*Brandt v. Superior Court* (1985) 37 Cal. 3d 813).

Despite the fact that, due to its breach of the duties described above, IUIC will now be obligated to provide both defense and indemnity coverage for the claims made against Mr. Young regardless of whether the D&O Policy actually provides for coverage of those claims, IUIC would be required to provide for Mr. Young's defense regardless. All that is required is to show, under the very broad standards set forth by California courts, that there is the potential for coverage for any part of the claims made against Mr. Young. *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal. 4th 287. As discussed below, the claims made against Mr. Young easily meet this standard.

**The Claim Is Potentially Covered Under the D&O Policy**

Even a cursory investigation of this claim and the ongoing litigation reveals that there is the potential for coverage under the D&O Policy for this claim. Mr. Young was at all relevant times a director and/or officer of TRI Commercial Real Estate Services ("TRI").

By virtue of his status as a director or officer of TRI, Mr. Young enjoys the following coverage under the D&O Policy: "[IUIC] shall pay on behalf of [Mr. Young] Loss resulting from any Claim first made against [Mr. Young] during the Policy Period for a Wrongful Act." A Wrongful Act is defined as: "any actual or alleged error, omission, misleading statement, neglect, breach of duty or act by:



**BERDING & WEIL LLP**
ATTORNEYS AT LAW

Mr. George Glavas
August 11, 2006
Page 5

a)      any of the Directors and Officers, while acting in their capacity as:

(i)      a director, officer or employee of the Company . . ."

The FACC makes the following allegations against Mr. Young:

"Robert L. Young (Young) was an officer and director of TRI and, as such, had a degree of control over or influence on TRI's actions herein.  With respect to certain actions alleged herein, Young acted as TRI's agent and within the course and scope of his position as an officer and/or director of TRI, Young placed his interests as an officer and/or director of TRI above his professional obligations to Raybern." (FACC ¶3.)

"Specifically, [Young] had an obligation to inform Raybern that he was then serving as an officer and/or director of TRI and therefore had conflicting fiduciary duties . . ." (FACC ¶12.)

". . . in the interest of effecting a transaction that would result in a commission to TRI, the company upon whose board he served, Young failed to disclose his relationship with Tri and Fults, and he failed adequately to protect Raybern's financial interests in the transaction with Rose & Shore." (FACC, ¶13.)

"Finally, when Raybern asked Young to review a listing agreement between TRI and Raybern – an agreement that would result in a commission to TRI upon sale of Raybern's Hayward property – Young again failed to disclose his true relationship with TRI." (FACC, ¶13.)

"Cross-Defendants and each of them owed Raybern a duty of ordinary care to protect the financial interests of Raybern in the series of transactions in which defendants were involved. . . Finally, as a proximate result of Young's breach of his obligation to fully disclose his relationship with TRI and Fults, Raybern has incurred fees paid to Young, and hereby seeks disgorgement of those fees." (FACC, ¶19.)

Raybern initially did not cross-complain against Mr. Young, and in fact did so *only after* having learned that Mr. Young was an officer and/or director of TRI.  Raybern had been informed in writing that Mr. Young had acted as counsel for TRI and that Raybern had waived any such potential conflict.  Moreover, Raybern was obviously aware from the outset of any and all facts arising out of Mr. Young's representation of it in the transaction.  Despite being aware of all of those facts, it was not until Raybern learned that Mr. Young was an officer and/or


BERDING & WEIL LLP
ATTORNEYS AT LAW

Mr. George Glavas
August 11, 2006
Page 6

director of TRI that Raybern made any claims against Mr. Young. It is therefore indisputable that Mr. Young was sued by Raybern based upon the fact that he was an officer and/or director of TRI, and not due to legal services provided as counsel for Raybern. Given that Mr. Young's alleged liability arises from his status and actions as an officer and/or director of TRI, the potential for coverage under the D&O Policy clearly exists.

This is the <u>exact</u> circumstance for which Young <u>demanded</u> indemnification from and the acquisition of insurance by TRI <u>before</u> he would agree to become an officer or director of TRI. Young would never have agreed to become an officer or director of TRI without such express insurance and indemnity. Young's insistence that TRI provide insurance for and agree to defend and indemnify Young <u>before</u> Young would agree to join TRI as an officer and director is fully corroborated by Edward Welch, TRI's president at the time Young joined TRI as an officer and director. As stated by Mr. Welch:

"2.     As TRI's President, I reviewed, edited and approved, and instructed TRI's secretary, Charles J. Shaffer, to execute and certify the TRI Bylaws.

3.     A key provision in the TRI Bylaws was Section 29, which Section provides that TRI will defend and indemnify any of its officers or directors against any claims made or actions filed against them by reason of their having served as a director or officer of TRI.

4.     Mr. Young expressed to me that he would not serve as an officer or director of TRI without such an indemnity provision obligating TRI to defend and indemnify Young against such actions.

5.     I have reviewed Paragraph 3 of Raybern Foods, Inc.'s ("Raybern") First Amended Cross-Complaint against Young, and especially the allegation that "Cross-Complainant is informed and believes and thereon alleges that Robert L. Young (Young) was an officer and director of TRI and, as such, had a degree of control over or influence on TRI's actions herein. With respect to certain actions alleged herein, Young acted as TRI's agent and within the course and scope of his position as an officer and/or director of TRI. Raybern contends that in failing to disclose his role as an officer and director of TRI, Young placed his interests as an officer and/or director of TRI above his professional obligations to Raybern."

6.     It was my intent as President of TRI that TRI's Bylaws provide defense and indemnity protection from TRI to its present and past officers and directors,


BERDING & WEIL LLP
ATTORNEYS AT LAW

Mr. George Glavas
August 11, 2006
Page 7

including Young, against the above types of allegations made by Raybern against Young in the lawsuit instigated by TRI against Raybern."

As shown above, it is <u>undisputed</u> that Young would not have become an officer or director of TRI without TRI's agreement to provide insurance for and defend and indemnify him against claims made against him based on his alleged actions, control and influence over TRI while acting as TRI's officer and/or director.

Young was sued because of his alleged role as an officer and director of TRI. He refused to join TRI's board of directors or become an officer of TRI without TRI's provision of insurance for and agreement to defend and indemnify Young from allegation such as Rayberns. TRI unquestionably agreed to provide same. Young now needs and demands such defense and indemnity. The refusal of IUIC to defend Mr. Young has put Young exactly where he demanded not to be, faced with paying attorney's fees defending himself against claims from a claimant initially involved in only a suit with TRI, which claimant (Raybern) then expanded its suit to include Young in the hopes that Young could influence TRI into a settlement with Raybern.

Such suits against officers and directors individually to add pressure and force a settlement, such as is the case here, are <u>exactly</u> why advisors such as Young demand D&O insurance and express defense and indemnity provisions <u>before</u> joining a company's Board. IUIC is required to and must now provide such defense and indemnity to Mr. Young.

Given that Mr. Young's potential liability arises from alleged Wrongful Acts, as defined by the D&O Policy, IUIC is obligated to reimburse Mr. Young for Loss resulting from Raybern's claim. Loss is defined to include "Costs, Charges and Expenses," which is defined to include "reasonable and necessary legal fees and expenses incurred by [Mr. Young] in defense of any Claim." As previously stated, Section J of the General Terms and Conditions of the D&O Policy requires that the Carrier cover *all* legal fees and expenses incurred in defending the claim, regardless of whether they are incurred defending against portions of the claim ultimately determined to be covered under the D&O Policy.

Mr. Young anticipates that IUIC will, should it ever choose to respond to his tender, argue that exclusion q of the D&O Policy, added by way of endorsement D&O 120, serves to preclude coverage for Mr. Young's claim. Exclusion q states that the D&O Policy does not cover any claim "based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way related to any act, error or omission in connection with performance of any professional services by or on behalf of any of the Insureds for the benefit of any other entity or person . . ." However, this exclusion is quite obviously ambiguous, if not incomprehensible.



Mr. George Glavas
August 11, 2006
Page 8

Exclusions are to be interpreted strictly and, in the face of ambiguous language, interpreted in favor of coverage. (See, *MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 648 ("Moreover, insurance coverage is ' " 'interpreted broadly so as to afford the greatest possible protection to the insured, [whereas] ... exclusionary clauses are interpreted narrowly against the insurer.' " ' ( *White v. Western Title Ins. Co.* (1985) 40 Cal.3d 870, 881 [221 Cal. Rptr. 509, 710 P.2d 309].) '[A]n insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear. As we have declared time and again "any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect." [Citation.] Thus, "the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language." [Citation.] The exclusionary clause "must be *conspicuous, plain and clear*." ' .")

The claims made against Mr. Young are the most basic kinds of claims meant to be covered by D&O policies -- allegations of liability based upon the fact of his position as a director or officer of TRI. Understand clearly that this tender is not a tender under a professional negligence or malpractice policy or claim. This tender only relates to the claims made by Raybern as related, *supra*, that Mr. Young, as a director or officer of TRI, had a degree of control over TRI's actions and acted as TRI's agent and within the course and scope of his position as a director or officer of TRI with respect to the alleged bad acts of TRI more fully referenced in Raybern's cross-complaint against TRI. Therefore, any interpretation of exclusion q that would bar coverage for Mr. Young's claim would necessarily bar coverage for any and all claims except for the extremely narrow category of shareholder derivative lawsuits. A D&O policy that only provides coverage for shareholder derivative lawsuits is so vastly limited from the scope of coverage that an insured would expect to receive the benefit of when purchasing D&O coverage that the carrier would have an affirmative duty to explicitly disclose that limited coverage to the insured. (See, *Underwriters Insurance Co. v. Purdie* (1983) 145 Cal.App.3d 57, 65; *Logan v. John Hancock Mutual Life Insurance Co.* (1974) 41 Cal. App. 3d 988, 994-995, ["In *Gray v. Zurich Insurance Co.*, 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d 168], the court held that in the field of insurance contracts, when the policy does not clearly define the application of exclusions to the basic coverage the insured could reasonably expect, courts will not relieve the insurer of liability on the basis of those exclusions . . . In the case of standardized insurance contracts, exceptions and limitations on coverage that the insured could reasonably expect must be called to his attention, clearly and plainly, before the exclusions will be interpreted to relieve the insurer of liability or performance."] Therefore, even if one of the many reasonable interpretations of exclusion q would arguably preclude coverage for Mr. Young's claim, which it does not, such an interpretation would not be enforced by a California Court because it so fundamentally limits the coverage normally afforded by a D&O policy that such a limitation would have had to have been made plainly and explicitly clear to the insured, which it was not.



Mr. George Glavas
August 11, 2006
Page 9

Mr. Young, by way of the attached letter dated May 19, 2006, has already alerted Mr. Joseph Ferrari, legal counsel for the Carrier responsible for claims, of IUIC's breaches of its duties by failing to respond to Mr. Young's multiple tenders.  The consequences of IUIC's continued breach of its duties with respect to Mr. Young are becoming more and more severe, especially now that trial in this matter, set for September 29, 2006, is rapidly approaching.  The financial hardship and negative impact on Mr. Young's defense caused by IUIC's continued breach only grow exponentially as that trial rapidly approaches.  It was Mr. Young's sincere hope that by alerting Mr. Ferrari to IUIC's flagrant breaches of its duties owed to Mr. Young under the D&O Policy, the necessity of a bad faith lawsuit against IUIC could be avoided.  However, as IUIC continues to maintain silence with respect to Mr. Young's tenders, unless IUIC accepts its duties under the D&O Policy by immediately reimbursing Mr. Young for the legal expenses he has incurred thus far in defending against the claims in the FACC and sets up a method of timely reimbursing Mr. Young for further legal costs as they become due, Mr. Young will have no choice but to file a bad faith lawsuit against IUIC, seeking reimbursement for all of his legal costs thus far, a declaration that IUIC is responsible to indemnify him for any payments he makes to Raybern either as a result of settlement or as a result of an adverse judgment at trial, for all legal costs and fees incurred in bringing such a bad faith lawsuit against IUIC, and for punitive damages against IUIC due to its blatant and inexcusable breaches of the several duties owed to Mr. Young that it has breached in bad faith.

Therefore, we demand you to respond to this tender and provide coverage in this matter for Mr. Young under the D&O Policy, thereby avoiding liability for bad faith that will assuredly attach given IUIC's behavior to date.

Sincerely,

**BERDING & WEIL LLP**

Clifford R. Horner
chorner@berding-weil.com

CRH/KPM:jw
cc:   Robert L. Young, Esq.
      Terrence A. Meyerhoff, Esq.
      Kevin P. Montee, Esq.



BERDING & WEIL LLP
ATTORNEYS AT LAW



**BERDING & WEIL LLP**

ATTORNEYS AT LAW

November 30, 2006

**VIA CERTIFIED/REGISTERED U.S. MAIL**

George Glavas
ACE Westchester Specialty Group
1133 Avenue of the Americas, 38th Floor
New York, New York 10036

      Re:    *TRI Commercial Real Estate Services, Inc., et al.  v. Raybern Foods, Inc., et. al., Superior Court of California, Alameda County, Case No. RGO4141329*
              **Robert L. Young and TRI Commercial Real Estate Services, Inc.**
                  **(collectively, "Insured")**
              **Directors & Officers Policy**
              **Illinois Union Insurance Company ("Carrier")**
              **First E-Risk Certificate #90001415**
              **Last Policy #BMI20024368**

Dear Mr. Glavas:

      This letter is to inform you that mediation will occur between the parties in this matter on December 6, 2006, beginning at 10:00 a.m. in our offices at 3240 Stone Valley Road West, Alamo, California 94507. Mr. Young hereby formally makes one further request for a defense in this matter and demands that a representative of the Carrier attend this mediation with authority to settle the claims made against him. Without a defense or immediate advancement of defense costs, Mr. Young is not in a position to continue the litigation to defend himself through Judgment; accordingly, Mr. Young may have to settle the claim against him and surrender his cross-claims.

      As set forth in our prior correspondence in this matter, the Carrier has failed to perform its contractual and statutory duties under the policy and it has dealt unfairly with Mr. Young and engaged in bad faith conduct by failing to respond to his requests for the protections and benefits under the Policy. As a result, Mr. Young is free to settle this matter without the Carrier's input or consent and the same shall raise an evidentiary presumption in his favor (or his assignee) with respect to the existence and amount of his liability notwithstanding the truth.

      We reiterate to you that the Carrier has failed in its duty to respond to Mr. Young's numerous tenders, as more specifically set forth in the many letters previously sent to you (and enclosed herewith as Exhibits A, B, C, D, E, and F for ease of reference). Notwithstanding all of

**EXHIBIT**

**10**

Mr. George Glavas
November 30, 2006
Page 2

the prior correspondence, we direct your attention and strongly encourage you to re-read Clause L. 2. SETTLEMENTS AND DEFENSE of the General Terms and Conditions Coverage Section for this Policy, which reads: "Insurer shall have the right **and the duty to defend any Claim** and such right and duty shall exist even if any of the allegations are groundless, false or fraudulent (*emphasis added*)." Not only has the Carrier not defended, but it has not even replied to Mr. Young's tender letters and request for a defense.

Our last tender letter was forwarded on August 11, 2006 (*see* Exhibit F). We then received a letter dated October 5, 2006 from D. Victoria LaBrie of Wilson, Elser, Moskowitz, Edelman & Dicker LLP in Los Angeles confirming a telephone conversation in which she promised a response within 30 days at the latest (*see* Exhibit G). That *promised* response is now several weeks overdue. We consider this latest failure to respond amidst the litany of failures as further evidence of the Carrier's inexcusable conduct and bad faith in its failure to investigate the claims against Mr. Young or to properly respond to his numerous requests for a defense.

At the upcoming mediation, Mr. Young is prepared to resolve the underlying dispute and any related potential litigation, including litigation against the Carrier as a result of the matters expressed herein. We expect that you share the same interest in resolving both the underlying dispute and this Policy matter. In this regard, we look forward to seeing a representative of the Carrier at our offices for the December 6th mediation. If not, we are prepared to immediately serve you with our Complaint. Please do not hesitate to contact the undersigned with any questions.

Very truly yours,

BERDING & WEIL LLP

Daniel R. Rottinghaus
drottinghaus@berding-weil.com
Kevin P. Montee
kmontee@berding-weil.com

DLR/mp
Enclosures
cc:    Robert L. Young
       D. Victoria LaBrie (w/encls.)

O:\WDOCS\0001\391\LETTER\00421563.DOC



BERDING & WEIL LLP
A T T O R N E Y S   A T   L A W

W/C RLY

1  ALBERT E. CORDOVA (State Bar No. 74283)
2  A Professional Law Corporation
   1299 Fourth St., Suite 202
3  San Rafael, California 94901
   Telephone: (415) 457-9656
4  Telefacsimile: (415) 453-6260

5

   Attorneys for Plaintiff TRI COMMERCIAL REAL ESTATE
6  SERVICES, INC., a California corporation and JOHN FULTS

7              THE SUPERIOR COURT OF CALIFORNIA

8                   COUNTY OF ALAMEDA

9

10 TRI COMMERCIAL REAL ESTATE          ) No. RGO4141329
   SERVICES, INC., et al.,             )
11                                     )
                                       ) **CROSS-COMPLAINT ON**
12         Plaintiff(s),               ) **BEHALF OF TRI**
                                       ) **COMMERCIAL REAL ESTATE**
13         vs.                         ) **SERVICES, INC. AND JOHN**
                                       ) **FULTS AND AGAINST ROBERT**
14 RAYBERN FOODS, INC., BERNARD J.     ) **YOUNG FOR BREACH OF**
   VIGGIANO and DOES 1-20,            ) **FIDUCIARY DUTY, LEGAL**
15                                     ) **MALPRACTICE, INDEMNITY,**
16         Defendant(s).               ) **CONTRIBUTION AND**
                                       ) **DECLARATORY RELIEF**
17 _____ )

18 RAYBERN FOODS, INC.,                )
                                       )
19         Cross-Complainants,         )
                                       )
20         vs.                         )
                                       )
21                                     )
   TRI COMMERCIAL REAL ESTATE          )
22 SERVICES, INC., JOHN FULTS, ROBERT  )
   L. YOUNG, individually and dba LAW  )
23 OFFICES OF ROBERT YOUNG,.           )
                                       )
24                                     )
           Cross-Defendants.           )
25 _____ )

26

27                    1

28
                              _____
                              CROSS-COMPLAINT BY TRI COMMERCIAL and
                              JOHN FULTS

**EXHIBIT**

11

| | |
|---|---|
| ROBERT YOUNG, | ) NO. RGO4141329 |
| | ) |
| Cross-complainant, | ) |
| | ) |
| vs. | ) |
| | ) |
| TRI COMMERCIAL REAL ESTATE | ) |
| SERVICES, INC., JOHN FULTS, an | ) |
| individual, and ROES 1-50, inclusive, | ) |
| | ) |
| Cross-defendants. | ) |
| | ) |
| _____ | ) |
| | ) |
| TRI COMMERCIAL REAL ESTATE | ) |
| SERVICES, INC. and JOHN FULTS, | ) |
| | ) |
| Cross-complainants, | ) |
| | ) |
| vs. | ) |
| | ) |
| ROBERT YOUNG and ZOES 1-20, | ) |
| | ) |
| Cross-defendants. | ) |
| | ) |
| _____ | ) |

Cross-complainants TRI COMMERCIAL REAL ESTATE SERVICES, INC. and

JOHN FULTS allege the following causes of action against ROBERT YOUNG.

## FIRST CAUSE OF ACTION

**(Breach of Fiduciary Duty-Constructive Fraud)**
**(On behalf of TRI Only)**

1. Cross-complainants are ignorant of the true names and capacities of Cross-

defendants sued herein as ZOES I-20, inclusive, and therefore sue these Cross-

2

CROSS-COMPLAINT BY TRI COMMERCIAL and
JOHN FULTS

1   defendants by such fictitious names.  Cross-complainants will amend this Cross-

2   complaint to allege their true names and capacities when ascertained.  Cross-

3

4   complainants are informed and believe and thereon allege that, if these Cross-

5   complainants are liable to Cross-complainant RAYBERN FOODS, INC. as alleged in

6   the Cross-complaint in this action, each of the fictitiously named Cross-defendants is

7

8   jointly or jointly and severally liable with Cross-complainants to Cross-complainant

9   RAYBERN FOODS INC. for its damages as set forth therein.  Each reference in this

10   Cross- complaint to "Cross-defendant," "Cross-defendants," or a specifically named

11   Cross-defendant refers also to all Cross-defendants sued under fictitious names.

12       2.  Cross-complainants are informed and believe and on that basis allege that

13

14   each cross-defendant individually or fictitiously named herein, acted in his, her, or its

15   own right and also was or is the agent, employee, or servant of each of the other

16   cross-defendants as to each of the matters set forth herein, and each such cross-

17   defendant, whether individually or fictitiously named, was at all times acting within

18

19   the scope and purpose of such agency, employment or service, or alternatively, if the

20   acts of each such cross-defendant were not authorized at the time, such acts were

21   subsequently ratified by the appropriate principal.

22       3.  TRI COMMERCIAL REAL ESTATE SERVICES, INC. (hereinafter

23

24   "TRI") is and at all times mentioned herein was, a real estate broker duly licensed by

25

26

27                           3

28                          CROSS-COMPLAINT BY TRI COMMERCIAL and
                            JOHN FULTS

the State of California engaged in the brokerage of both real estate transactions and business opportunities.

4. Cross-defendant ROBERT YOUNG is and at all times mentioned herein was, an attorney at law duly licensed by the State of California.

5. At all times relevant to the facts herein pleaded, Cross-defendant ROBERT YOUNG served as a corporate officer and was a shareholder of Cross-complainant TRI. On October 18, 2001, Cross-defendant ROBERT YOUNG became a director of TRI. In addition to the foregoing, at all times relevant to the facts herein pleaded, Cross-defendant served as legal counsel for TRI.

6. By virtue of the aforementioned relationship between Cross-defendant ROBERT YOUNG and TRI, Cross-defendant enjoyed a position of great trust and confidence with TRI and thereby owed to TRI a fiduciary duty of utmost care, integrity, honesty and undivided loyalty in his dealings with TRI.

7. Separate and apart from his relationship to TRI, Cross-defendant ROBERT YOUNG also maintained a private law practice whereby he undertook to represent clients for his own account as an independent attorney at law.

8. On or about May 7, 2001, RAYBERN FOODS, INC. retained TRI, through its agent JOHN FULTS, to represent it as a business broker in connection with certain business and contractual negotiations it was engaged in with ROSE AND SHORE, INC.

4

CROSS-COMPLAINT BY TRI COMMERCIAL and
JOHN FULTS

9. On or about May 10, 2001, acting within the course and scope of his duties as an independent attorney at law and working for his own account, Cross-defendant ROBERT YOUNG accepted employment by RAYBERN FOODS, INC. to represent it as its legal counsel in the negotiations between RAYBERN FOODS, INC. and ROSE AND SHORE, INC.

10. At the time Cross-defendant ROBERT YOUNG accepted employment as attorney for RAYBERN FOODS, INC., he was fully aware that TRI was acting as a business broker for RAYBERN FOODS, INC. in the aforementioned negotiations.

11. In undertaking to represent RAYBERN FOODS, INC. as its legal counsel, Cross-defendant ROBERT YOUNG did not seek nor was he granted permission to act in said capacity by TRI. At no time did YOUNG disclose to TRI that his representation of RAYBERN might result in a conflict of interest; nor did YOUNG ever obtain a waiver from TRI of any such potential conflict.

12. Cross-defendant ROBERT YOUNG did not seek nor was he granted authority to act on behalf of TRI in connection with the services he undertook to provide for RAYBERN FOODS, INC. as its counsel.

13. The activities of Cross-defendant ROBERT YOUNG as counsel for RAYBERN FOODS, INC. were not within the course or scope of his duties as officer, director, or legal counsel for TRI.

5

CROSS-COMPLAINT BY TRI COMMERCIAL and JOHN FULTS

14.  In undertaking to represent RAYBERN FOODS, INC. as its legal counsel, Cross-defendant ROBERT YOUNG was acting for own account and for his sole benefit and not for any benefit to TRI.

15. Defendant RAYBERN FOODS, INC. has filed a Cross-complaint against ROBERT YOUNG, TRI COMMERCIAL REAL ESTATE SERVICES, INC. and JOHN FULTS, alleging, inter alia, that Cross-defendant ROBERT YOUNG breached his fiduciary duty to RAYBERN FOODS, INC. by undertaking to act as its legal counsel without fully disclosing his relationship with TRI.

16.  If it is established that there was a breach of duty on the part of Cross-defendant ROBERT YOUNG to make a full disclosure to RAYBERN FOODS, INC. of his relationship with TRI or to obtain a fully informed waiver of potential conflict of interest and consent from RAYBERN FOODS, INC., said breach arose out of and was occasioned by the fact that Cross-defendant ROBERT YOUNG undertook to represent RAYBERN FOODS, INC. as its legal counsel without fulfilling obligations that arose directly out of that attorney/client relationship.

17.  If there was a failure by Cross-defendant ROBERT YOUNG to make necessary disclosures or to obtain a fully informed waiver and consent from RAYBERN FOODS, INC., that failure was attributable solely to the acts undertaken by or omissions made by Cross-defendant ROBERT YOUNG in his capacity as an attorney at law acting as such for his own account.

6

CROSS-COMPLAINT BY TRI COMMERCIAL and JOHN FULTS

18. In undertaking to represent RAYBERN FOODS, INC. as its legal counsel, Cross-defendant ROBERT YOUNG did not disclose to TRI the extent of his disclosures to RAYBERN FOODS, INC. such that TRI had no notice of any error or omission in connection therewith and no opportunity to address any such error or omission.

19. In undertaking to represent RAYBERN FOODS, INC. as its legal counsel, Cross-defendant ROBERT YOUNG is solely responsible for the events which have resulted in the present claim against TRI.

20. The aforementioned conduct by ROBERT YOUNG, if true, was adverse to TRI and proximately caused TRI to incur attorneys fees and costs in the defense of the Cross-complaint by RAYBERN FOODS, INC.

21. If damages were sustained by RAYBERN FOODS, INC. as alleged in the Cross-complaint, these damages were caused, entirely or in part, by Cross-defendant ROBERT YOUNG, in that he was actively and primarily at fault, and not by any wrongdoing or by any actual fault on the part of Cross-complainants TRI COMMERCIAL REAL ESTATE SERVICES, INC. or JOHN FULTS.

22. In undertaking to represent RAYBERN FOODS, INC. as its legal counsel, Cross-defendant ROBERT YOUNG placed his self-interest ahead of the interests of TRI.

7

CROSS-COMPLAINT BY TRI COMMERCIAL and JOHN FULTS

23. The aforementioned conduct by Cross-defendant ROBERT YOUNG, if true, was in breach of his fiduciary duties to TRI and constitutes constructive fraud by said Cross-defendant.

WHEREFORE, Cross-complainants pray judgment against Cross-defendant ROBERT YOUNG as hereinafter set forth.

### SECOND CAUSE OF ACTION
### (Legal Malpractice)
### (On behalf of TRI Only)

24. Cross-complainant TRI realleges and incorporates by reference each and every allegation contained in the First Cause of Action as though fully set forth herein.

25. Cross-complainant RAYBERN FOODS, INC. has alleged in its Cross-complaint, inter alia, that TRI was under a duty to make certain disclosures and/or to obtain a waiver of conflict of interest and consent from RAYBERN FOODS, INC., all as more fully set forth therein. TRI has denied said allegations in the Answer to Cross-complaint filed on its behalf. However, if it should be established that such a duty did exist, then Cross-defendant ROBERT YOUNG, as legal counsel for TRI, was under a duty to properly advise TRI in connection with any potential conflict of interest and any duties or obligations arising therefrom.

26. Cross-defendant ROBERT YOUNG's failure to advise TRI of any duty or obligation arising from the retention of ROBERT YOUNG by RAYBERN FOODS,

8

1    INC., if any such duty or obligation is established, constituted an error and omission

2    committed within the course and scope of his duty to TRI as an attorney at law acting

3    as legal counsel to TRI.

4

5        27.  Cross-complainant has been damaged by virtue of having to defend

6    against the instant Cross-complaint and will suffer additional damage in the event it is

7    determined that there was a breach of duty by TRI arising out of the retention of

8    Cross-defendant ROBERT YOUNG by RAYBERN FOODS, INC.  Cross-

9
     complainant will amend this Cross-complaint to allege said damages with certainty

10   upon proof at trial.

11
         WHEREFORE, Cross-complainants pray judgment against Cross-defendant

12
     ROBERT YOUNG as hereinafter set forth.

13

14

15                          **THIRD CAUSE OF ACTION**
                                  **(Indemnity)**
16                      **(On behalf of TRI and JOHN FULTS)**

17
         28.  Cross-complainants reallege and incorporate by reference each and every

18
     allegation contained in the First Cause of Action as though fully set forth herein.

19

20       29.  Cross-complainants are entitled to indemnification from cross-defendant

21   ROBERT YOUNG for all legal costs and fees, including attorneys' fees, incurred in

22
     the defense of the Cross-complaint by RABYERN FOODS, INC. against TRI.

23

24

25

26

27                                     9

28
     CROSS-COMPLAINT BY TRI COMMERCIAL and
     JOHN FULTS

30.  Cross-complainant has made written demand for indemnification by Cross-defendant ROBERT YOUNG.  Notwithstanding said demand, Cross-defendant ROBERT YOUNG has failed and refused to indemnify TRI.

WHEREFORE, these cross-complainants pray for judgment against Cross-defendants as hereinafter set forth.

### FOURTH CAUSE OF ACTION
### (Contribution)
### (On behalf of TRI and JOHN FULTS)

31.  Cross-complainants reallege and incorporate by reference each and every allegation contained in the First Cause of Action as though fully set forth herein.

32.  If Cross-complainants are found liable under the allegations contained in the Cross-complaint of RAYBERN FOODS, INC., which liability Cross-complainants specifically deny, Cross-complainants and Cross-defendant ROBERT YOUNG, and each of them, will be joint tortfeasors and there will exist a right of comparative equitable indemnity between and amongst them as joint tortfeasors, based on the principles enunciated in American Motorcycle Association v. Superior Court (1978) 20 Cal.d 570.

WHEREFORE, Cross-complainants pray judgment against Cross-defendant ROBERT YOUNG as hereinafter set forth.

10

CROSS-COMPLAINT BY TRI COMMERCIAL and JOHN FULTS

## FIFTH CAUSE OF ACTION
### (Declaratory Relief)
### (On behalf of TRI and JOHN FULTS)

33.  Cross-complainants reallege and incorporate by reference each and every allegation contained in the First Cause of Action as though fully set forth herein.

34.  An actual controversy has arisen and now exists between Cross-complainants TRI and JOHN FULTS and Cross-defendant ROBERT YOUNG in that said Cross-complainants contend, and Cross-defendant denies:

a.  that as between said Cross-complainants and Cross-defendant, responsibility, if any, for damages claimed by RAYBERN FOODS, INC., if any, rests entirely or partially on Cross-defendant ROBERT YOUNG.

b.  that, as a result, Cross-defendant ROBERT YOUNG is obligated to partially or fully indemnify Cross-complainants for any sums that Cross-complainants may be compelled to pay as the result of this action, together with Cross-complainants' costs, expenses and attorney's fees.

35.  Cross-complainants desire a judicial determination of the respective rights and duties of Cross-complainants and Cross-defendant with respect to the damages claimed by RAYBERN FOODS, INC.  In particular, Cross-complainants desire a declaration of the comparative liability of Cross-complainants and Cross-defendant

11

for these damages, if any, and a declaration of Cross-defendant's responsibility for

comparative indemnity to Cross-complainants for any sums that Cross-complainants

may be compelled to pay and for which Cross-defendant ROBERT YOUNG is

determined responsible, entirely or in part.

36.   Such a declaration is necessary and appropriate at this time in order that

Cross-complainants may ascertain their rights and duties with respect to RAYBERN

FOODS, INC.'s claim for damages.  Furthermore, the claim of  RAYBERN FOODS,

INC. and the claim of Cross-complainants arise out of the same transaction, and

determination of both in one proceeding is necessary and appropriate in order to

avoid the multiplicity of actions that would result if Cross-complainants were

required now to defend against the claim of RAYBERN FOODS, INC. and then bring

a separate action against Cross-defendant ROBERT YOUNG for indemnification of

sums that Cross-complainants may be compelled to pay as the result of any damages,

judgment, or other awards recovered by RAYBERN FOODS, INC. against these

Cross-complainants.

WHEREFORE, Cross-complainants pray judgment against Cross-defendant

ROBERT YOUNG as follows:

**AS TO THE FIRST THROUGH FOURTH CAUSES OF ACTION**

1.  For damages according to proof;

2.  For costs of suit herein incurred;

12

CROSS-COMPLAINT BY TRI COMMERCIAL and
JOHN FULTS

3. For reasonable attorneys fees incurred in the defense of the Cross-complaint by RAYBERN FOODS, INC. against TRI; and

4. For such other and further relief as the court may deem proper.

### AS TO THE FIFTH CAUSE OF ACTION

1. For a judicial determination of the comparative fault of Cross-complainants and Cross-defendant ROBERT YOUNG for the damages claimed by RAYBERN FOODS, INC. if any are found to exist;

2. For a declaration of the amount that Cross-defendant ROBERT YOUNG is obligated to indemnify Cross-complainants if Cross-complainants are compelled to pay any sum as the result of any damages, judgment, or other awards recovered by RAYBERN FOODS, INC. against these Cross-complainants;

3. For costs of suit herein incurred;

4. For reasonable attorneys fees; and

5. For such other and further relief as the court may deem proper.

Dated: September 13, 2005

ALBERT E. CORDOVA
A Professional Law Corporation

By _____
ALBERT E. CORDOVA
Attorney for Cross-complainant
TRI COMMERCIAL REAL ESTATE
SERVICES, INC. and JOHN FULTS

13

CROSS-COMPLAINT BY TRI COMMERCIAL and
JOHN FULTS

## PROOF OF SERVICE

I am a citizen of the United States and employed in Marin County, State of California; I am over the age of eighteen (18) years of age and not a party to the within above-entitled action; my business address is: 1299 Fourth St., Suite 202, San Rafael, CA 94901. On September 13, 2005, I caused to be served the documents identified herein as follows:

**Documents Served: CROSS-COMPLAINT ON BEHALF OF TRI COMMERCIAL REAL ESTATE SERVICES, INC. AND JOHN FULTS AND AGAINST ROBERT YOUNG FOR BREACH OF FIDUCIARY DUTY, LEGAL MALPRACTICE, INDEMNITY, CONTRIBUTION AND DECLARATORY RELIEF**

Kyra A. Subbotin
Law Offices of Kyra A. Subbotin
2625 Alcatraz Avenue, No. 152
Berkeley, CA 94705
Telephone: (510) 923-0451
Facsimile: (510) 923-0565

Clifford Horner
Berding & Weill LLP
3240 Stone Valley Road West
Alamo, CA 94507-1558
Telephone: (925) 838-2090
Facsimile: (925) 820-5592

XXX  (BY MAIL) I placed such envelope with postage thereon fully prepaid in the United States mail at San Rafael, California.

____  (BY PERSONAL SERVICE) I caused said documents to be delivered to the above address.

____  (VIA TELEFACSIMILE) I caused said document to be transmitted to the above addressee via telefacsimile.

XXX  (STATE) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

____  (FEDERAL) I declare that I am employed at the office of a member of the bar of this court at whose direction the service was made.

Executed at San Rafael, California on September 13, 2005

ANN MEGAN